IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

GRACE CHEN and DANIELLE
VILLARREAL, individually and on
behalf of all others similarly situated,

Case No. 1:23-cv-1129-JMB-PJG

    Plaintiffs,

District Judge: Jane M. Beckering
Magistrate Judge: Phillip J. Green

    v.

HILLSDALE COLLEGE,

    Defendant.

**Oral Argument Requested**

---

**DEFENDANT HILLSDALE COLLEGE'S BRIEF IN SUPPORT OF
MOTION TO DISMISS THE CLASS ACTION COMPLAINT FOR FAILURE
TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

---

**ORAL ARGUMENT REQUESTED**

---

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

STATEMENT OF THE FACTS .......................................................................... 6

    A.  Hillsdale's Sexual-Misconduct Policy. ............................................ 6

    B.  Plaintiff Chen's Allegations ........................................................... 11

    C.  Plaintiff Villarreal's Allegations. ................................................... 12

    D.  Plaintiffs' Class Allegations and Claims. ...................................... 13

LEGAL STANDARD ........................................................................................ 14

ARGUMENT ..................................................................................................... 14

I.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER TITLE IX .................................. 14

    A.  Title IX Does Not, and Cannot, Apply to Hillsdale Because the College
        Does Not Receive Any Federal Financial Assistance. ............................... 14

    B.  Even if Title IX Applied, Plaintiffs Have Failed to State a Title IX
        Claim for Gender Discrimination ................................................................ 31

II.  PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENCE ..................................... 45

    A.  Plaintiffs Do Not Adequately Allege a Special Relationship with
        Hillsdale, Which Is a Necessary Element of Their Negligence Claim. ..... 46

    B.  Plaintiffs Fail to Allege That Hillsdale Breached Any Duty It May
        Have Had to Plaintiffs. ................................................................................ 48

    C.  Hillsdale's Alleged Negligence Was Not the But-For Cause of
        the Harm. ..................................................................................................... 51

III.  PLAINTIFFS FAIL TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF
       EMOTIONAL DISTRESS ............................................................................................ 53

IV.  PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT INFLICTION OF
       EMOTIONAL DISTRESS ............................................................................................ 55

V.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ELLIOTT-LARSEN CIVIL
       RIGHTS ACT ............................................................................................................ 56

VI.  PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE MICHIGAN CONSUMER
       PROTECTION ACT .................................................................................................... 61

VII. INSOFAR AS PLAINTIFFS SEEK INJUNCTIVE RELIEF, THEY HAVE FAILED
       PLAUSIBLY TO ALLEGE AN IMMEDIATE AND SIGNIFICANT RISK OF
       IRREPARABLE HARM .............................................................................................. 65

CONCLUSION .................................................................................................. 66

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abney v. Amgen, Inc.*,
  443 F.3d 540 (6th Cir. 2006) ..................................................................... 65

*Arangure v. Whitaker*,
  911 F.3d 333 (6th Cir. 2018) ..................................................................... 28

*Ariz. Christian Sch. Tuition Org. v. Winn*,
  563 U.S. 125 (2011) ................................................................................... 18

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................... 14, 50, 52

*Atl. Coast Line R. Co. v. Phillips*,
  332 U.S. 168 (1947) ................................................................................... 30

*Austin-Hall v. Woodard*,
  No. 3:18-CV-270, 2020 WL 5943018 (S.D. Ohio Oct. 7, 2020) ............... 59

*Bachman v. Am. Soc'y of Clinical Pathologists*,
  577 F. Supp. 1257 (D.N.J. 1983) ............................................................... 20

*Bailey v. Schaaf*,
  494 Mich. 595, 835 N.W.2d 413 (2013) ...................................... 47, 49, 50

*Barlow v. Washington*,
  No. C20-5186 BHS, 2021 WL 2036704 (W.D. Wash. May 21, 2021) .............. 34, 35

*Barnett v. Kapla*,
  No. 20-cv-03748-JCS, 2020 WL 7428321 (N.D. Cal. Dec. 18, 2020) ........... 36, 40, 41

*Bledsoe v. FCA US LLC*,
  378 F. Supp. 3d 626 (E.D. Mich. 2019) ..................................................... 63

*Bond v. United States*,
  572 U.S. 844 (2014) ................................................................................... 25

*Bose v. Bea*,
  947 F.3d 983 (6th Cir. 2020) ............................................... 17, 41, 42, 43

*Bradley v. Stevens*,
    329 Mich. 556, 46 N.W.2d 382 (1951) ................................................................ 49

*Brock v. Michigan State Univ.*,
    No. 1:21-CV-436, 2022 WL 178681 (W.D. Mich. Jan. 20, 2022) ........................... 55

*Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n*,
    No. CV RDB-20-3132, 2022 WL 2869041 (D. Md. July 21, 2022) ........................ 28

*Burgess v. United States*,
    553 U.S. 124 (2008) .......................................................................................... 23

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*,
    520 U.S. 564 (1997) .......................................................................................... 20

*Cannon v. Univ. of Chi.*,
    441 U.S. 677 (1979) .......................................................................................... 17

*Case v. Consumers Power Co.*,
    463 Mich. 1, 615 N.W.2d 17 (2000) .................................................................... 48

*Chambers v. Trettco, Inc.*,
    463 Mich. 297, 614 N.W.2d 910 (2000) .............................................................. 56

*Charles C. Steward Mach. Co. v. Davis*,
    301 U.S. 548 (1937) .......................................................................................... 19

*Cook v. Bennett*,
    94 Mich. App. 93, 288 N.W.2d 609 (1979) ......................................................... 58

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
    596 U.S. 212 (2022) .......................................................................................... 15

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
    526 U.S. 629 (1999) ................................................................................... *passim*

*Davis v. Monroe Cnty. Bd. of Educ.*,
    120 F.3d 1390 (11th Cir. 1997) .................................................................... 16, 17

*Doe 1 v. Baylor Univ.*,
    240 F. Supp. 3d 646 (W.D. Tex. 2017) ......................................................... 47, 48

*Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*,
    No. 1:21-cv-4460, 2023 WL 2428870 (N.D. Ill. Mar. 9, 2023) ........................ *passim*

*Doe by Next Friend Kolokithas v. Alpena Pub. Sch. Dist.*,
   511 Mich. 994, 991 N.W.2d 196 (2023) .................................................................. 58

*Doe by next friend Kolokithas v. Alpena Pub. Sch.*
  -- N.W.2d --, No. 359190,
   2022 WL 17868146 (Mich. Ct. App. Dec. 22, 2022) ............................. 56, 58, 59, 60

*Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty.,*
  *Tennessee,*
   35 F.4th 459 (6th Cir. 2022) .................................................................. *passim*

*Doe v. Cmty. Coll. of Baltimore Cnty.*,
   595 F. Supp. 3d 392 (D. Md. 2022) ........................................................ 47

*Doe v. Columbia Coll. Chicago*,
   299 F. Supp. 3d 939 (N.D. Ill. 2017) ....................................................... 46

*Doe v. Horne*,
   No. CV-23-00185-TUC-JGZ (D. Ariz. Dec. 11, 2023) .................................. *passim*

*Doe v. Plymouth-Canton Cmty. Sch.*,
   2022 WL 1913074 (E.D. Mich. June 3, 2022) ........................................... 31

*E.H. by & through Herrera v. Valley Christian Acad.*,
   616 F. Supp. 3d 1040 (C.D. Cal. 2022) .............................................. 28, 29

*Emeldi v. Univ. of Oregon*,
   698 F.3d 715 (9th Cir. 2012) ................................................................ 41

*Finazzo v. Fire Equip. Co.*,
   323 Mich. App. 620, 918 N.W.2d 200 (2018) .......................................... 49

*Fitzgerald v. Barnstable Sch. Comm.*,
   555 U.S. 246 (2009) ........................................................................... 16

*Foster v. Bd. of Regents of Univ. of Michigan*,
   982 F.3d 960 (6th Cir. 2020) .............................................................. *passim*

*Franklin v. Gwinnett Cnty. Pub. Sch.*,
   503 U.S. 60 (1992) ............................................................................. 17

*Freeman v. Busch*,
   349 F.3d 582 (8th Cir. 2003) ............................................................... 46

*Furek v. Univ. of Delaware,*
   594 A.2d 506 (Del. 1991) ................................................................. 47

*Gaincott v. Davis,*
   281 Mich. 515, 275 N.W.229 (1937) ................................................ 58

*Garretson v. City of Madison Heights,*
   407 F.3d 789 (6th Cir. 2005) ..................................................... 53, 54

*Garrett v. Ohio State Univ.,*
   60 F.4th 359 (6th Cir. 2023) ...................................................... 42, 43

*Gebser v. Lago Vista Indep. Sch. Dist.,*
   524 U.S. 274 (1998) .................................................................. *passim*

*Gibbons v. District of Columbia,*
   116 U.S. 404 (1886) ......................................................................... 30

*Gillespie v. City of Battle Creek,*
   100 F. Supp. 3d 623 (W.D. Mich. 2015) ......................................... 55

*Global Licensing, Inc. v. Namefind LLC,*
   582 F. Supp. 3d 467 (E.D. Mich. 2022) ............................................ 1

*Gordon v. Traverse City Area Pub. Sch.,*
   686 F. App'x 315 (6th Cir. 2017) ........................................ 41, 43, 44

*Gowland v. Aetna,*
   143 F.3d 951 (5th Cir. 1998) ........................................................... 17

*Graves v. Warner Bros.,*
   253 Mich. App. 486, 656 N.W.2d 195 (2002) ......................... 46, 49, 50

*Grove City Coll. v. Bell,*
   687 F.2d 684 (3d Cir. 1982) ..................................................... 20, 21

*Guest v. Hansen,*
   603 F.3d 15 (2d Cir. 2010) .............................................................. 47

*Hamed v. Wayne Cnty.,*
   490 Mich. 1, 803 N.W.2d 237 (2011) ............................................. 57

*Haynie v. State,*
   468 Mich. 302, 664 N.W.2d 129 (2003) ......................................... 57

*Hedrick v. W. Michigan Univ.*,
No. 1:22-CV-308, 2022 WL 10301990 (W.D. Mich. Oct. 17, 2022) .................. 47, 59

*Hesse v. Chippewa Valley Sch.*,
No. 244153, 2004 WL 1161416 (Mich. Ct. App. May 25, 2004) ............................ 54

*Highfield Beach at Lake Michigan v. Sanderson*,
331 Mich. App. 636, 954 N.W.2d 231 (2020) ......................................................... 45

*Home Owners Ins. Co. v. ADT LLC*,
109 F. Supp. 3d 1000 (E.D. Mich. 2015) ...................................................... 62, 63, 64

*Horner v. Ky. High Sch. Athletic Ass'n*,
43 F.3d 265 (6th Cir. 1994) ...................................................................................... 17

*Horocofsky v. City of Lawrence*,
No. 20-2529-EFM, 2022 WL 1421554 (D. Kan. May 5, 2022) ................................ 42

*Huang v. Ohio State Univ.*,
No. 2:19-cv-1976, 2022 WL 16715641 (S.D. Ohio Nov. 4, 2022)............................ 44

*In re Doe*,
2006 WL 475285 (Mich. Ct. App. Feb. 28, 2006)..................................................... 61

*In re Fed.-Mogul Corp. Sec. Litig.*,
166 F. Supp. 2d 559 (E.D. Mich. 2001)..................................................................... 63

*In re Flint Water Cases*,
384 F. Supp. 3d 802 (E.D. Mich. 2019) .................................................................... 55

*In re Packaged Ice Antitrust Litig.*,
779 F. Supp. 2d 642 (E.D. Mich. 2011)..................................................................... 62

*In re Royal Appliance Sec. Litig.*,
64 F.3d 663 (6th Cir. 1995) ...................................................................................... 63

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005) ............................................................................................ 17, 44

*Jean v. Bucknell Univ.*,
534 F. Supp. 3d 404 (M.D. Pa. 2021)........................................................................ 47

*Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
134 F. Supp. 2d 965 (N.D. Ill. 2001) ............................................................ 19, 23, 30

*K.S. v. Detroit Pub. Sch.*,
    130 F. Supp. 3d 1073 (E.D. Mich. 2015) ................................................. 49, 56, 57, 61

*Kalich v. AT&T Mobility, LLC*,
    679 F.3d 464 (6th Cir. 2012) .................................................................... 57, 60

*Karasek v. Regents of Univ. of California*,
    956 F.3d 1093 (9th Cir. 2020) ......................................................................... 36

*Karasek v. Regents of Univ. of California*,
    500 F. Supp. 3d 967 (N.D. Cal. 2020) ............................................................ 41, 52

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*,
    944 F.3d 613 (6th Cir. 2019) ............................................................ 31, 32, 33, 34

*Leaf v. Nike, Inc.*,
    No. 21-1045, 2021 WL 4950383 (6th Cir. Oct. 25, 2021) ........................................ 62

*Leaf v. Refn*,
    742 F. App'x 917 (6th Cir. 2018) ..................................................................... 62

*Leathers v. Medlock*,
    499 U.S. 439 (1991) ........................................................................................ 30

*Lewis v. LeGrow*,
    258 Mich. App. 175, 670 N.W.2d 675 (2003) ........................................................ 53

*Lozano v. Baylor Univ.*,
    408 F. Supp. 3d 861 (W.D. Tex. 2019) ................................................................ 49

*Lucas v. Awaad*,
    299 Mich. App. 345, 830 N.W.2d 141 (2013) ........................................................ 53

*Madden v. United States*,
    80 F.2d 672 (1st Cir. 1935) .............................................................................. 17

*Massey v. Scripter*,
    401 Mich. 385, 258 N.W.2d 44 (1977) ................................................................. 48

*Mayhall v. A. H. Pond Co., Inc.*,
    129 Mich. App. 178, 341 N.W.2d 268 (1983) ........................................................ 61

*McCarty v. S. Farm Bureau Cas. Ins. Co.*,
    758 F.3d 969 (8th Cir. 2014) ............................................................................ 17

*McCauley v. Univ. of the Virgin Islands*,
    618 F.3d 232 (3d Cir. 2010).......................................................................... 47

*Milman v. Fieger & Fieger, P.C.*,
    58 F.4th 860 (6th Cir. 2023)......................................................................... 24

*Moore v. Sun Bank of N. Fla., N.A.*,
    923 F.2d 1423 (11th Cir. 1991) ................................................................... 17

*Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*,
    709 F.3d 276 (4th Cir. 2013) ....................................................................... 17

*Murdock v. Higgins*,
    454 Mich. 46, 559 N.W.2d 639 (1997).................................................... 46

*N. Haven Bd. of Ed. v. Bell*,
    456 U.S. 512 (1982) ..................................................................................... 17

*Nat'l Collegiate Athletic Ass'n v. Smith*,
    525 U.S. 459 (1999) ..................................................................................... 21

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012) ..................................................................................... 22

*New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*,
    44 F.4th 393 (6th Cir. 2022)........................................................................ 62

*Ogden River Water Users Ass'n v. Weber Basin Water Conservancy*,
    238 F.2d 936 (10th Cir. 1956) .................................................................... 65

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981) ......................................................................................... 15

*Pitts v. Monaco Coach Corp.*,
    330 F. Supp. 2d 918 (W.D. Mich. 2004) .................................................. 61

*R.W. v. Columbia Basin Coll.*,
    572 F. Supp. 3d 1010 (E.D. Wash. 2021) ................................................. 47

*Radtke v. Everett*,
    442 Mich. 368, 501 N.W.2d 155 (1993)..................................... 57, 58, 60

*Ramsay v. Frontier, Inc.*,
    No. 19-CV-03544-CMA-NRN, 2020 WL 4557545 (D. Colo. July 30, 2020)...... 65, 66

*Ray v. Swager,*
    501 Mich. 52, 903 N.W.2d 366 (2017) ....................................................... 51

*Reed v. S. Illinois Univ.,*
    No. 3:18-CV-1968-GCS, 2020 WL 3077186 (S.D. Ill. June 10, 2020) ......... 36, 40, 52

*Regan v. Taxation with Representation,*
    461 U.S. 540 (1983) ................................................................................. 29

*Reinert v. Dolezel,*
    147 Mich. App. 149, 383 N.W.2d 148 (1985) ........................................... 59

*Rosipko v. FCA US, LLC,*
    No. 15-11030, 2015 WL 8007649 (E.D. Mich. Dec. 7, 2015) .................... 62

*Roskin-Frazee v. Columbia Univ.,*
    No. 17 CIV. 2032 (GBD), 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018) .......... 36

*Ross v. Corp. of Mercer Univ.,*
    506 F. Supp. 2d 1325 (M.D. Ga. 2007) .................................................... 36

*Schemansky v. California Pizza Kitchen, Inc.,*
    122 F. Supp. 2d 761 (E.D. Mich. 2000) ............................................... 57, 60

*Scott v. Harper Recreation, Inc.,*
     444 Mich. 441, 506 N.W.2d 857 (1993) ................................................. 49

*Simpson v. University of Colorado Boulder,*
    500 F.3d. 1170 (10th Cir. 2007) .............................................................. 37

*Solek v. K & B Transp., Inc.,*
    No. 21-CV-10442, 2021 WL 4290181 (E.D. Mich. Sept. 21, 2021) ............... 53, 54

*Stewart v. IHT Ins. Agency Grp., LLC,*
    990 F.3d 455 (6th Cir. 2021) .................................................................. 66

*Tarlea v. Crabtree,*
    687 N.W.2d 333 (Mich. Ct. App. 2004) ................................................... 55

*Teadt v. Lutheran Church Missouri Synod,*
    237 Mich. App. 567, 603 N.W.2d 816 (1999) ......................................... 55

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.,*
    83 F.4th 514 (6th Cir. 2023) ............................................................. 62, 64

*Totten v. Benedictine Univ.*,
    No. 20 C 6107, 2021 WL 3290926 (N.D. Ill. Aug. 2, 2021) ...................................... 47

*U. S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
    477 U.S. 597 (1986) ...................................................................................................... 21

*United States v. Lopez*,
    514 U.S. 549 (1995) ...................................................................................................... 26

*United States v. Palomar-Santiago*,
    593 U.S. 321 (2021) ............................................................................................... 24, 26

*Valhalla Inv. Props., LLC v. 502, LLC*,
    456 F. Supp. 3d 939 (M.D. Tenn. 2020) ..................................................................... 18

*Waldo v. Consumers Energy Co.*,
    726 F.3d 802 (6th Cir. 2013) ....................................................................................... 57

*Walz v. Tax Comm'n of City of N. Y.*,
    397 U.S. 664 (1970) ............................................................................... 22, 26, 29, 30

*Weckhorst v. Kansas State Univ.*,
    241 F. Supp. 3d 1154 (D. Kan. 2017) ................................................................... 33, 47

*Wells by & through Glover v. Creighton Preparatory Sch.*,
    82 F.4th 586 (8th Cir. 2023) ....................................................................................... 44

*Whitman v. Am. Trucking Ass'ns, Inc.*,
    531 U.S. 457 (2001) ...................................................................................................... 19

*Wilmington & W.R. Co. v. Reid*,
    80 U.S. 264 (1871) ....................................................................................................... 30

*Zine v. Chrysler Corp.*,
    236 Mich. App. 261, 600 N.W.2d 384 (1999) ...................................................... 61, 62

## Constitutional Provisions

U.S. Const. Amend. XVI ................................................................................................ 22

## Statutes

20 U.S.C. § 1681 ..................................................................................................... 14, 15

20 U.S.C. § 1682 ............................................................................................... 16, 24, 27

29 U.S.C. § 794 ...................................................................................... 25

42 U.S.C. § 2000d .................................................................................. 25

42 U.S.C. § 6102 ..................................................................................... 25

Mich. Comp. Laws § 37.2101 ................................................................ 13

Mich. Comp. Laws § 37.2102 ................................................................ 56

Mich. Comp. Laws § 37.2103 .......................................................... 56, 60

Mich. Comp. Laws § 37.2401 ................................................................ 56

Mich. Comp. Laws § 37.2402 ................................................................ 56

Mich. Comp. Laws § 445.901 ................................................................ 13

Mich. Comp. Laws § 445.903 ................................................................ 61

Mich. Comp. Laws § 722.52 .................................................................. 59

**Rules**

Fed. R. Civ. P. 12 .................................................................................... 14

**Regulations**

34 C.F.R. § 106.2 .......................................................................... 18, 22, 45

Nondiscrimination on the Basis of Sex In Education Programs or Activities
    Receiving Federal Financial Assistance,
    65 Fed. Reg. 52,858 (Aug. 30, 2000) ........................................... 23

**Other Authorities**

*Respecting Foundation and Charity Autonomy: How Public Is Private
    Philanthropy?*,
    85 Chi.-Kent L. Rev. 571 (2010) ................................................... 25

Restatement (Second) of Torts § 314A (1965) ........................................ 46

# INTRODUCTION

Hillsdale College's commitment to the equal treatment of persons, regardless of sex, is unmatched. Founded in 1844, Hillsdale was the first American college to prohibit in its charter any discrimination based on sex.[1] It was the second college in the nation by charter to grant four-year liberal arts degrees to women.[2] For nearly 200 years, it has "furnish[ed] all persons who wish, irrespective of nation, color, or sex, a literary, scientific, or theological education" and "combine[d] with this, such moral, social, and artistic instruction and culture as will best develop the minds and improve the hearts of the students."[3]

Befitting this high calling, Hillsdale expects—and demands—its students to act honorably. A signed pledge to be "honorable in conduct" and "respectful of the rights of others" is a condition of enrollment.[4] Protecting those rights is also the purpose of the College's Sexual Misconduct Policy. Far more robust than those of its federally funded peers, it avows that "[a]ny sexual assault—the imposition of sexual acts upon someone unwilling at the time to participate—is not only a gross failure to govern

---

[1] *History*, Hillsdale College, https://www.hillsdale.edu/about/history/. Hillsdale is attaching as exhibits to this brief copies of this and other pages from its website incorporated by reference in the Complaint. "If referred to in a complaint and central to the claim, documents attached to a motion to dismiss form part of the pleadings." *Global Licensing, Inc. v. Namefind LLC*, 582 F. Supp. 3d 467, 475 (E.D. Mich. 2022) (citation omitted). The Complaint repeatedly quotes, cites, and even includes photographs of Hillsdale's website (including from its "About" section), *see, e.g.*, Compl. Intro., ¶ 21; PageID.1, 5, the contents of which are plainly integral to Plaintiffs' claims. The Court here should therefore consider these documents as part of the Complaint. *See, e.g.*, *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 & n.3 (S.D.N.Y. 2009) ("Because the Website is incorporated by reference into the Complaint, the Court may consider it on a motion to dismiss.").

[2] *Id.*

[3] *Honor Code*, Hillsdale College, https://www.hillsdale.edu/campus-life/honor-code/. (*See* Compl.; PageID.8–9, 35 (citing, quoting, and including a photograph of Hillsdale's "Honor Code" page)).

[4] *Id.*

oneself, but violates the rights and dignity of the victim, the standards of the Honor Code, and the basis of partnership with the College."[5] The demanding standards reflected in this document have helped make Hillsdale an "atypically safe and community-oriented" campus.[6]

But student wrongdoing is unavoidable. When sexual misconduct in particular is reported, Hillsdale typically hires experienced outside counsel to perform a full investigation. Once it has the facts, Hillsdale does whatever is necessary to "eliminate the conduct, prevent its recurrence, and remedy its effects."[7] The goal of its approach is to protect and support victims, including by ensuring confidentiality, while respecting the due-process rights of the accused.

This lawsuit arises from two claimed sexual assaults that allegedly occurred in the fall of 2021. When the two Plaintiffs filed reports with Hillsdale, the College promptly hired outside counsel, who spoke with the women, the alleged perpetrators, and other witnesses as appropriate, and provided her conclusions to Hillsdale administrators. The Deans then responded as they deemed appropriate given the

---

[5] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct. Plaintiffs cite or otherwise refer to Hillsdale's Sexual Misconduct Policy dozens of times in the Complaint. *See, e.g.*, Compl.; PageID.3, 9–13. While the Complaint references another page on Hillsdale's website containing this policy, *see* Compl. Intro. n.3; PageID.3 (citing Hillsdale College, *Hillsdale College Procedures for Addressing Sexual Misconduct*, https://www.hillsdale.edu/smp/), the policy is contained verbatim in other locations, including the webpage cited above. For ease of reference, Hillsdale cites to the policy as contained on the student-handbook webpage, which provides the full policy in one location and in a more readable format.

[6] Kaylee McGhee, *Let's Talk About Sexual Assault on Campus*, The Collegian (Oct. 4, 2018), https://hillsdalecollegian.com/2018/10/lets-talk-sexual-assault-campus/ (cited at Compl. ¶ 24 n.8; PageID.6).

[7] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct.

2

unique circumstances of each case. The two female students, dissatisfied with the College's process and response, filed this lawsuit on behalf of themselves and a putative class of other female students. Plaintiffs claim that Hillsdale engaged in gender discrimination and retaliation in violation of Title IX; that Hillsdale is liable in tort for negligence, intentional infliction of emotional distress, and negligent infliction of emotional distress; and that Hillsdale violated the Elliott-Larsen Civil Rights Act (ELCRA) and the Michigan Consumer Protection Act (MCPA).

These meritless claims should be dismissed for a host of reasons. To begin, Hillsdale is not subject to Title IX, which applies only to recipients of "Federal financial assistance." As Plaintiffs admit, Hillsdale does not accept one penny of state or federal taxpayer funding—not even indirectly in the form of student grants and loans. And while Plaintiffs contend that Hillsdale's tax-exempt status subjects it to Title IX—on the theory that not paying taxes is the same as receiving federal funds— that assertion has no basis in language, logic, or law. It cannot be squared with the plain text of the statute, decades of Supreme Court precedent, the uniform understanding of every federal agency to have interpreted the phrase "Federal financial assistance," or the statute's grounding in the Spending Clause, through which Congress may impose obligations only through the actual expenditure of federal funds—meaning money collected through taxes and disbursed from the treasury. To hold otherwise would be to conclude that Congress's power under the Spending Clause is virtually unlimited. Plaintiffs' invitation to upend our constitutional order should be declined.

3

Regardless, even if Title IX applied, Plaintiffs fall well short of alleging a plausible claim under the statute. Gender discrimination claims require a showing of deliberate indifference, and the facts alleged here show that Hillsdale has a strong and clear Sexual Misconduct Policy, that Hillsdale implements that policy as written, that Hillsdale responded promptly to Plaintiffs' reports, and that Hillsdale never took any retaliatory action. Plaintiffs' disagreement with the investigative findings and the Deans' disciplinary decisions are not grounds for Title IX liability.

Plaintiffs' tort claims fare no better. They assert that Hillsdale acted unreasonably by failing to adopt a policy that prevents sexual assault and that this alleged negligence somehow caused their alleged assaults. But a negligence claim premised on injuries inflicted by a third party requires a special relationship giving rise to a duty to protect. Although courts have held that elementary and secondary schools have a special relationship with students because those institutions assume the duties, character, or function of a lawful parent, courts have recognized for more than half a century that colleges and universities do *not* occupy a similar role vis-à-vis the young adults on (or off) their campuses. Because Hillsdale has no legal duty to ensure that student-on-student sexual assault never occurs (though it works mightily to prevent it), Plaintiffs' negligence claim fails as a matter of law. More, Plaintiffs also have failed to allege any facts plausibly suggesting that Hillsdale's policy or prior conduct was unreasonable or that the alleged assaults would not have occurred had Hillsdale followed different policies or procedures.

Plaintiffs' emotional-distress claims are even flimsier. A plaintiff has a claim for *negligent* infliction of emotional distress only if she witnesses a physical injury to certain third parties—such as when a mother sees her child struck by a vehicle—and consequently suffers emotional distress. That is not what Plaintiffs allege here. And a claim for *intentional* infliction of emotional distress requires a showing that Defendant engaged in outrageous and extreme conduct. The facts alleged do not show that Hillsdale acted unreasonably, much less that Hillsdale's conduct was beyond the bounds of decency.

Plaintiffs' ELCRA claim is equally flawed. To start, Plaintiffs have not alleged facts plausibly showing that Hillsdale is vicariously liable under a theory of *respondeat superior*. Courts applying Michigan law have upheld ELCRA claims against only those schools that have a special custodial relationship with their students, which Hillsdale (like other colleges, but unlike elementary and secondary schools) does not. Plaintiffs also have failed to allege, as they must, that Hillsdale was notified of a risk *to Plaintiffs*, that Hillsdale failed to respond to that *specific* risk, and that Plaintiffs suffered sexual assault because of that failure. Plaintiffs' vague and conclusory allegations that Hillsdale mishandled previous reports of sexual assault need not be accepted as true and do not state an ELCRA claim.

Plaintiffs likewise fail to state an MCPA claim. Their primary theory is that Hillsdale's alleged failure to disclose the heightened risk of sexual assault that female students purportedly face was a material misrepresentation. But Plaintiffs have not alleged a single fact suggesting plausibly that Hillsdale students are at a heightened

risk of sexual assault. On the contrary, an article cited favorably by Plaintiffs describes Hillsdale and its campus as "atypically safe."[8] The premise of Plaintiffs' MCPA claim is thus entirely conclusory. And Rule 9(b) forbids Plaintiffs' generalized allegations of fraud.

Hillsdale's thoughtful policies and careful, individualized approach to preventing and punishing sexual misconduct have served students well for decades, and Plaintiffs offer no legal basis for disturbing them or subjecting Hillsdale to further litigation. Their claims should be dismissed with prejudice.

## STATEMENT OF THE FACTS

### A. Hillsdale's Sexual-Misconduct Policy.

**1.** Hillsdale College is a private Christian liberal-arts college in southern Michigan, founded in gratitude "to God for the inestimable blessings resulting from the prevalence of civil and religious liberty and intelligent piety in the land" and in the belief "that the diffusion of sound learning is essential to the perpetuity of these blessings."[9] The College has built a strong national reputation, resting in part upon its principled refusal to accept federal or state taxpayer subsidies, even indirectly in the form of student grants or loans, precisely so that it may operate independently and in accordance with its founding documents.[10]

---

[8] McGhee, *supra*, n.6.

[9] *Articles of Association*, Hillsdale College (May 17, 1855), https://www.hillsdale.edu/about/history/founding-documents/.

[10] *About*, Hillsdale College, https://www.hillsdale.edu/about/ (cited at Compl.; PageID.5).

Consistent with its mission to form the character of its students, Hillsdale expects its students to uphold their moral commitments to God and to each other. Regarding sexual conduct in particular, "[t]he College has always understood morally responsible sexual acts to be those occurring in marriage and between the sexes."[11] Hillsdale expects "all students, faculty, and staff [to] grasp the fact of its commitments and become partners with the College by engaging to cooperate with its principles."[12]

Hillsdale's policy statement on sexual misconduct makes clear that "[a]ny sexual assault—the imposition of sexual acts upon someone unwilling at the time to participate—is not only a gross failure to govern oneself, but violates the rights and dignity of the victim, the standards of the Honor Code, and the basis of partnership with the College."[13] Such conduct "is, at a minimum, a matter of College discipline for the assailant and may be a criminal matter punishable by law."[14]

Hillsdale also condemns and forbids "sexual misconduct," which it defines broadly. Sexual misconduct "begin[s] with the showing of disrespect to another person based upon sex. This necessarily includes any sexual harassment, sexual assault, stalking, relationship violence, or retaliation, as well as violation of any protective measures instituted while an investigation of a sexual misconduct complaint is ongoing."[15] The

---

[11] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct (quoting *Guideline Regarding the Mission and Moral Commitments of Hillsdale College*).
[12] *Id.*
[13] *Id.*
[14] *Id.*
[15] *Id.*

policy adds that "[s]exual misconduct includes unwelcome sexual conduct or advances, or graphic obscenity or innuendo. This conduct may be verbal or non-verbal, physical or not physical."[16]

Hillsdale's policy on sexual misconduct specifically addresses consent. It explains:

> Consent is a clear and unambiguous agreement, expressed outwardly through mutually understandable words or actions, to engage in a particular sexual activity. Consent must be voluntarily given and cannot be obtained through coercion or force. Consent may not be inferred from an existing or prior dating or sexual relationship. Consent to engage in one sexual activity at one time is not consent to engage in a different sexual activity or the same activity on a later occasion. Consent can be withdrawn by any party at any point. Once consent is expressly withdrawn, the sexual activity must cease immediately. Consent cannot be gained by taking advantage of the incapacitation of another, where the person initiating the sexual activity knew or reasonably should have known that the other was incapacitated.[17]

The policy contains a paragraph called "Understanding Incapacitation," which makes clear that "[c]onsent cannot be gained by taking advantage of the incapacitation of another, where the person initiating the sexual activity knew or reasonably should have known that the other was incapacitated."[18]

Finally, Hillsdale's online Sexual Misconduct Policy provides Frequently Asked Questions (FAQs) addressing the definitions of sexual misconduct, sexual harassment, and sexual assault.[19] To a question about the legal definition of sexual assault, the College answers, "Forcing or coercing an individual to engage in any non-

---

[16] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct.

[17] *Id.*

[18] *Id.*

[19] *Frequently Asked Questions*, Hillsdale College, https://www.hillsdale.edu/smp/faq/ (cited at Compl.; PageID.13–15).

sexual contact or sexual penetration. Sexual assault is sexual misconduct and sexual harassment."[20] The FAQs explain that "[m]any colleges/universities define [sexual misconduct] as 'conduct of a sexual nature or conduct based on sex or gender that is nonconsensual, or has the effect of threatening, intimidating, or coercing a person."[21] Sexual harassment is defined as "[u]nwelcome verbal, visual or physical conduct based upon sex or gender that is sufficiently severe, persistent or pervasive that it interferes with, denies, or limits an individual's ability to participate in or benefit from a college's educational programs and activities."[22]

**2.** Hillsdale also has a detailed policy addressing the reporting of sexual misconduct. The College "encourages prompt reporting" to "any member of the College faculty or staff, to local law enforcement, or to both."[23] "Reports are forwarded to a member of the College office of student affairs." Hillsdale's policy provides contact information for the Dean of Men, Dean of Women, Associate Dean of Men, and Associate Dean of Women. Hillsdale also provides the ability to report sexual misconduct confidentially.[24]

Under Hillsdale's policy, "[a]ll reports of sexual misconduct will be reviewed and investigated, as appropriate," and the College "may refer such investigation to a neutral, third-party investigator, when circumstances warrant, as determined by the

---

[20] *Id.* (while the FAQs use the phrase "non-sexual contact," the clear meaning of the term is "sexual contact").

[21] *Id.*

[22] *Id.*

[23] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct.

[24] *Id.*

College."[25] The College "reserves the right to investigate, even if the complaining person does not request an investigation or seeks to remain confidential, where doing so is necessary to ensure the health and safety of the College community."[26] "In all cases, the College will make an initial assessment, will offer assistance to the complaining person, and will implement necessary interim measures, whether supportive (services, accommodations, and other assistance to the complaining student) or protective (addressed toward the accused, such as no contact directives, housing or schedule modifications, placing a hold on transcripts or degrees, or suspension)."[27] "Following any investigation, the College will summarize its findings and determinations to each party and take appropriate disciplinary actions."[28]

Although the College takes the principle of due process seriously, and thus is "not quick to punish in any case, and never without evidence amounting to proof," the College "may impose any of the disciplinary measures outlined in the Procedure for Student Discipline" if a student "is found responsible for violating any of the Regulations of Proper Student Conduct, the Honor Code, and the [Sexual Misconduct] Policy." "The Deans may take any other actions deemed necessary to eliminate the conduct, prevent its recurrence, and remedy its effects, while also protecting the Hillsdale College community."[29]

---

[25] *Id.*

[26] *Id.*

[27] *Id.*

[28] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct.

[29] *Id.*

Hillsdale is committed to protecting the privacy of all individuals involved in any report of sexual misconduct. Accordingly, "information related to a report of prohibited conduct will be shared with a limited circle of College employees who need to know in order to assist in assessing and responding to a report."[30] Reports to "physicians, nurses, psychiatrists, psychologists, professional counselors, and those who provide services under their supervision" "will remain confidential, as will medical records generated by such professionals."[31]

### B. Plaintiff Chen's Allegations.

Plaintiff Chen, a current Hillsdale College student, states that she was raped by a fellow track athlete on or around November 22, 2021. Compl. ¶ 48; PageID.15. Chen reported the assault to school personnel. Compl. ¶¶ 50, 53; PageID.16. The Dean initiated an investigation, and Chen met with an outside lawyer leading the investigation on March 24. Compl. ¶ 56; PageID.16. Chen's alleged assailant apparently did not dispute Chen's description of the events in November 2021. Compl. ¶¶ 57–58; PageID.16. The lawyer met with Chen again on April 5 and allegedly informed Chen that her assailant would not be punished. Compl. ¶¶ 61–63; PageID.17. Chen also met with the Dean of Men to ask about a no-contact order, but the Dean allegedly declined to implement one. Compl. ¶ 66; PageID.17.

Chen's mother emailed the Deans to request a meeting about the investigation. Compl. ¶¶ 68–69; PageID.17–18. The Deans referred Chen's mother to Robert

---

[30] *Id.*
[31] *Id.*

Norton, Hillsdale's general counsel. Compl. ¶ 70; PageID.18. Norton allegedly refused to provide a written investigation report. Compl. ¶ 71; PageID.18. Chen's mother again asked the Deans for a written report, but Hillsdale declined to provide one to Chen or her mother. Compl. ¶¶ 72–77; PageID.18. Chen alleges that she continued to see the alleged assailant in class and at track events. Compl. ¶ 79; PageID.19. These interactions allegedly made her uncomfortable and anxious, and she was diagnosed with post-traumatic stress disorder in July 2023. Compl. ¶ 79; PageID.19.

### C. Plaintiff Villarreal's Allegations.

Villarreal, a former student, alleges that she was raped on or around August 29, 2021, by a member of Hillsdale's baseball team in his off-campus apartment. Compl. ¶ 80; PageID.19. Villarreal reported the rape to the local police, Compl. ¶ 81; PageID.19, and then emailed the Dean of Men, who instructed her to meet with an outside lawyer overseeing the investigation, Compl. ¶ 82; PageID.19. Villarreal met with the lawyer (a different lawyer than the one who handled Chen's investigation) the next day and recounted her story. Compl. ¶ 85; PageID.20. The lawyer allegedly declined to interview Villarreal's assailant for several months, Compl. ¶ 86; PageID.20, although Villareal also alleges that the lawyer completed her investigation approximately six weeks after the alleged assault. Compl. ¶¶ 91–92; PageID.21. The lawyer allegedly met with Villarreal a second time several weeks later and asked questions about alleged discrepancies between her story and her assailant's. Compl. ¶¶ 87–88; PageID.20.

12

Ultimately, the lawyer found that, while the alleged assailant would be punished for violating the sexual misconduct policy, he would not be expelled. Compl. ¶ 91; PageID.21. Ten or so days later, the lawyer informed Villarreal that her assailant had been placed on social probation, required to do community service, and suspended indefinitely from baseball. Compl. ¶ 94; PageID.21.

Villarreal alleges that Norton threatened her with consequences if her parents continued to ask about the investigation and punishment and suggested that Villarreal regretted a consensual encounter. Compl. ¶¶ 100–01; PageID.22. Villarreal continued to see her assailant around campus and ultimately decided to transfer after suffering depression. Compl. ¶ 102; PageID.22.

### D. Plaintiffs' Class Allegations and Claims.

Plaintiffs seek to certify a class consisting of "All female students who are or were enrolled at Hillsdale College from October 25, 2017 onwards and who were sexually assaulted or treated in a manner covered by the sexual assault policy." Compl. ¶ 103; PageID.22. Plaintiffs allege that the class has thousands of members whose identities can be ascertained from Hillsdale's records. Compl. ¶ 108; PageID.23.

Plaintiffs assert claims for negligence (Count I), intentional infliction of emotional distress (Count II), negligent infliction of emotional distress (Count III), violation of the Elliott-Larsen Civil Rights Act, MCLA 37.2101, *et seq.* (Count IV), violation of the Michigan Consumer Protection Act, MCLA 445.901 *et seq.* (Count V), violation of Title IX for discrimination (Count VI), and violation of Title IX for retaliation (Count VII).

13

In addition to compensatory and punitive damages, Plaintiffs seek injunctive relief requiring Hillsdale to establish and implement what they regard as the appropriate sexual-assault policies, training programs, and response systems, as well as to create a "Coordinated Community Response Team" to assess Hillsdale's existing policies. Compl. ¶ 133; PageID.29. Plaintiffs also ask the Court to appoint an independent monitor to supervise Hillsdale's implementation of these proposed policies. Compl. ¶ 133; PageID.29.

## LEGAL STANDARD

A complaint must "contain sufficient factual matter" "to state a claim to relief that is plausible on its face" in order "[t]o survive a motion to dismiss." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see* Fed. R. Civ. P. 12(b)(6). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* If "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint must be dismissed. *Id.* at 679.

## ARGUMENT

I.  **Plaintiffs Fail To State a Claim Under Title IX**

### A. Title IX Does Not, and Cannot, Apply to Hillsdale Because the College Does Not Receive Any Federal Financial Assistance.

Title IX applies only to educational programs or services that "receiv[e] Federal financial assistance," such as loans, grants, or contracts. 20 U.S.C. § 1681(a). Because Hillsdale does not accept *any* funds from the federal government, Hillsdale is not

subject to Title IX, and Plaintiffs thus cannot state a Title IX claim against it. Hillsdale's status as a tax-exempt 501(c)(3) organization does not save Plaintiffs' claims, since to claim a tax exemption is not to receive federal funds.

> ### 1. *The text and context of Title IX confirm that only entities receiving federal funds are subject to Title IX, and Hillsdale receives no such funds.*

Title IX is a Spending Clause statute. "Unlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent"—"in what amounts essentially to a contract between the Government and the recipient of funds." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (internal citations and quotation marks omitted). The contract's structure is always the same: "in return for federal funds, the [recipients] agree to comply with federally imposed conditions." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Yet the bargain is enforceable only if the recipient "voluntarily and knowingly accepts [its] terms." *Cummings*, 596 U.S. at 219 (citation omitted). The terms of Title IX's proposed contract are as follows: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity *receiving Federal financial assistance* ... ." 20 U.S.C. § 1681(a) (emphasis added).

The meaning of "Federal financial assistance" in Title IX is unambiguous. Federal means "of or relating to the central government ... as distinguished from the governments of the ... states." *Webster's Third New International Dictionary:*

*Unabridged* 833 (1961). Financial means "relating to" "money." *Id.* at 851 (defining "financial" as "relating to finance"); *id.* (defining "finance" as "the pecuniary affairs or resources of a state, company, or individual"); *id.* at 1663 (defining "pecuniary" as "taking the form of or consisting of money"). The term "assistance" means "help," "aid," or "support." *See id.* at 132. Hence "Federal financial assistance" plainly denotes monetary aid or support provided by the national government. Legal dictionaries agree. *See, e.g.*, Financial Assistance, *Black's Law Dictionary* (11th ed. 2019) (defining "federal financial assistance," since 1928, as "[a]n economic benefit provided by the federal government to a recipient in the form of a trust, grant, or other federal program or activity.").

Context confirms this plain meaning. *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 258 (2009) (examining "Title IX's context" to confirm its meaning). In the very next section, Title IX "authorize[s] and direct[s]" "[e]ach Federal department and agency which is empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, ... to effectuate the provisions of section 1681." 20 U.S.C. § 1682. This provision shows that schools "receiving Federal financial assistance" are those funded by federal loans, grants, or contracts.[32]

---

[32] The legislative history confirms that lawmakers understood "Federal financial assistance" to constitute the spending of federal, not private, funds. *See Davis v. Monroe Cnty. Bd. of Educ.*, 120 F.3d 1390, 1397–98 (11th Cir. 1997), *rev'd on other grounds sub nom. Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999); *see also* 118 Cong. Rec. 5807 (1972) (sponsoring Senator Bayh describing the amendment that would become Title IX as one that "would prohibit

16

Likewise, the Supreme Court and the Sixth Circuit have long understood Title IX to apply only when an entity's education programs or activities receive federal funds. According to the Supreme Court, Title IX is "justif[ied]" by "the expenditure of federal funds," *Cannon v. Univ. of Chi.*, 441 U.S. 677, 708–09 (1979), and the statute "condition[s] an offer of federal funding on a promise by the recipient." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998); *see also Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 74–75 (1992) (noting regulated school received "federal funds"); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640–41 (1999) (applying Title IX to "recipient of federal funds"); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 181–82 (2005) (same). The Sixth Circuit agrees: schools are subject to Title IX if they are "recipient[s] of federal funds." *Bose v. Bea*, 947 F.3d 983, 990 (6th Cir. 2020) (citation omitted); *see also Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271 (6th Cir. 1994) ("federal funds").

Courts understand "federal funds" to mean monies disbursed from the federal treasury. *See, e.g.*, *Madden v. United States*, 80 F.2d 672, 675 (1st Cir. 1935); *Moore v. Sun Bank of N. Fla., N.A.*, 923 F.2d 1423, 1432 n.43 (11th Cir. 1991), *reh'g en banc granted, opinion vacated,* 953 F.2d 1274 (11th Cir. 1992), *vacated* and *opinion reinstated,* 963 F.2d 1448 (11th Cir. 1992); *Gowland v. Aetna*, 143 F.3d 951, 955 (5th Cir. 1998); *McCarty v. S. Farm Bureau Cas. Ins. Co.*, 758 F.3d 969, 973 (8th Cir.

discrimination on the basis of sex in *federally funded* education programs") (emphasis added); *N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982) ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.").

2014).[33] Private funds, by contrast, belong to private parties. Until private funds "come into the tax collector's hands" and are deposited in the federal "treasury," they are not "government property." *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 143–44 (2011).

Applying the settled meaning of "Federal financial assistance" here is straightforward. As Plaintiffs repeatedly admit, Hillsdale receives no federal funds. It "does not accept government funding." Compl.; PageID.2. It "does not accept federal or state taxpayer subsidies for any of its operations." Compl. ¶ 21; PageID.5. Indeed, one of the first things a visitor to the college's website learns is that Hillsdale "operates independently of government funding."[34] It asks for private donations precisely because, "[t]o maintain [its] independence in every regard, Hillsdale does not accept one penny of state or federal taxpayer funding—even indirectly in the form of student grants and loans."[35] *See* Compl. n.2; Page.ID.2.

Because the complaint's concessions compel the conclusion that Hillsdale does not receive federal funds and therefore is not subject to Title IX, Counts VI and VII, which allege violations of Title IX, must be dismissed. *Valhalla Inv. Props., LLC v. 502, LLC*, 456 F. Supp. 3d 939, 948 (M.D. Tenn. 2020) ("a 'plaintiff can plead [it]self out of

---

[33] Consistent with the above, some courts have described federal funds as those "belong[ing] to the federal government," even if held by a third-party fiduciary rather than in the federal Treasury. *Mun. Ass'n of S.C. v. USAA Gen. Indem. Co.*, 709 F.3d 276, 283 (4th Cir. 2013). And while the Department of Education includes in its definition of "*Federal financial assistance*" items like "[t]he [Department's] acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof," "[a] grant of Federal real or personal property or any interest therein" for less than fair-market value, and "[p]rovision of the services of Federal personnel," 34 C.F.R. § 106.2(g) (2023), each of these items is, ultimately, paid for with funds belonging to the federal government.

[34] Hillsdale College, www.hillsdale.edu.

[35] *Id.*

court by alleging facts which show that [it] has no claim'") (alteration in original) (citation omitted).

### 2. To claim a tax exemption is not to "receive Federal financial assistance," and concluding otherwise would put Title IX's constitutionality in doubt.

Yet Plaintiffs claim to have found a particularly enormous elephant hidden—for over 50 years—in an exceedingly undersized mousehole. *But see Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001) ("[Congress] does not ... hide elephants in mouseholes."). They assert that, although Hillsdale receives no funding from the federal government, it is nonetheless subject to Title IX because its tax-exempt status under the Internal Revenue Code constitutes receipt of federal financial assistance. Compl. ¶ 186; PageID.37. That is wrong, for many reasons.

*First*, and most obviously, it is linguistic nonsense. To *possess* an untaxed dollar is not to *receive* that dollar from the government. The government does not "spend" or otherwise transfer the dollar to its holder merely by exempting it from taxation; it simply declines to take it. All that the dollar's owner "receives," as Judge Shadur observed, is "a higher net income than if it had to pay taxes." *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001). After all, Congress cannot appropriate and "spend" a dollar that was never in the federal treasury in the first place. *See Charles C. Steward Mach. Co. v. Davis*, 301 U.S. 548, 585 (1937) (explaining that after a tax is collected are "[t]he proceeds ... paid into the Treasury at Washington" and "subject to appropriation"); *Ariz. Christian Sch. Tuition*, 563 U.S. at 143 ("When the government collects and spends taxpayer money,

governmental choices are responsible for the transfer of wealth."). And while Plaintiffs imply that all private funds the government *could have* taxed but did not are somehow federal funds received from the government, the Supreme Court has never endorsed that "heads the government wins, tails the taxpayer loses" theory of private property—which would turn all United States currency into federal subsidies. Quite the contrary, a long line of precedent stresses the "constitutionally significant difference between subsidies and tax exemptions." *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 590 (1997); *Ariz. Christian Sch. Tuition*, 563 U.S. at 142–43 (describing "distinction between governmental expenditures and tax credits" and noting that the government is not involved in "decisions of private taxpayers regarding their own funds"). Thus, "[t]ax exempt status is distinguishable from an affirmative grant of federal resources because the bestowment of 501(c)(3) status does not, by and in itself, provide the 501(c)(3) organization with federal money, property, or services." *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip op. at 4 (D. Ariz. Dec. 11, 2023).[36]

Although the Supreme Court has recognized that certain "indirect benefits" can constitute federal financial assistance, those benefits still must flow from *actual government expenditures*, such as "federal grants and student loans." *Bachman v. Am. Soc'y of Clinical Pathologists*, 577 F. Supp. 1257, 1264–65 (D.N.J. 1983) (citing *Grove City Coll. v. Bell*, 687 F.2d 684, 700 (3d Cir. 1982), *aff'd*, 465 U.S. 555 (1984)). The

---

[36] A copy of this opinion is attached as Exhibit H.

Court has never "relied ... on the tax exempt status of the schools themselves" to impose regulations under the Spending Clause. *Id.* (holding that tax exemption is not "federal financial assistance" under the Rehabilitation Act). On the contrary, the Supreme Court has repeatedly assumed that tax-exempt status does *not* subject an entity to government regulation when analyzing whether federal funds flowed indirectly to tax-exempt entities. *See generally Grove City Coll.*, 465 U.S. at 563–74 (assuming that tax-exempt colleges were not already subject to Title VI or Title IX); *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 465–69 (1999) (assuming that NCAA, a tax-exempt entity, was not subject to Title IX); *U. S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 603–10 (1986) (assuming that tax-exempt entities were not already subject to the Rehabilitation Act). The Court's thoughtful analysis of indirect benefits in each of these cases would have been unnecessary if an entity's tax-exempt status alone triggered coverage under a Spending Clause statute.[37] Indeed, the *NCAA* case, which held that the NCAA's receipt of dues from members that received federal financial assistance did not subject the organization to Title IX, would have come out the other way if Plaintiffs were correct. *See* 525 U.S. at 470.

*Second*, and relatedly, reading Title IX to apply to tax-exempt entities would contradict decades of Supreme Court precedent recognizing that Title IX is a

---

[37] More, tax-exempt status alone does not guarantee any benefit, as "the benefit of not having to pay certain taxes is realized only if the tax-exempt organization earns income which would otherwise be taxed," and "[a]n entity with 501(c)(3) status may or may not have taxable income." *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip. op. at 4–5 (D. Ariz. Dec. 11, 2023). "In other words, the IRS's designation does not ensure an organization will receive any benefit." *Id.* at 5.

Spending Clause—not Taxing Clause—statute. *E.g.*, *Gebser*, 524 U.S. at 287; *Davis*, 526 U.S. at 640. Levying taxes or granting exemptions from otherwise applicable taxes is an exercise of Congress's power under the latter only.[38] Indeed, Congress could not spend money under its taxing power even if tried—it may only *collect*. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 564 (2012) ("the essential feature of any tax" is that "[i]t produces at least some revenue for the Government"). It is therefore an "exercise of this (taxing) power" to "wholly exempt certain classes of property from taxation" or to "tax them at a lower rate than other property." *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 679–80 (1970) (citation omitted). Because Title IX is authorized only by the Spending Clause, Hillsdale cannot be subjected to Title IX by an exercise of Congress's taxing power, including by its decision not to tax private non-profit colleges.

*Third*, Plaintiffs' theory flies in the face of regulations promulgated by the Department of Education ("DOE") as well as the positions of the Department of Justice and numerous other agencies. The DOE's rules state that "*Federal financial assistance* means" "[a] grant or loan," a "grant of Federal real or personal property," "[p]rovision of the services of Federal personnel," "[s]ale or lease of Federal property," or "[a]ny other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty." 34 C.F.R. § 106.2(g) (2023). "[C]onspicuously absent from

---

[38] Congress did not have authority to collect income taxes until the Sixteenth Amendment was ratified in 1913. *See* U.S. Const. Amend. XVI.

that laundry list" of "federal financial assistance" is any mention of "tax exemption[s]." *Johnny's Icehouse,* 134 F. Supp. 2d at 971–72. "Rather, the enumerated categories consist of affirmative grants of federal resources, such as federal funds, federal property, and federal personnel." *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip op. at 4 (D. Ariz. Dec. 11, 2023). That matters because, "[a]s a rule, [a] definition which declares what a term 'means' ... excludes any meaning that is not stated." *Burgess v. United States*, 553 U.S. 124, 130 (2008) (second alteration in original) (citation omitted). Likewise, in 2000, the Department of Justice and *twenty* other agencies issued a "final common rule" to "promote consistent and adequate enforcement of Title IX." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 Fed. Reg. 52,858, 52,858 (Aug. 30, 2000). That rule defines "Federal financial assistance" in virtually identical terms as the DOE rule, indicating that federal financial assistance does not encompass tax-exempt status. The Justice Department's Title VI Legal Manual is even more explicit: "Typical tax benefits—tax exemptions, tax deductions, and most tax credits—are not considered federal financial assistance." U.S. Dep't of Justice, *Defining Title VI*, *in* Title VI Legal Manual 1, 8 (agreeing with position of "[m]ost courts" on this point).[39] Counsel for Defendant are not aware of *any* enforcement action in which a federal agency has claimed that tax-exempt status alone brought an organization under Title IX.

[39] https://www.justice.gov/crt/fcs/T6manual.

It makes sense that these agencies have never even *attempted* to use "Federal financial assistance" as a foothold for the regulation of tax-exempt entities under Title IX: they are not allowed to. Section 1682 empowers only those agencies that "extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty," to issue "rules, regulations, or orders of general applicability" implementing Title IX "with respect to [that] program or activity." 20 U.S.C. § 1682. Because an entity's tax-exempt status is not a "grant, loan, or contract," agencies have no license to regulate on that basis. Hence, while a given agency may withdraw its "assistance" (by revoking a "grant, loan, or contract") to punish a recipient's violations of Title IX, it plainly may not strip an entity's tax-favored status. *Id.*

Plaintiffs do not, and cannot, explain why Congress would make an entity's tax-exempt status a form of "Federal financial assistance" triggering Section 1681, but then leave agencies without any means of enforcement against the thousands of entities supposedly covered by Title IX solely on that basis. It makes no sense that there would be a (very large) group of organizations subject to Title IX but not subject to the regulation or oversight of any agency charged with implementing that statute. Avoiding this absurd result is yet another reason to reject Plaintiffs' reading. *Milman v. Fieger & Fieger, P.C.*, 58 F.4th 860, 869 (6th Cir. 2023) (eschewing "nonsensical readings of a statute").

*Fourth*, Plaintiffs' reading of Title IX raises several serious constitutional problems. *United States v. Palomar-Santiago*, 593 U.S. 321, 328–29 (2021) (detailing

24

constitutional-avoidance canon). For starters, under Plaintiffs' rule, anyone claiming a federal tax exemption or deduction could be subject not just to Title IX but to *any* statute imposing conditions on recipients of "Federal financial assistance," such as Title VI (42 U.S.C. § 2000d), the Rehabilitation Act (29 U.S.C. § 794), and the Age Discrimination Act (42 U.S.C. § 6102). And that massive expansion of federal regulatory power would be just the tip of the iceberg. If simply *not being taxed* constitutes receiving federal financial assistance, then Congress could use this new "Spending Clause authority" to impose any condition it wanted on taxpayers who claim tax deductions (which is presumably all of them, since every taxpayer claims at least the standard deduction), *see* Evelyn Brody & John Tyler*, Respecting Foundation and Charity Autonomy: How Public Is Private Philanthropy*?, 85 Chi.-Kent L. Rev. 571, 605–06 (2010) (describing the myriad kinds of "tax-favored treatments")—wholly displacing the States in our federalist system. *See Bond v. United States*, 572 U.S. 844, 863 (2014) (applying the "critically important" rule that statutes should be read not to "intrude upon the police power of the States"). Congress could require anyone claiming a tax deduction to take a literacy test, eat only organic food, or keep a gun in the home for self-defense. And the absurdity does not stop there: Since everyone taxed at 10 percent *could be* taxed at a higher rate, presumably Congress could declare anyone who pays less than 100 percent to be the recipient of federal financial assistance—even if she claims *no* deduction. Plaintiffs' tortured reading of Title IX is thus an invitation for Congress to assume a "plenary police

power," which our Constitution quite obviously "withhold[s] from [it]." *United States v. Lopez*, 514 U.S. 549, 566 (1995).

Plaintiffs' interpretation would likewise create grave concerns under the First Amendment's Establishment Clause by causing "excessive [ ] entanglement" between the government and myriad tax-exempt religious entities. *Walz v. Tax Comm'n of City of N.Y.*, 397 U.S. 664, 674 (1970). As the Supreme Court has explained, Spending Clause laws create relationships, between the regulator and regulated, "pregnant with involvement," possibly "encompass[ing] sustained and detailed administrative relationships for enforcement of statutory or administrative standards." *Id.* at 675. Yet, if Plaintiffs were right, tax-exempt mosques, synagogues, churches, and other religious entities would be subject to myriad federal rules and oversight, creating a serious risk of establishments of religion. By contrast, hewing to the settled view— that "Federal financial assistance" means funds from the federal treasury—would avoid this problem all together. *Palomar-Santiago*, 593 U.S. at 328–29.

### 3. *Applying Title IX to Hillsdale solely because it is tax exempt would violate the Spending Clause's clear-statement rule.*

Even if Congress theoretically *could* use its Spending Clause authority to compel tax-exempt entities to comply with Title IX, foisting Title IX's requirements onto Hillsdale would flout the principle that Congress must first give "adequate notice that [the funding recipient] could be liable for the conduct at issue." *Davis*, 526 U.S. at 639–40. Congress, in other words, must "speak with a clear voice," since there can "be no knowing acceptance" of a Spending Clause contract if the offeree "is unaware of

the conditions" imposed. *Id.* at 640 (citation omitted). Hence courts "examine closely the propriety of" extending monetary liability under Title IX. *Gebser*, 524 U.S. at 287.

Hillsdale, like numerous other tax-exempt entities, plainly had no clue that Congress somehow had subjected it to Title IX (or Title VI, or any other statute applying conditions on recipients of federal financial assistance) simply because it is tax exempt. That is because Title IX does not so much as *hint*—much less declare "with a clear voice"—that claiming a tax exemption or deduction constitutes "receiving Federal financial assistance." *See Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip op. at 6 (D. Ariz. Dec. 11, 2023) ("[T]here is no indication that Congress intended [this]."). Indeed, the statute provides "important clues that Congress did *not* intend to allow recovery" against tax-exempt entities. *Gebser*, 524 U.S. at 288 (emphasis added). One is that it authorizes certain agencies to effectuate the provisions of Title IX but only if "empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty." 20 U.S.C. § 1682. "It would be unsound … for a statute's *express* system of enforcement to" apply only to those receiving grants, loans, or contracts, "while a judicially *implied* system of enforcement permits substantial liability" for anyone who merely claims a tax deduction. *Gebser*, 524 U.S. at 289. Expanding Title IX's implied cause of action to tax-exempt entities would thus contradict the requirement that the statute give "adequate notice" of coverage. *Davis*, 526 U.S. at 639–40.

### 4. *The two outlier district-court decisions applying Title IX to tax-exempt entities are easily distinguished and also wrong.*

Although two district courts have, largely in dicta, accepted Plaintiffs' theory, those decisions should be given no weight. *See E.H. by & through Herrera v. Valley Christian Acad.*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022); *Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n,* 2022 WL 2869041 (D. Md. July 21, 2022), *reconsideration denied, motion to certify appeal granted*, 2022 WL 4080294 (D. Md. Sept. 6, 2022). In each case, the court's discussion of the defendant's tax-exempt status was largely or entirely unnecessary, because each defendant had accepted a Paycheck Protection Program ("PPP") loan, which separately constituted the receipt of "Federal financial assistance." *See E.H.*, 616 F. Supp. 3d at 1049; *Buettner-Hartsoe,* 2022 WL 2869041, at *5.[40] Plaintiffs wisely do not allege that Hillsdale received any PPP loans.

Anyway, both decisions are wrong on the merits. The court in *E.H.* held that "the plain purpose of the statute is controlling," 616 F. Supp. 3d at 1049, rather than the plain text, which gets the interpretive task exactly backwards, *see Arangure v. Whitaker*, 911 F.3d 333, 345 (6th Cir. 2018) ("It is that text that controls, not a court's after-the-fact reevaluation of the purposes behind it."); *Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip op. at 8 (D. Ariz. Dec. 11, 2023) ("The purpose of a statute is not

---

[40] The Small Business Administration made explicit that receipt of a PPP loan "constitute[d] Federal financial assistance and carrie[d] with it the application of certain nondiscrimination obligations," but clarified that "[a]ny legal obligations that you incur through your receipt of this loan are not permanent, and once the loan is paid or forgiven, those nondiscrimination obligations will no longer apply." *FAQ Regarding Participation of Faith-Based Organizations in PPP and EIDL,* U.S. Small Business Administration 2 (Apr. 3, 2020), https://www.sba.gov/document/support-faq-regarding-participation-faith-based-organizations-ppp-eidl. This proviso would not have been necessary if tax-exempt status alone rendered 501(c)(3) organizations subject to Title VI, Title IX, and any other federal nondiscrimination statute tied to the receipt of federal financial assistance.

determinative of whether 501(c)(3) is a federal benefit"). Regardless, there is no indication that Congress had the "purpose" of imposing Title IX on tax-exempt entities. *See supra* pp. 19–24. The decision is especially unconvincing given the court's failure to grapple with Supreme Court precedent holding that Title IX is a Spending Clause statute. *See Doe v. Horne*, No. CV-23-00185-TUC-JGZ, slip op. at 8 (D. Ariz. Dec. 11, 2023) ("[A] recipient's *acceptance* of federal funds triggers coverage under the nondiscrimination provision, not the other way around."). Nor did the court bother to explain how Congress's decision not to tax private funds is equivalent to the expenditure of public funds from the treasury. *See E.H.*, 616 F. Supp. 3d at 1049–50.

The decision in *Buettner-Hartsoe* turned largely on an overreading of the Supreme Court's opinion in *Regan v. Taxation with Representation*, 461 U.S. 540 (1983).[41] 2022 WL 2869041, at *4–5. In *Regan*, the Court stated in dictum that "tax exemptions and tax-deductibility" could be considered "a form of subsidy that is administered through the tax system." 461 U.S. at 544. The Court was careful, however, to explain that it "d[id] not mean to assert that" a subsidy and tax exemption or deduction "are in all respects identical." *Id.* at 544 n.5. To support this statement, the Court cited *Walz*, including the separate opinions of Justices Brennan and Harlan. *Id.* There, the Court was explicit that tax exemptions are *not* "direct money subsid[ies]," describing the difference between the two at length. *Walz*, 397 U.S. at 674–76. When an entity

---

[41] The decision in *Buettner-Hartsoe* is on appeal to the Fourth Circuit and scheduled for argument in January 2024. *See* Tentative Calendar Order, *Buettner-Hartsoe v. Baltimore Lutheran High Sch. Ass'n*, No. 23-1453 (4th Cir. Nov. 3, 2023), ECF No. 45.

claims a tax exemption, "the government does not transfer part of its revenue to [private parties]." *Id.* at 675. Hence no federal funds are expended. *See id.*; *see also id.* at 690 (Brennan, J., concurring).

*Regan* did not purport to overrule *Walz*, which recognized that tax exemptions flow from Congress's power to tax, not from its power to spend public funds. *See Walz*, 397 U.S. at 679–80. Nor did *Regan* disturb the long line of cases similarly holding that granting tax exemptions is an exercise of the taxing power. *See Gibbons v. District of Columbia*, 116 U.S. 404, 408 (1886) (concluding tax exemptions are part of the taxing power); *Wilmington & W.R. Co. v. Reid*, 80 U.S. 264, 266 (1871) (similar); *Atl. Coast Line R. Co. v. Phillips*, 332 U.S. 168, 173 (1947) (similar). Hence decisions post-dating *Regan* have continued to recognize that Congress uses its taxing power when it creates tax exemptions. *See Leathers v. Medlock*, 499 U.S. 439, 451 (1991) ("Inherent in the power to tax is the power to discriminate in taxation."). Indeed, *Leathers* explained that the "tax scheme" at issue in *Regan* involved "a tax preference" enacted under "the power to tax." *Id.* at 451–52. Because *Regan* provides no support for the proposition that tax-exempt status is the same as receiving "Federal financial assistance," the *Buettner-Hartsoe* court's reliance on *Regan* was misplaced.

\*      \*      \*

No one disputes that "Congress may condition tax exempt status on an organization's conforming to the specific categories in Section 501(c)(3)," but "that was not the power that Congress invoked to subject entities to the nondiscrimination requirements of Title IX." *Johnny's Icehouse*, 134 F. Supp. 2d at 972. Because

30

Hillsdale's status as a tax-exempt entity does not subject it to Title IX, Plaintiffs' claims under that statute must be dismissed.

### B. Even if Title IX Applied, Plaintiffs Have Failed to State a Title IX Claim for Gender Discrimination.

Even if Title IX applied to Hillsdale because of its tax-exempt status, Plaintiffs' claims should be dismissed because Plaintiffs have failed to plead a claim for gender discrimination or retaliation.

#### 1. *Plaintiffs fail to plead a discrimination claim for peer-on-peer harassment.*

Although Title IX has been read to confer a right of action on students who suffer sexual harassment or assault, it does not create *respondeat superior* liability. Instead, a school can be held liable only "for its own official decision[s]." *Gebser*, 524 U.S. at 281–82, 290–91. Title IX also does not apply to harassment that occurs outside of a school's control. *See Davis*, 526 U.S. at 644–45. Indeed, because universities and colleges have less control over their students than do elementary schools, middle schools, or high schools, universities and colleges are typically not held liable even for on-campus harassment absent special circumstances. *See Doe v. Plymouth-Canton Cmty. Sch.*, 2022 WL 1913074, at *10 (E.D. Mich. June 3, 2022).

The standard for proving a Title IX claim for peer-on-peer sexual harassment is demanding. "By design and effect, the *Davis* Court's Title IX private cause of action against a school for its response to student-on-student sexual harassment is a 'high standard' that applies only 'in certain limited circumstances.'" *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 619 (6th Cir. 2019) (quoting

31

*Davis*, 526 U.S. at 643). Administrators are not required to "purg[e] their schools of actionable peer harassment." *Davis*, 526 U.S. at 648. Nor are they required to "engage in particular disciplinary action." *Id.* To the contrary, "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Id.* Thus, a school may be held liable only if its administrators are "deliberately indifferent" to the harassment. *Id.* Deliberate indifference exists "only where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* "Deliberate indifference, as the phrase suggests, presents a 'high bar' to imposing Title IX liability on a university." *Foster v. Bd. of Regents of Univ. of Michigan*, 982 F.3d 960, 965 (6th Cir. 2020).

In the Sixth Circuit, a plaintiff may raise only two types of Title IX discrimination claims for peer-on-peer sexual harassment: an "after" claim and a "before" claim. An "after" claim alleges that the school was deliberately indifferent to a plaintiff's report of sexual harassment and that such indifference led to a plaintiff's further harassment. *See Kollaritsch*, 944 F.3d at 623–24. A "before" claim, which the Sixth Circuit first recognized last year, alleges that the school was deliberately indifferent to *other* instances of sexual harassment and that the school's indifference resulted in the plaintiff being harassed. *See Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 465–66 (6th Cir. 2022). Plaintiffs have not stated a Title IX claim under either theory.

### a. *Plaintiffs fail to state an "after" claim.*

To state an "after" claim, the plaintiff must allege (1) "an incident of actionable sexual harassment," (2) "the school's actual knowledge of it," (3) "some further incident of actionable sexual harassment," (4) "that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response," and (5) "that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch*, 944 F.3d at 623–24. Because sexual harassment must be "pervasive" to be "actionable," "one incident of harassment is not enough," regardless of its severity. *Id.* at 620. Thus, the plaintiff must "demonstrat[e] the school's deliberate indifference to the foreseeable possibility of *further* actionable harassment of the victim," which then occurs. *Id.* at 621.

To begin, Plaintiff Villarreal has not alleged an "actionable" sexual assault because her alleged assault occurred in private, off-campus housing not "subject to [Hillsdale's] control." *Davis*, 526 U.S. at 645, 650; Compl. ¶ 80; PageID.19 (alleged assault occurred at private apartment "which is a five-minute drive away from campus"). Plaintiff Villarreal's harassment claim should be dismissed for this reason alone. *See, e.g.*, *Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1182 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) (denying joinder because "[t]he alleged sexual assault ... occurred at a private off-campus apartment, and not in relation to any fraternity event").

33

Beyond that, neither Plaintiff alleges a second sexual assault, as required for an "after" claim. Instead, each Plaintiff alleges a single incident of sexual harassment. Plaintiff Chen alleges that she was sexually assaulted "[o]n or around November 22, 2021." Compl. ¶ 48; PageID.15. And Plaintiff Villarreal alleges that she was raped "[o]n or around August 29, 2021." Compl. ¶ 80; PageID.19. Because "one incident of harassment is not enough" to state an "after" claim, Plaintiffs fail to state any such claim here. *Kollaritsch*, 944 F.3d at 620, 623–24.

Any "after" claims are also deficient because Plaintiffs do not adequately allege that Hillsdale was deliberately indifferent to their reports of harassment. Deliberate indifference requires that the school's response "was 'clearly unreasonable in light of the known circumstances.'" *Kollaristch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 648). This is a "high bar": "[i]t's not a university's job to do the impossible—to 'purg[e] [its] school[ ] of actionable peer harassment'; it's a university's job to respond in good faith when allegations of harassment arise." *Foster*, 982 F.3d at 965. For example, courts have held that a university is not deliberately indifferent when the university responds to complaints of harassment by investigating and issuing a punishment to the harassing student. *See, e.g.*, *Barlow v. Washington*, 2021 WL 2036704, at *4 (W.D. Wash. May 21, 2021), *aff'd in part*, 2022 WL 2256318 (9th Cir. June 23, 2022).

Here, Hillsdale immediately initiated investigations in response to both Plaintiffs' reports, including using third-party investigative counsel who interviewed the

Plaintiffs and other witnesses and made findings.[42] The College then determined the appropriate punishment for the two alleged harassers. Hillsdale clearly was not deliberately indifferent to Plaintiffs' complaints. *See Barlow*, 2021 WL 2036704, at *4.

Plaintiffs' disagreement with Hillsdale's conclusions and punishments is not enough to show deliberate indifference. *See Davis*, 526 U.S. at 648. A university is not required to ensure that a victim of sexual harassment never sees her alleged harasser again. *Id.* And schools have wide discretion to determine the appropriate punishment; only a "clearly unreasonable" response constitutes "deliberate indifference." *See id.* (Plaintiffs do not "have a Title IX right to make particular remedial demands" of the school); *Foster*, 982 F.3d at 968–69. Hillsdale's choices here were far from "clearly unreasonable." *See Barlow*, 2021 WL 2036704, at *4 (nine-day suspension, alcohol dependency assessment, reflection paper, and probation statement was not a "clearly unreasonable" punishment).

### b. *Plaintiffs fail to state a "before" claim.*

To state a "before" claim, a Plaintiff must allege facts plausibly showing that "(1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious

---

[42] The Complaint alleges that the investigator "did not interview" Villarreal's alleged harasser "until months after meeting with Villareal," and then did not meet with Villareal again until "months later." Compl. ¶ 87; PageID.20. But the Complaint admits that the investigator reported her findings to Villarreal— after interviewing the alleged harasser—"[o]n or around October 15, 2021," barely six weeks later. Compl. ¶ 91; PageID.21.

(3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was 'so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school.'" *Doe #2*, 35 F.4th at 465 (quoting *Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1112 (9th Cir. 2020)). A plaintiff must provide more than mere conclusory assertions that these elements are met. *See, e.g.*, *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, 2023 WL 2428870, at *7 (N.D. Ill. Mar. 9, 2023) (dismissing "before" claim); *Reed v. S. Illinois Univ.*, 2020 WL 3077186, at *7 (S.D. Ill. June 10, 2020) (same); *Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1356 (M.D. Ga. 2007). In fact, as many courts recognize, the school must have "actual knowledge of a more particularized risk *to the plaintiff*—knowledge of risk to students generally is not sufficient. *Doe A*, 2023 WL 2428870, at *7 (dismissing "before" claim); *see, e.g.*, *Roskin-Frazee v. Columbia Univ.*, 2018 WL 6523721, at *5 (S.D.N.Y. Nov. 26, 2018) (same). Put simply, "adequately alleging a causal link between a plaintiff's harassment and a school's deliberate indifference to sexual misconduct *across campus* is difficult." *Barnett v. Kapla*, 2020 WL 7428321, at *17 (N.D. Cal. Dec. 18, 2020) (quoting *Karasek*, 956 F.3d at 1114) (dismissing "before" claim). Accordingly, "something more than the university's general knowledge of assaults on campus and awareness by the university of its deficient response [is] required to state a claim." *Reed*, 2020 WL 3077186, at *7 (dismissing "before" claim); *Roskin-Frazee*, 2018 WL 6523721, at *5 ("Allowing or imposing liability in circumstances when [ ] specific knowledge is absent would come 'too close to asking

that [a] [u]niversity be held liable for its failure to purg[e] [its] schoo[l] of [all] actionable peer harassment,' which *Davis* specifically warned is not the intent of Title IX.") (citation omitted).

Here, Plaintiffs' "before" claims fail for multiple, independent reasons.

First, Plaintiffs do not adequately allege that Hillsdale "maintained a policy of deliberate indifference to reports of sexual misconduct." *Doe #2*, 35 F.4th at 465 (citation omitted). Plaintiffs say that "Hillsdale fails to have or enforce policies that prevent sexual assault, or otherwise effectively and transparently handle reports of sexual assaults." Compl. ¶¶ 11–47; PageID.9–15. But a university is not required to prevent all sexual assaults, *Davis*, 526 U.S. at 648, which would be impossible. And contrary to Plaintiffs' allegation, Hillsdale's sexual harassment policy clearly defines sexual assault and consent and explains the process Hillsdale follows when investigating allegations of sexual assault. *See supra* Statement of Facts Part A. Plaintiffs may quibble with the details of Hillsdale's policy, but there can be no dispute that Hillsdale *has* a policy and that it is not deliberate indifference.

Regardless, the relevant question is "not whether the school's efforts were ineffective but whether they amounted to 'an official decision ... not to remedy the violation[s].'" *Foster*, 982 F.3d at 968 (quoting *Davis*, 526 U.S. at 642). For example, in *Simpson v. University of Colorado Boulder*—the apparent genesis of the "before" claim endorsed in *Doe #2*—the university's football program had a long-running practice of making "women ... available to recruits for sex," that multiple women were reportedly sexually assaulted by players, including during recruiting events, and that

multiple officials, including district attorneys, had brought this issue to the school's attention. 500 F.3d. 1170, 1181–84 (10th Cir. 2007). The Tenth Circuit held that the school's failure to put an end to this well-known, years-long practice could constitute "deliberate indifference" and thus support the plaintiffs' sexual harassment claims arising out of individual assaults. *Id.* at 1172, 1184–85. Plaintiffs do not (and cannot) allege anything close to such deliberate indifference. To the contrary, the 2018 editorial Plaintiffs cite from Hillsdale's student newspaper, Compl. ¶ 24; PageID.6, describes the college as an "atypically safe and community-oriented" campus and reports that Hillsdale gives in-person presentations to all fraternities and sororities on how to prevent sexual assault; that "the administration invited a lawyer specializing in sexual assault to train the dorms' resident assistants" in how to prevent assault and respond to reports; and that "resident assistants, house directors, and athletic staff members undergo education and training to ensure they can properly handle sexual misconduct allegations if need be."[43]

Plaintiffs' conclusions are rebutted even by their own accounting of how Hillsdale handled *their* reports of harassment. They admit that Hillsdale immediately began investigating after receiving their reports, that Hillsdale employed third-party attorneys who interviewed witnesses and made findings, and that Hillsdale determined a punishment it believed appropriate for the alleged perpetrators after the investigations were completed. Compl.; PageID. 16–18 (Plaintiff Chen); Compl.;

---

[43] McGhee, *supra*, n.6.

PageID.19–22 (Plaintiff Villareal). Again, while Plaintiffs might be unhappy with the results of the investigations or the length or severity of the punishments and might have preferred to receive the investigative findings in writing rather than verbally, they have wholly failed to clear the "high bar" of pleading deliberate indifference, *Foster*, 982 F.3d at 965, which requires that the school's response "was 'clearly unreasonable in light of the known circumstances,'" *Kollaristch*, 944 F.3d at 621 (quoting *Davis*, 526 U.S. at 648).

Second, Plaintiffs do not adequately allege that Hillsdale's policies created a known or obvious heightened risk of sexual harassment for Chen and Villarreal. Plaintiffs lob only threadbare assertions that "Hillsdale College has deliberately fostered a campus environment that exposes students to an unacceptable and unusually high risk of sexual assault" and that Hillsdale "students are at an unusually high risk of sexual assault because Hillsdale fails to have or enforce policies that prevent sexual assault." Compl. Intro.; PageID.1–2. But Plaintiffs allege no facts to support that scurrilous claim.

Plaintiffs also allege that "Hillsdale has long been aware that its students are at risk of sexual assault on campus through numerous reports by students of sexual assault by their peers and student efforts to make the 'sexual misconduct policy'" more robust. Compl. Intro.; PageID.3; *see also* Compl. ¶ 188; PageID.37 (alleging that Hillsdale "had actual knowledge of the substantial, increased, above baseline risk that Plaintiffs would be sexually assaulted at Hillsdale."). But Plaintiffs do not allege how many sexual assaults have been reported. Nor do they provide any data

39

suggesting that the number or rate of reports at Hillsdale exceeds those at other colleges and universities. And Plaintiffs' bare assertions of Hillsdale's supposed "awareness" of the alleged risk that female students face is not enough. *See Doe A*, 2023 WL 2428870, at *7 (disregarding as conclusory assertions that "hazing was 'well-known' by Defendant[s]"); *Reed*, 2020 WL 3077186, at *7 (Plaintiff "does not address how ... the process created a heightened risk of sexual harassment that was obvious to" the school). At all events, a school's duty under Title IX is not to ensure that sexual assault never occurs (which is impossible) but to "respond in good faith when allegations of harassment arise," *Foster*, 982 F.3d at 965, and Plaintiffs do not allege a single fact plausibly showing that Hillsdale failed to respond appropriately to *any* prior report of sexual assault. Plaintiffs' conclusory and unfounded assertions regarding "sham investigations, arbitrary decisions, and punishments" are insufficient to state a claim. Compl. Intro.; PageID.1, 3; *see Doe A*, 2023 WL 2428870, at *7.

Third, and for the same reason, Plaintiffs do not adequately allege causation. As courts have recognized, "adequately alleging a causal link between a plaintiff's harassment and a school's deliberate indifference to sexual misconduct *across campus* is difficult." *Barnett*, 2020 WL 7428321, at *17. Villarreal cannot show that Hillsdale's supposed deliberate indifference caused her assault, because she alleges an assault off-campus at an apartment that was not under Hillsdale's control. *Doe #2*, 35 F.4th at 465. Plaintiffs allege that "[b]ecause of the deficiencies in the College's policies and practices, student assailants are emboldened to act with impunity," and that "[a]s a

direct and proximate result of Hillsdale's actions and/or inactions, Plaintiffs and Class members have been damaged." Compl. ¶¶ 18, 198; PageID.10, 39. These are quintessential conclusory allegations that fail to state a claim. *Karasek v. Regents of Univ. of California*, 500 F. Supp. 3d 967, 991 (N.D. Cal. 2020) (even if the school's "deliberately indifferent policy created some general heightened risk," plaintiff failed to allege facts to show that the "policy would have made *her* assault more likely"); *see also Barnett*, 2020 WL 7428321, at *17. What is required—and what is missing here— are *factual* allegations showing that Plaintiffs' "experience of sexual misconduct was causally linked to any prior action or inaction by" Hillsdale. *Barnett*, 2020 WL 7428321, at *17.

### 2.   *Plaintiffs fail to state a retaliation claim.*

To state a claim for retaliation under Title IX, a plaintiff must allege "that (1) [s]he engaged in protected activity, (2) [the funding recipient] knew of the protected activity, (3) [s]he suffered an adverse school-related action, and (4) a causal connection exists between the protected activity and the adverse action." *Bose v. Bea*, 947 F.3d 983, 988 (6th Cir. 2020) (citation omitted). A "protected activity" includes complaining about sexual harassment or a school's discrimination in the handling of sexual-harassment claims. *See Emeldi v. Univ. of Oregon*, 698 F.3d 715, 725 (9th Cir. 2012). "To qualify as 'adverse,' an educational action must be sufficiently severe to dissuade a 'reasonable person' from engaging in the protected activity." *Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 320 (6th Cir. 2017).

The retaliation also must have been undertaken by the school itself, since "an educational institution is responsible under Title IX only for its 'own official decision[s].'" *Bose*, 947 F.3d at 991 (quoting *Gebser*, 524 U.S. at 290–91). Thus, retaliation by school employees is not enough to impose Title IX liability on the school. *Id.*; *accord Garrett v. Ohio State Univ.*, 60 F.4th 359, 367 (6th Cir. 2023) (dismissing claim because plaintiffs "failed to allege that the funding recipient, Ohio State, retaliated against them" but rather "broadly claim retaliation by 'OSU employees, faculty, staff, former employees of OSU, friends and/or benefactors of OSU'").

As an initial matter, Plaintiff Villarreal cannot state a claim for retaliation because the alleged harassment she reported occurred off campus, and her report is thus not "an objectively reasonable complaint of Title IX discrimination" that constitutes "protected activity." *Horocofsky v. City of Lawrence*, 2022 WL 1421554, at *19 & n.52 (D. Kan. May 5, 2022) (dismissing retaliation claim because "Plaintiff's administrative complaint addressed an off-campus assault which under existing law, as expressed in *Davis*, was simply not an event for which the University could be held responsible."); Compl. ¶ 80; PageID.19. In all events, Plaintiffs fail to state a retaliation claim for several additional, independent reasons.

The Complaint alleges the following retaliatory actions:

- Hillsdale refused to provide Plaintiffs with anything in writing about the investigations into their reports of assault.

- Dean Dell indicated to Plaintiff Chen that she risked facing a counter-suit, possibly for defamation, by her assailant.

- Hillsdale outside counsel Kimberley Graham suggested that Plaintiff Chen take time off during the summer break to put the sexual assault behind her.

- Hillsdale counsel Bob Norton called Plaintiff Chen's mother and tried to intimidate her by telling her that Plaintiff Chen was wrong about her assault, and dared her to get a lawyer.

- Hillsdale counsel Bob Norton threatened Plaintiff Villarreal if she continued to seek transparency and clarity about the investigation and punishment.

- Hillsdale never implemented or enforced any punishment for Plaintiffs' assailants, forcing Plaintiffs to see and interact with their assailants in class, at sporting events, in the dining hall, and at social events.

Compl. ¶ 208; PageID.41–42. The first five alleged actions were undertaken by various employees—not by Hillsdale itself—and thus cannot support a retaliation claim. *Bose*, 947 F.3d at 991; *Garrett*, 60 F.4th at 367. The closest Plaintiffs come to alleging action by the school itself is that Hillsdale failed to implement or enforce punishment on the alleged assailants. But *non-action* against the *assailants* cannot constitute an adverse *action* against *Plaintiffs*. In any event, Plaintiffs' dissatisfaction with the punishments Hillsdale administered does not support a retaliation claim because the "victims of peer harassment" do not "have a Title IX right to make particular remedial demands." *Davis*, 526 U.S. at 648. Nor is a school required to expel an alleged assailant or otherwise prevent the victim from ever seeing the alleged assailant again. *Id.*

Beyond that, many of these actions were not even "adverse," much less so adverse as to "dissuade a 'reasonable person' from engaging in the protected activity." *Gordon*, 686 F. App'x at 320. For example, investigating a student's report, ensuring the

43

student is fully informed, and stressing the importance of accuracy is not an "adverse" action. *See, e.g.*, *Huang v. Ohio State Univ.*, 2022 WL 16715641, at *21–22 (S.D. Ohio Nov. 4, 2022) (conducting investigation, drafting report, and telling plaintiff to "trust the process" was not retaliatory); Compl. ¶ 208; PageID.41–42. Even "[o]ffering a student *the option* of staying home following a sexual assault does not constitute an adverse educational action." *Gordon*, 686 F. App'x at 321. Nor could a "refus[al] to provide [ ] anything in writing about the investigations," Compl. ¶ 208; PageID.41, plausibly dissuade a student from reporting sexual assault.

### 3. *Any "violation" of DOE regulations (and Plaintiffs allege none) would be non-actionable.*

Plaintiffs assert that Hillsdale is subject to the Department of Education's Title IX regulations but stop short of alleging that Hillsdale has violated any of them. Compl. ¶¶ 181–83, 186, 205; PageID.36–37, 40 (citing these regulations). So the question of the regulations' applicability is not presented here. Anyway, even if Plaintiffs *had* alleged rule violations, and even if those hypothetical allegations had merit, Plaintiffs could not hold Hillsdale liable on that basis, for two reasons. First, private parties "may not assert claims under Title IX for conduct not prohibited by that statute," *Jackson*, 544 U.S. at 178 & n.2, including conduct prohibited only by rule. *See e.g. Wells by & through Glover v. Creighton Preparatory Sch.*, 82 F.4th 586, 593 (8th Cir. 2023). In other words, rule violations are not even within the scope of Title IX's implied private right of action.

Second, and more fundamentally, claiming a tax exemption—even if it constitutes "Federal financial assistance"—does not trigger coverage under the regulations. The rules define coverage-triggering "Federal financial assistance" as funds "authorized or extended under a law *administered by the Department* [*of Education*]." 34 C.F.R. § 106.2(g) (emphasis added). Because the only financial assistance Hillsdale is alleged to have received is a tax exemption under Internal Revenue Code § 501(c)(3), and because DOE does not administer the Internal Revenue Code, the Department's regulations governing "recipients" of "Federal financial assistance" do not apply to Hillsdale. *See id.* § 106.2(i) (defining "*Recipient*").

## II.   PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENCE

Plaintiffs claim that Hillsdale's negligence caused them to be sexually assaulted. Compl. ¶¶ 116–123, PageID.26–28. But they have not adequately alleged at least three of the four traditional elements of a negligence claim arising from harms inflicted by a third party: duty, breach, and causation. *See Highfield Beach at Lake Michigan v. Sanderson*, 331 Mich. App. 636, 666 (2020) (elements of negligence tort). Plaintiffs do not adequately allege the existence of a special relationship with Hillsdale that would give rise to a duty to protect them individually; Plaintiffs have not alleged facts plausibly showing that Hillsdale acted negligently; and any such negligence was plainly not the but-for or proximate cause of Plaintiffs' assaults.

### A. Plaintiffs Do Not Adequately Allege a Special Relationship with Hillsdale, Which Is a Necessary Element of Their Negligence Claim.

"The threshold question, whether a duty exists, is a question of law, an issue solely for the court to decide." *Murdock v. Higgins*, 454 Mich. 46, 53 (1997) (citation omitted). In general, "[a]n individual has no duty to protect another from the criminal acts of a third party in the absence of a special relationship between the defendant and the plaintiff or the defendant and the third party." *Graves v. Warner Bros.*, 253 Mich. App. 486, 493 (2002). "The rationale underlying this general rule is the fact that criminal activity, by its deviant nature, is normally unforeseeable." *Id.* (citation omitted).

More, "[s]ince the late 1970s, the general rule is that no special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003) (collecting cases). "[I]n several different contexts, courts have consistently found that the university-student relationship is not the type of 'special relationship' such that the university has a duty to protect students from the harmful acts of third parties." *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 962 (N.D. Ill. 2017), *aff'd,* 933 F.3d 849 (7th Cir. 2019) ("*CCC*") (collecting cases); *see also* Restatement (Second) of Torts § 314A (1965).

Defendant has located no Michigan case finding a special relationship between universities and their students, and extant law indicates that. And Michigan courts are highly unlikely ever to find one. *See also infra* pp. 58–59. "[S]pecial relationships are predicated on an imbalance of *control,* where 'one person entrusts himself to the

46

control and protection of another, with a consequent loss of control to protect himself.'" *Bailey v. Schaaf*, 494 Mich. 595, 604, 835 N.W.2d 413 (2013) (citation omitted). And since post-secondary students do not entrust themselves to their schools' control, much less give up "control to protect [themselves]," *id.*, "universities do not act *in loco parentis* in the way that grade schools do." *Hedrick v. W. Michigan Univ.*, 2022 WL 10301990, at *5 (W.D. Mich. Oct. 17, 2022).[44] Courts in other jurisdictions thus have dismissed negligence claims against colleges arising from on-campus student-on-student assaults on the ground that the colleges had no duty to protect against such assaults. *See, e.g., Totten v. Benedictine Univ.*, 2021 WL 3290926, at *11, (N.D. Ill. Aug. 2, 2021) (dismissing negligence claim because colleges do not have "a duty to protect students from the harmful acts of third parties" "even where ... the university exerts control over the location where the criminal act took place") (citation omitted); *Doe 1 v. Baylor Univ.*, 240 F. Supp. 3d 646, 667 (W.D. Tex. 2017) (dismissing negligence claims even though plaintiffs "allege[d] they were

---

[44] *See also McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 243 (3d Cir. 2010) ("'[P]ublic elementary and high school administrators,' unlike their counterparts at public universities, 'have the unique responsibility to act *in loco parentis*.'") (citation omitted); *Guest v. Hansen*, 603 F.3d 15, 21 (2d Cir. 2010) ("Under New York law, colleges . . . do not act *in loco parentis*."); *Doe v. Cmty. Coll. of Baltimore Cnty.*, 595 F. Supp. 3d 392, 420 (D. Md. 2022) ("[U]nder Maryland law, institutions of higher education—universities and colleges—do not stand in loco parentis as to their students."); *R.W. v. Columbia Basin Coll.*, 572 F. Supp. 3d 1010, 1026 (E.D. Wash. 2021), *aff'd in part, appeal dismissed in part*, 77 F.4th 1214 (9th Cir. 2023) ("The doctrine of *in loco parentis* does not apply in the university setting for independent, young adults."); *Jean v. Bucknell Univ.*, 534 F. Supp. 3d 404, 413 n.70 (M.D. Pa. 2021) ("[A]pplying a more stringent duty of care on Bucknell also runs counter to firmly established public policy rejecting the imposition of an *in loco parentis* duty on colleges and universities."); *Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1179 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) ("The in loco parentis doctrine is outmoded and inconsistent with the reality of contemporary college life.") (citation omitted); *Furek v. Univ. of Delaware*, 594 A.2d 506, 516 (Del. 1991) ("The concept of university control based on the doctrine of *in loco parentis* has all but disappeared in the face of the realities of modern college life.").

sexually assaulted on Baylor's campus"). And, of course, colleges and universities have no duty to protect their students from assaults occurring *off campus. See, e.g., Baylor Univ.*, 240 F. Supp. 3d at 667.

Plaintiffs do not (and cannot) allege that Hillsdale exercised *any* control over them, much less the degree of control warranting a departure from the general no-duty rule. Specifically, although Chen's assault occurred on campus, she does not allege that Hillsdale exercised control over the circumstances of the assault. *See* Compl. ¶ 48; PageID.15. And Villarreal concedes that her assault occurred off campus, Compl. ¶ 80; PageID.19, where Hillsdale plainly exercises no control over student conduct. Thus, Plaintiffs' negligence claims fail as a matter of law.

### B. Plaintiffs Fail to Allege That Hillsdale Breached Any Duty It May Have Had to Plaintiffs.

Even if Hillsdale had a special relationship with Plaintiffs, the allegations do not plausibly suggest that Hillsdale breached any duty owed to Plaintiffs. "The general standard of care is always 'reasonable care.'" *Case v. Consumers Power Co.*, 463 Mich. 1, 3 (2000). "[W]hile the standard of conduct required may differ depending upon the activity one is involved in, the standard of care required does not change." *Massey v. Scripter*, 401 Mich. 385, 390 (1977). "The standard of care required of a party is always that which a reasonably careful person would do or would refrain from doing under the circumstances." *Id*. If "all reasonable persons would agree the defendant did not create an unreasonable risk of harm," then "whether a defendant's conduct in

48

the particular case breached this general standard of care" is a question of law for the court. *Finazzo v. Fire Equip. Co.*, 323 Mich. App. 620, 634, 918 N.W.2d 200 (2018).

Michigan law does not impose a duty to prevent unforeseen intentional acts of third parties. Even those with special relationships, such as merchants or landlords, are not required to prevent the criminal acts of third parties. *See Scott v. Harper Recreation, Inc.*, 444 Mich. 441, 451–52 (1993); *Bailey*, 494 Mich. at 614–15.[45] Instead, there must be an "imminent and foreseeable" threat of which the landlord or merchant has notice before any duty is triggered. *Graves*, 253 Mich. App. at 497; *Bailey*, 494 Mich. at 614–15.[46]

The facts alleged here do not plausibly suggest that Hillsdale breached any duty owed to Plaintiffs. Neither Plaintiff argues that Hillsdale was aware of the alleged assaults while they occurred and failed to contact police. *See generally* Compl. ¶¶ 48, 80, PageID.15, 19; *see Graves*, 253 Mich. App. at 497. Neither Plaintiff claims to have been assaulted by the same perpetrator after Hillsdale was notified of the first alleged assaults, or that Hillsdale had any notice of propensity on the part of the alleged perpetrators. *See generally* Compl. ¶¶ 48, 80, PageID.15, 19; *see Bradley*, 329 Mich. at 562. Instead, Plaintiffs allege that Hillsdale "fail[ed] to have policies that prevent

---

[45] Similarly, employers are not liable "for torts intentionally or recklessly committed by an employee beyond the scope of his master's business." *Bradley v. Stevens*, 329 Mich. 556, 562 (1951). Only if the employer was negligent in hiring the employee because the employer knew or should have known of the employee's propensities can the employer be held liable. *Id.*; *cf. K.S. v. Detroit Pub. Sch.*, 130 F. Supp. 3d 1073, 1086 (E.D. Mich. 2015). Consistent with this notion, some courts have held that a college's knowledge of a previous assault can give rise to a duty to prevent a second assault involving the same assailant and victim. *See, e.g., Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861 (W.D. Tex. 2019).

[46] And, where that is the case, the duty is only to contact the police. *Graves*, 253 Mich. App. at 497.

sexual assault." Compl. ¶ 118, PageID.26. But even those in special relationships have no duty to prevent conduct like sexual assault. *See Graves*, 253 Mich. App. at 497; *Bailey*, 494 Mich. at 613–15. And to the extent that Plaintiffs allege Hillsdale was generally aware that there was a heightened risk to students of sexual assaults, and that Hillsdale failed to adequately respond to other, unrelated incidents of sexual assaults, *see generally* Compl. Intro., ¶¶ 11–47; PageID.1–2, 9–15, these allegations are entirely conclusory, *Iqbal*, 556 U.S. at 678; *see also supra* pp. 39–40, and, even if true, do not allege a breach of a duty to protect.[47]

Additionally, though Hillsdale had no duty to prevent any sexual assault from ever occurring, the steps that Hillsdale did take to make such assaults less likely are entirely reasonable. As Plaintiffs concede, Hillsdale's "dormitories are sex-segregated," Compl. ¶ 20; PageID.5, and Hillsdale has a robust Sexual Misconduct Policy, *see* Compl. ¶ 12; PageID.9; *see also supra* Statement of Facts, Part A. The policy discusses sexual misconduct and consent.[48] And when assaults are reported, the Policy highlights the College's commitment to protecting everyone's privacy.[49] *See also* Compl. ¶ 32; PageID.12.

Plaintiffs provide nothing beyond unsupported assertions to support a claim that Hillsdale's actions were unreasonable. *See Doe A*, 2023 WL 2428870, at *7. And while

---

[47] Plaintiffs do allege facts regarding Hillsdale's handling of *their* reports of assaults, Compl. ¶ 119; PageID.26, but Hillsdale's post-assault conduct was obviously not the cause of their assaults. And in any event, Hillsdale's investigation was not unreasonable. *See supra* Argument Part I.B.1.a.

[48] *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct.

[49] *Id.*

50

Plaintiffs complain that Hillsdale's policy leaves all investigation and enforcement up to the school's discretion, Compl. ¶¶ 14, 21–27; PageID.10–12, not only is this characterization contradicted by the policy itself,[50] Plaintiffs do not explain why that feature is unreasonable or even inferior to some unspecified alternative. Plaintiffs provide no reason to think the Deans are biased. While other colleges are free to adopt alternative investigation procedures, Hillsdale's policies are not unreasonable merely because they are different.

### C. Hillsdale's Alleged Negligence Was Not the But-For Cause of the Harm.

"In a negligence action, a plaintiff must establish both factual causation, i.e., 'the defendant's conduct in fact caused harm to the plaintiff,' and legal causation, i.e., the harm caused to the plaintiff 'was the general kind of harm the defendant negligently risked.'" *Ray v. Swager*, 501 Mich. 52, 64 (2017) (citation omitted). "[A] court must find that the defendant's negligence was a cause in fact of the plaintiff's injuries before it can hold that the defendant's negligence was the proximate or legal cause of those injuries." *Id.* (citation omitted).

Here, Plaintiffs do not and cannot plausibly allege that Hillsdale's purported negligence was a but-for or factual cause of their assaults. Plaintiffs' causal theory is that, because of Hillsdale's alleged negligence—its supposed failure to have a sexual

---

[50]   *See, e.g.*, *Sexual Misconduct*, Hillsdale College, https://catalog.hillsdale.edu/student-handbook/sexual-misconduct ("All reports of sexual misconduct will be reviewed and investigated, as appropriate"); *id.* ("In all cases, the College will make an initial assessment, will offer assistance to the complaining person, and will implement necessary interim measures . . . . Following any investigation, the College will summarize its findings and determinations to each party and take appropriate disciplinary actions.").

misconduct policy and failure to enforce its policy—"student assailants [we]re emboldened to act with impunity." Compl. ¶ 18; PageID.10. But this allegation is entirely conclusory, *Iqbal*, 556 U.S. at 678, and relies on a series of implausible links and unsupported assumptions. First, Plaintiffs ask the Court to assume—without a single supporting fact—that Hillsdale failed to investigate previous reports of sexual assault and failed to punish *other* alleged assailants. *See Doe A*, 2023 WL 2428870, at *7 ("The Second Amended Complaint is missing facts tending to show that the District ignored reports of sexual harassment within the athletic department."). Second, they ask the Court to infer that Hillsdale's alleged mismanagement of those previous assaults "embolden[ed]" students "to act with impunity." Compl. ¶ 18; PageID.10, with no facts plausibly suggesting that Hillsdale students believe they can get away with sexual assault without consequence. *See Reed*, 2020 WL 3077186, at *7 (Plaintiff "does not address how ... the process created a heightened risk of sexual harassment that was obvious to" the school). Third, Plaintiffs ask the Court to infer that this allegedly hostile campus culture caused the assailants here to commit the assaults. Compl. ¶ 120; PageID.27. But the facts alleged provide no plausible basis for inferring that the assaults would not have happened if Hillsdale had implemented a different sexual misconduct policy or had responded differently to previous reports. *See Karasek*, 500 F. Supp. 3d at 991 (even if the school's "policy created some general heightened risk," plaintiff failed to allege facts to show that the "policy would have made *her* assault more likely").

### III.   PLAINTIFFS FAIL TO STATE A CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

The elements of intentional infliction of emotional distress ("IIED") are "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Lewis v. LeGrow*, 258 Mich. App. 175, 196, 670 N.W.2d 675 (2003) (citation omitted). Plaintiffs allege that Hillsdale intended to inflict emotional distress by failing to have or enforce policies to prevent sexual assault and mismanaging student reports of sexual assault. Compl. ¶¶ 135–36; PageID.30. They allege that Hillsdale intended or knew or should have known that emotional distress would result from those acts and omissions, and that they in fact suffered emotional distress. Compl. ¶¶ 135–39; PageID.30–31. But Plaintiffs' IIED claim fails because the alleged facts do not plausibly demonstrate that Hillsdale's conduct was extreme and outrageous. Plaintiffs also fail to adequately allege intent or recklessness.

Plaintiffs fail to allege extreme or outrageous conduct. "The threshold for showing extreme and outrageous conduct is high." *Solek v. K & B Transp., Inc.*, 2021 WL 4290181, at *10 (E.D. Mich. Sept. 21, 2021) (citation omitted). The alleged conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." *Lucas v. Awaad*, 299 Mich. App. 345, 360 (2013) (citation omitted).

"It is generally the duty of the trial court to determine whether a defendant's alleged conduct may reasonably be regarded as so 'outrageous.'" *Garretson v. City of*

*Madison Heights*, 407 F.3d 789, 799 (6th Cir. 2005). "[T]he question is for the jury"

only "[w]here reasonable minds may differ" as to the outrageousness of the conduct.

*Id.* And "it is the [defendants'] conduct, rather than the consequences of the conduct,

that must be 'extreme and outrageous,' for a plaintiff's action to succeed." *Solek,* 2021

WL 4290181, at *12 (citing *Hesse v. Chippewa Valley Sch.*, 2004 WL 1161416, at *2

(Mich. Ct. App. May 25, 2004)) (alteration in original).

Plaintiffs disagree with Hillsdale's Sexual Misconduct Policy and how Hillsdale

enforced that policy, but Hillsdale's policy is not unreasonable—much less extreme

or outrageous. *See supra* pp. 34–35. And Plaintiffs have not alleged any facts

plausibly suggesting that Hillsdale's conduct in investigating prior reports of sexual

assault went beyond the bounds of decency—indeed, they have alleged no facts at all

regarding Hillsdale's prior conduct. *See supra* pp. 39–40. This claim should be

dismissed.

Plaintiffs also do not plausibly allege intent or recklessness. "A plaintiff can show

that a defendant specifically intended to cause a plaintiff emotional distress or that

a defendant's conduct was so reckless that 'any reasonable person would know

emotional distress would result.'" *Garretson*, 407 F.3d at 799 (citation omitted).

Plaintiffs allege that Hillsdale intentionally or recklessly inflicted emotional

distress. Compl. ¶ 135; PageID.30. But Plaintiffs allege no facts plausibly

demonstrating any such intent. Nor do Plaintiffs plausibly allege that "any

reasonable person would know emotional distress would result" from Hillsdale's

conduct. Instead, Plaintiffs generally allege that Hillsdale could have implemented a

different misconduct policy, better investigated previous reports, or administered harsher punishments (though they allege no facts about how any prior reports were handled). But "[s]imply alleging that an actor could have done more is insufficient under Michigan law, because, with the benefit of hindsight, a claim can always be made that extra precautions could have influenced the result." *Brock v. Mich. State Univ.*, No. 1:21-CV-436, 2022 WL 178681, at *5 (W.D. Mich. Jan. 20, 2022) (quoting *Tarlea v. Crabtree*, 263 Mich. App. 80, 90, 687 N.W.2d 333 (2004)). Plaintiffs' IIED claims should be dismissed.

## IV.   PLAINTIFFS FAIL TO STATE A CLAIM FOR NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Michigan courts do not recognize a "direct negligent infliction of emotional distress claim." *In re Flint Water Cases*, 384 F. Supp. 3d 802, 870 (E.D. Mich. 2019), *aff'd and remanded,* 960 F.3d 303 (6th Cir. 2020). Instead, "Michigan recognizes the tort of negligent infliction of emotional distress only when a plaintiff witnesses negligent injury to a third party and suffers mental disturbance as a result." *Teadt v. Lutheran Church Missouri Synod*, 237 Mich. App. 567, 581 n.6 (1999).

Plaintiffs have not alleged any physical harm to a third person or that they suffered emotional distress due to witnessing any such injury. Rather, Plaintiffs seek to recover for the direct emotional injuries they allegedly suffered due to Hillsdale's supposed negligence. That claim is not cognizable under Michigan law and must be dismissed. *See Gillespie v. City of Battle Creek*, 100 F. Supp. 3d 623, 634 (W.D. Mich. 2015).

## V.   PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE ELLIOTT-LARSEN CIVIL RIGHTS ACT

In Michigan, "the full and equal utilization of" "educational facilities without discrimination because of ... sex" is a "civil right." Mich. Comp. Laws § 37.2102(2). An "education institution," including a private college, may not "[d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of ... sex." Mich. Comp. Laws §§ 37.2401, 37.2402(a).

"Discrimination because of sex includes sexual harassment." Mich. Comp. Laws § 37.2103(k). "Sexual harassment means unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct or communication of a sexual nature" under certain defined circumstances. *Id.* This conduct or communication must have "the purpose or effect of substantially interfering with an individual's ... education ... or creating an intimidating, hostile, or offensive ... educational ... environment." Mich. Comp. Laws § 37.2103(k)(iii). Sexual harassment fitting this definition "is commonly labeled hostile environment harassment." *Chambers v. Trettco, Inc.*, 463 Mich. 297, 310 (2000). It also, under certain circumstances, gives rise to a claim of hostile educational environment. *See K.S.*, 130 F. Supp. 3d at 1083; *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, -- N.W.2d --, 2022 WL 17868146, at *3 (Mich. Ct. App. Dec. 22, 2022) (same).

To establish a *prima facie* case of hostile educational environment based on sexual harassment under ELCRA, the plaintiff must show five elements: (1) the student

"belonged to a protected group"; (2) the student "was subjected to communication or conduct on the basis of sex"; (3) the student "was subjected to unwelcome sexual conduct or communication"; (4) "the unwelcome sexual conduct or communication was intended to or in fact did substantially interfere with the student's access to education or created an intimidating, hostile, or offensive educational environment";[51] and (5) "*respondeat superior*." *K.S.*, 130 F. Supp. 3d at 1083; *see also Haynie v. State*, 468 Mich. 302, 307–08 (2003) (quoting *Radtke v. Everett*, 442 Mich. 368, 382–83 (1993)); *Kalich v. AT&T Mobility, LLC*, 679 F.3d 464, 470 (6th Cir. 2012).

Even if Plaintiffs adequately alleged the first four elements of a hostile-educational-environment claim, they have failed to allege facts supporting the final element: *respondeat superior*. Under that doctrine, "[a]n employer is generally liable for the torts its employees commit within the scope of their employment." *Hamed v. Wayne Cnty.*, 490 Mich. 1, 10–11 (2011). To establish *respondeat superior*, the plaintiff must "establish that the employer had either actual or constructive notice of the hostile work environment and failed to take prompt and adequate remedial action." *Kalich*, 679 F.3d at 474. Crucially, an employer "cannot be held accountable on a sexually hostile work environment claim for conduct prior to the time the plaintiff complained to her supervisors of which [the employer] was unaware." *Schemansky v. California Pizza Kitchen, Inc.*, 122 F. Supp. 2d 761, 772–73 (E.D. Mich. 2000); *see also*

---

[51] The Sixth Circuit occasionally articulates this element as "the harassment was sufficiently severe or pervasive to alter the conditions of [education] and create an abusive [] environment." *Waldo v. Consumers Energy Co.*, 726 F.3d 802, 813 (6th Cir. 2013) (citation omitted).

*Radtke*, 442 Mich. at 395 & n.41 (explaining that the ELCRA "does not establish strict liability for sexual assault by a co-worker or supervisor").

But while employers may be held liable for the actions of their employees, the same is not true of universities and their students. A recent Michigan Court of Appeals decision, holding that *grade schools* "exercise control over their students such that a school may be vicariously liable for students' conduct," confirms as much. *Kolokithas*, 2022 WL 17868146, at *4.[52] Evaluating a claim of "several incidents of student-on-student sexual harassment at an elementary school," the *Kolokithas* Court explained that, in the special circumstance of the education of "children," schools "exercise some amount of control over students via their responsibility *in loco parentis*." *Id.* at *1, *4 (citation omitted) (explaining that *in loco parentis* "refer[s] to a temporary assumption of the duties, character, or function of a lawful parent"). Importantly, *Kolokithas* traces this "basic principle of Michigan jurisprudence" to *Gaincott v. Davis*, 281 Mich. 515 (1937), which makes clear that the *in loco parentis* relationship of "a teacher to a pupil" arises from the "duties of a teacher" not only "in the care" of the student but also in "*custody*" of her. *Id.* at 518–19 (emphasis added). In other words, the students must be in "the teacher's presence" and under the teacher's "control" at the time of the incident to trigger any duty. *Cook v. Bennett*, 94 Mich. App. 93, 98 (1979). And even when standing *in loco parentis*, an elementary

---

[52] The Michigan Supreme Court has decided to hear the appeal in *Kolokithas*, but oral argument has not yet been scheduled. *See Doe by Next Friend Kolokithas v. Alpena Pub. Sch. Dist.*, 511 Mich. 994 (2023).

school "avoids vicarious liability for these claims if it investigates and takes prompt and appropriate remedial action upon learning of the student's behavior." *Kolokithas*, 2022 WL 17868146, at *6.

By contrast, colleges do not have "a custodial relationship with [their] students." *CCC*, 299 F. Supp. at 962–63 (citation omitted) (collecting cases); *see also Hedrick v. W. Mich. Univ.*, 2022 WL 10301990, at *7 (W.D. Mich. Oct. 17, 2022); *Austin-Hall v. Woodard*, 2020 WL 5943018, at *6 (S.D. Ohio Oct. 7, 2020) (college had "no duty of custodial care") (collecting cases). This is because "[c]ollege students are adults and must be treated as such." *Austin-Hall*, 2020 WL 5943018, at *6. Indeed, under Michigan law, even parents cannot be held vicariously liable for the acts of their adult children, meaning by extension that no other person could be held labile for those acts on an *in loco parentis* theory. *See Reinert v. Dolezel*, 147 Mich. App. 149, 156–57, 383 N.W.2d 148 (1985) ("Any duty the parents had to supervise their child's conduct ended when that child became an adult.") (citing Mich. Comp. Laws § 722.52).

Plaintiffs cannot establish vicarious liability here for multiple reasons. First, as discussed above, "universities do not act *in loco parentis* in the way that grade schools do." *Hedrick*, 2022 WL 10301990, at *5. Accordingly, Hillsdale cannot be held vicariously liable for any harassment Chen and Villarreal may have suffered at the hands of their fellow students. *See also Reinert*, 147 Mich. App. at 156–57.[53]

---

[53] Reinforcing the very reason that colleges do not stand *in loco parentis*, there is no suggestion here that Hillsdale had control or custody of the students at the time of the assaults. Any duty to act

Third, Plaintiffs fail to allege that Hillsdale had actual or constructive notice that either Plaintiff was facing a hostile educational environment before the assaults occurred. *See Kalich*, 679 F.3d at 474. Plaintiffs do not allege that they previously reported any incidents of sexual harassment. Nor do Plaintiffs allege that Hillsdale had notice that either Chen's or Villarreal's alleged assailant had engaged in similar past conduct. Plaintiffs' conclusion that Hillsdale knew about unrelated assaults committed against other students do not establish constructive notice, much less actual notice, of a hostile educational environment. *See id.*; *see also Doe A*, 2023 WL 2428870, at *7 (disregarding conclusory assertions of school's knowledge).

Fourth, Plaintiffs do not allege that they were subject to further sexual harassment, as defined by Mich. Comp. Laws § 37.2103(k), after they reported their assaults to Hillsdale—that is, after Hillsdale was put on notice. *See Schemansky*, 122 F. Supp. 2d at 772–73; *Radtke*, 442 Mich. at 395 & n.41. Plaintiffs thus cannot claim that Hillsdale's response failed to prevent further instances of sexual harassment. *See Kalich*, 679 F.3d at 474–75; *Kolokithas*, 2022 WL 17868146, at *6.

Finally, Villarreal does not allege that her assault even occurred in the educational setting. Rather, she alleges that her assault occurred off campus. Compl. ¶ 80; PageID.18. While some cases have suggested that ELCRA claims can accrue

---

*in loco parentis* applies only when the students are "in the [] presence" and under the "control" of the defendant at the time of the incident. *Cook*, 94 Mich. App. at 98. There is no allegation that the school controlled the students during Plaintiffs' alleged assault. See Compl. ¶ 48, PageID.15; Compl. ¶ 80, PageID.19; *accord In re Doe*, 2006 WL 475285, at *2 (Mich. Ct. App. Feb. 28, 2006) (school staff were not acting *in loco parentis* during assault that occurred on school premises "when school was not in session" and when victim "was not participating in any school-sponsored event").

even when the sexual conduct occurs outside of the school (or workplace), those cases rely on the ability of the assailant to leverage a position of power. *See, e.g.*, *K.S.*, 130 F. Supp. 3d at 1084–85. That type of relationship does not exist here.

## VI. PLAINTIFFS FAIL TO STATE A CLAIM UNDER THE MICHIGAN CONSUMER PROTECTION ACT

To state an MCPA claim, Plaintiffs must allege facts that, if true, establish that a "method[], act[], or practice[] in the conduct of trade or commerce" is "[u]nfair, unconscionable, or deceptive." Mich. Comp. Laws § 445.903(1). Plaintiffs claim that Hillsdale made material misrepresentations about its educational environment and failed to reveal material facts about its sexual misconduct policy and history of handling student reports of sexual abuse. Compl., ¶¶ 171–75; PageID.34–35. Plaintiffs allege that these misstatements and omissions fraudulently induced them to enroll at Hillsdale. Compl., ¶¶ 175–76; PageID.35. Plaintiffs' MCPA claims fail for several reasons.

"[T]he great majority of the specific prohibited practices enumerated in the [MCPA] ... involve fraud." *Mayhall v. A. H. Pond Co., Inc.*, 129 Mich. App. 178, 182, 341 N.W.2d 268 (1983). Hence Michigan courts construe the MCPA "with reference to the common-law tort of fraud." *Id.* at 183; *see also Zine v. Chrysler Corp.*, 236 Mich. App. 261, 283, 600 N.W.2d 384 (1999) (citing *Mayhall*); *Pitts v. Monaco Coach Corp.*, 330 F. Supp. 2d 918, 928 (W.D. Mich. 2004) (recognizing the same). This means that, in federal court, allegations of fraud-based MCPA violations "must include the

specificity required by Fed. R. Civ. P. 9(b)." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 666 (E.D. Mich. 2011).

Rule 9(b) requires a party "alleging fraud" to "specify the 'who, what, when, where, and how' of the alleged fraud." *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (citation omitted). Specifically, "a plaintiff's complaint must '(1) specify the statements that the plaintiff contends fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. Holdings, Inc.*, 83 F.4th 514, 524–25 (6th Cir. 2023) (citation omitted). Courts routinely dismiss fraud-based MCPA claims for failure to comply with this heightened pleading requirement. *See Home Owners Ins. Co. v. ADT LLC*, 109 F. Supp. 3d 1000, 1008–09 (E.D. Mich. 2015); *Rosipko v. FCA US, LLC*, 2015 WL 8007649, at *4–5 (E.D. Mich. Dec. 7, 2015); *Leaf v. Refn*, 742 F. App'x 917, 926–27 (6th Cir. 2018).

Here, "Plaintiff[s] ha[ve] not even identified which section[s] of the MCPA [Hillsdale] allegedly violated." *Home Owners Ins. Co.*, 109 F. Supp. 3d at 1008–09. This matters because the MCPA "prohibitions contain language that varies greatly." *Leaf v. Nike, Inc.*, 2021 WL 4950383, at *3 (6th Cir. Oct. 25, 2021). "Some subsections involve express representations, ... others involve omissions, ... and yet others do not speak in terms of representations or omissions." *Zine*, 236 Mich. App. at 281–82. Therefore, courts "follow a provision-by-provision approach to resolve a dispute, paying close attention to the text of the specific subsection at issue." *Leaf*, 2021 WL

4950383, at *3. Plaintiffs' failure to identify the specific subsections Hillsdale allegedly violated dooms their claims under Rule 9(b). *Home Owners Ins. Co.*, 109 F. Supp. 3d at 1008–09.

Anyway, Plaintiffs also fail to identify any actionable misrepresentations. They quote portions of Hillsdale's website, including the homepage and Honor Code, and allege that Hillsdale "represent[ed] that a Hillsdale education would have qualities it did not." Compl. ¶ 171; PageID.34–35. Specifically, Plaintiffs allege Hillsdale made the following representations:

- "Plaintiffs would '*grow in heart and mind* by studying timeless truths *in a supportive community dedicated to the highest things*.'"

- Hillsdale "would '*develop the minds and improve the hearts of the students*.'"

- Hillsdale "*exists for the improvement and ultimate happiness of its students. This great and enduring happiness is its highest purpose*."

- Hillsdale "*not only readies you for the world, [it] also set[s] a standard for it*."

Compl. ¶ 171; PageID.34–35.

Yet such high-minded, aspirational statements—even though sincerely espoused and believed to be important and true—are "not specific enough," as a matter of law, to induce a consumer to make a purchase and thus are "not material." *In re Royal Appliance Sec. Litig.*, 1995 WL 490131, at *3 (6th Cir. 1995); *see also Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 648–49 (E.D. Mich. 2019) (characterizing statements by auto manufacturers as "nonactionable"); *In re Fed.-Mogul Corp. Sec. Litig.*, 166 F. Supp. 2d 559, 562–63 (E.D. Mich. 2001) (similar).

More to it, Plaintiffs do not allege that these statements are even untrue. *See Teamsters Loc. 237*, 83 F.4th at 524–25 (requiring explanation that "the statements were fraudulent"); *see also Home Owners Ins. Co.*, 109 F. Supp. 3d at 1008. Although Plaintiffs allege that they were each assaulted once by a fellow student, they do not allege that the overall Hillsdale education failed to help them develop in heart and mind, or that the school community—including faculty, staff, coaches, administrators, and fellow students—are not supportive and "dedicated to the higher things."

Next, Plaintiffs allege that "Hillsdale failed to reveal its failure to have or enforce policies that prevent sexual assault," Compl., ¶ 172; PageID.35, and that Hillsdale "fail[ed] to reveal its history of mishandling student reports of sexual abuse," Compl. ¶ 174; PageID.35. They say that these omissions were "important to Plaintiffs' decision to purchase a Hillsdale education that Hillsdale knew or should have known would influence Plaintiffs' decision to purchase." Compl. ¶ 173; PageID.35.

But these alleged omissions are not actionable because Plaintiffs have failed to support their necessary predicates—for example, that Hillsdale did not have policies to prevent sexual assault, did not enforce those policies, or mishandled past reports of abuse—with *any* facts. Hillsdale indisputably *does* have a sexual misconduct policy designed to deter sexual assault, and it notifies all students that such conduct will be investigated and punished. Compl. Intro; PageID.3; *see supra* Statement of Facts Part A. Plaintiffs have not alleged anything other than conclusory assertions suggesting that Hillsdale historically failed to enforce that policy. And while Plaintiffs cite a

student editorial that advocated for "improvements to the policy," that same article lauded Hillsdale as an "atypically safe and community-oriented" college and recognized that "school officials have [students'] best interests at heart and are fighting for [them]." Compl., ¶ 24; PageID.6.[54] Plaintiffs cannot survive a motion to dismiss simply by inventing a defect and then accusing Hillsdale of failing to disclose it.

## VII. INSOFAR AS PLAINTIFFS SEEK INJUNCTIVE RELIEF, THEY HAVE FAILED PLAUSIBLY TO ALLEGE AN IMMEDIATE AND SIGNIFICANT RISK OF IRREPARABLE HARM

Plaintiffs' request for injunctive relief is deficient as a matter of law and should be dismissed. Injunctive relief requires proof of irreparable harm that is "actual and imminent" rather than "speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (claimant must demonstrate that she "will suffer 'actual and imminent' harm"). "A complaint that 'alleges neither irreparable damages nor the threat of irreparable damages or facts from which it may be concluded irreparable damages may ensue' does not state a claim for any injunctive relief." *Ramsay v. Frontier, Inc.*, 2020 WL 4557545, at *15 (D. Colo. July 30, 2020), *report and recommendation adopted*, 2021 WL 651021 (D. Colo. Feb. 19, 2021) (citing *Ogden River Water Users Ass'n v. Weber Basin Water Conservancy*, 238 F.2d 936, 942 (10th Cir. 1956)).

---

[54] McGhee, *supra*, n.6.

Here, while Plaintiffs include conclusory allegations to support their requests for injunctive relief in support of each count, they do not and cannot plausibly allege an "essential element necessary for the issuance of any permanent injunction: the immediate threat of and significant risk of irreparable harm." *Ramsay*, 2020 WL 4557545, at *15. Plainly, a "merely speculative or possible" harm is not enough. *Id.* at *16. Although student-on-student sexual assault is always possible (at Hillsdale and anywhere else), and while the College is committed to doing all that it can to prevent it, there are no allegations here plausibly suggesting that a sexual assault at Hillsdale is an "actual and imminent" risk. "That sexual assaults by some unknown third parties may occur ... is a possibility. But it is just that, a 'fear that injury will occur' at 'some indefinite time in the future.' It cannot be described as a 'presently existing actual threat.'" *Id.* Plaintiffs' sparsely pleaded claims for injunctive relief are therefore facially deficient.

## CONCLUSION

This Court should dismiss Plaintiffs' Class Action Complaint with prejudice. *Stewart v. IHT Ins. Agency Grp., LLC*, 990 F.3d 455, 457 n.* (6th Cir. 2021) ("Dismissal with prejudice and without leave to amend is [ ] appropriate when it is clear ... that the complaint could not be saved by an amendment.").

Dated: December 21, 2023

Respectfully submitted,

Sarah L. Nirenberg
Carey A. DeWitt
BUTZEL LONG, P.C.
201 West Big Beaver Road, Suite 1200
Troy, MI 48084
(248) 258-2919
(248) 228-1439 (fax)
nirenberg@butzel.com

_s/ Ryan J. Walsh_
Ryan J. Walsh
EIMER STAHL LLP
10 East Doty Street, Suite 621
Madison, WI  53703
(608) 620-8346
(312) 692-1718 (fax)
rwalsh@eimerstahl.com

Allyson N. Ho (application for
admission forthcoming)
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
(214) 698 3233
(214) 571-2971 (fax)
aho@gibsondunn.com

*Counsel for Defendant*