**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| GRACE CHEN and DANIELLE VILLARREAL, individually and on behalf of all others similarly situated, | Case No. 1:23-cv-01129-JMB-PJG |
| | District Judge: Jane M. Beckering |
| Plaintiffs, | Magistrate Judge: Phillip J. Green |
| v. | |
| HILLSDALE COLLEGE, | |
| Defendant. | |

**BRIEF IN OPPOSITION TO HILLSDALE'S MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION .................................................................................................. 1

II.  BACKGROUND .................................................................................................. 2

III.  LEGAL STANDARD........................................................................................... 5

IV.  ARGUMENT ....................................................................................................... 6

    A.  Plaintiffs state claims under Title IX. .......................................................... 6

        1.  Hillsdale is subject to Title IX. ........................................................... 7

            a.  Title IX applies to schools that receive federal aid of any kind................ 7

            b.  A tax exemption constitutes federal aid for the purposes of anti-discrimination laws.................................................................................... 8

            c.  There is no basis for treating Title IX differently than other anti-discrimination laws.................................................................................... 9

        2.  Plaintiffs state Title IX claims. ......................................................... 14

            a.  Plaintiff Villarreal's Title IX claims are not barred because of the location of her assault. ....................................................................... 14

            b.  Plaintiffs state a Title IX claim for gender discrimination. ...................... 16

                i.  Deliberate Indifference to Prior Incidents........................................ 19

                ii.  Official Policy of Deliberate Indifference. ...................................... 22

                iii.  Other Elements................................................................................ 23

            c.  Plaintiffs state a Title IX claim for retaliation. .......................................... 25

    B.  Plaintiffs state a claim for negligence. ....................................................... 30

        1.  Plaintiffs established that Hillsdale owed Plaintiffs a legal duty....................... 30

        2.  Plaintiffs established breach, causation, and damages......................... 33

    C.  Plaintiffs state a claim for intentional infliction of emotional distress (IIED). .......... 35

    D.  Plaintiffs state a claim under the Elliot-Larsen Civil Rights Act (ELCRA)............... 38

    E.  Plaintiffs state a claim under the Michigan Consumer Protection Act (MCPA)........ 43

        1.  Plaintiffs are protected by the MCPA because the purchase of an undergraduate education is personal, not commercial or business-related........ 44

        2.  Plaintiffs' MCPA claims satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). ........................................................................... 45

            a.  Fraudulent Misrepresentation ................................................................. 45

            b.  Fraudulent Omission.............................................................................. 47

V.  CONCLUSION.................................................................................................... 48

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*,
   727 F.3d 502 (6th Cir. 2013) ............................................................... 34

*Allen v. Wright*,
   468 U.S. 737 (1984).............................................................................. 9

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009).............................................................................. 5

*Atl. Recording Corp. v. Project Playlist, Inc.*,
   603 F. Supp. 2d 690 (S.D.N.Y. 2009) ................................................... 7

*Austin-Hall v. Woodard*,
   No. 3:18-CV-270, 2020 WL 5943018 (S.D. Ohio Oct. 7, 2020) ........... 41

*Avila v. Citrus Community College Dist.*,
   38 Cal.4th 148 (2006) ........................................................................... 31

*Bailey v. Schaaf*,
   494 Mich. 595 (2013) ............................................................................ 32

*Barlow v. State*,
   540 P.3d 783 (Wash. 2024) .............................................................. 25, 31

*Barnett v. Kapla*,
   No. 20-CV-03748-JCS, 2020 WL 7428321 (N.D. Cal. Dec. 18, 2020) .................. 18

*Bledsoe v. FCA US LLC*,
   378 F. Supp. 3d 626 (E.D. Mich. 2019).................................................. 46

*Bob Jones University v. United States*,
   461 U.S. 574 (1983)...................................................................... 8, 9, 12

*Bose v. Bea*,
   947 F.3d 983 (6th Cir. 2020) ........................................................... 27, 28

*Bostock v. Clayton Cnty.*,
   140 S. Ct. 1731 (2020)........................................................................... 10

*Bowers v. Ophthalmology Grp.*,
   733 F.3d 647 (6th Cir. 2013) ............................................................. 6, 21

*Brennan v. Norton*,
   350 F.3d 399 (3d Cir. 2003) .................................................................. 30

*Brisboy v. Fibreboard Corp.*,
   429 Mich. 540 (1988) ............................................................................ 34

*Brock v. Mich. State Univ.*,
   No. 1:21-CV-436, 2022 WL 178681 (W.D. Mich. Jan. 20, 2022)........... 36

*Brown v. Arizona*,
   82 F.4th 863 (9th Cir. 2023) .................................................................. 14

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Brown v. Bargery*,
207 F.3d 863 (6th Cir. 2000) ....................................................... 6, 15

*Brownlow v. McCall Enterprises*, *Inc.*,
315 Mich. App. 103 (2016) .............................................................. 44

*Cannon v. Univ. of Chicago*,
441 U.S. 677 (1979)........................................................................ 13

*Cavalier v. Cath. Univ. of Am.*,
306 F. Supp. 3d 9 (D.D.C. 2018) .................................................... 29

*Coghlan v. Beta Theta Pi Fraternity*,
133 Idaho 388 (1999)...................................................................... 33

*Comm. For Pub. Ed. & Religious Liberty v. Nyquist*,
413 U.S. 756 (1973)......................................................................... 7

*Cook v. Bennett*,
94 Mich. App. 93 (1979) ................................................................. 41

*David v. Royal Caribbean Cruises Ltd.*,
No. 1:19-CV-21657-UU, 2019 WL 13235812 (S.D. Fla. Apr. 30, 2019)................................ 34

*Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*,
526 U.S. 629 (1999)................................................................... passim

*Dibbern v. Univ. of Michigan*,
No. 12-15632, 2013 WL 6068808 (E.D. Mich. Nov. 18, 2013)............................................ 17

*Doe 1 v. Baylor Univ.*,
240 F. Supp. 3d 646 (W.D. Tex. 2017) ............................................ 23

*Doe 1 v. Univ. of San Francisco*,
No. 22-CV-01559-LB, 2023 WL 5021811 (N.D. Cal. Aug. 4, 2023)..................................... 22

*Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*,
345 Mich. App. 35 (2022) ......................................................... 39, 41

*Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*,
35 F.4th 459 (6th Cir. 2022), *cert. denied sub nom. Metro. Gov't of Nashville & Davidson
Cnty., Tennessee v. Doe*, 143 S. Ct. 574 (2023); *cf. Doe A v. Plainfield Cmty. Consol. Sch.
Dist. 202*, No. 21 C 4460, 2023 WL 2428870 (N.D. Ill. Mar. 9, 2023) ........................... 17, 18

*Doe v. Columbia Coll. Chicago*,
299 F. Supp. 3d 939 (N.D. Ill. 2017) ............................................... 41

*Doe v. Morgan State Univ.*,
544 F. Supp. 3d 563 (D. Md. 2021) ...................................... 26, 29, 30

*Doe v. Plymouth-Canton Cmty. Sch.*,
2022 WL 1913074 (E.D. Mich. June 3, 2022) ................................... 16

*Doe v. Syracuse Univ.*,
No. 22-2674, 2023 WL 7391653 (2d Cir. Nov. 8, 2023) ..................... 28

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Doe v. Univ. of Denver*,
　2022 COA 57, 516 P.3d 946 cert. granted in part, No. 22SC499, 2023 WL 2372557 (Colo.
　Mar. 6, 2023) ......................................................................................................................... 33

*Doe v. Univ. of Kentucky*,
　971 F.3d 553 (6th Cir. 2020) ................................................................................................. 13

*Doe v. Univ. of Memphis*,
　No. 2:18-CV-2032-MSN-CGC, 2019 WL 13131407 (W.D. Tenn. Nov. 27, 2019) ................ 14

*Doe v. Univ. of Tennessee*,
　186 F. Supp. 3d 788 (M.D. Tenn. 2016) ..................................................................... 17, 18, 25

*Duranceau v. Alpena Power Co.*,
　250 Mich. App. 179 (2002) .................................................................................................... 42

*E.H. by & through Herrera v. Valley Christian Academy*,
　616 F. Supp. 3d 1040 (C.D. Cal. 2022) ........................................................................ 7, 10, 11

*Eide v. Kelsey-Hayes Co.*,
　431 Mich. 26 (1988) .............................................................................................................. 39

*El-Hallani v. Huntington Nat'l Bank*,
　623 F. App'x 730 (6th Cir. 2015) ........................................................................................ 6, 21

*Emeldi v. Univ. of Oregon*,
　698 F.3d 715 (9th Cir. 2012) ................................................................................................. 26

*Erickson v. Pardus*,
　551 U.S. 89 (2007) .................................................................................................................. 6

*Estate of Qing Kong v. A.J. Marshall Co.*,
　233 Mich. App. 229 (1998) .................................................................................................... 32

*Farmer v. Kansas State Univ.*,
　918 F.3d 1094 (10th Cir. 2019) .............................................................................................. 14

*Foster v. Board of Regents of University of Michigan*,
　982 F.3d 960 (6th Cir. 2020) ................................................................................................. 21

*Fulani v. League of Women Voters Educ. Fund*,
　684 F. Supp. 1185 (S.D.N.Y. 1988), *aff'd*, 882 F.2d 621 (2d Cir. 1989) ................................ 11

*Fultz v. Union-Commerce Assocs.*,
　470 Mich. 460 (2004) ........................................................................................................... 32

*Garrett v. Ohio State Univ.*,
　60 F.4th 359 (6th Cir.) ........................................................................................................... 28

*Gebser v. Lago Vista Indep. Sch. Dist.*,
　524 U.S. 274 (1998) ............................................................................................................... 27

*Geisinger Health Plan v. Comm'r*,
　985 F.2d 1210 (3rd Cir. 1993) ............................................................................................... 12

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Gordon v. Traverse City Area Pub. Sch.*,
  686 F. App'x 315 (6th Cir. 2017)............................................................. 26

*Graves v. Warner Bros.*,
  253 Mich. App. 486 (2002). ...................................................................... 32

*Green v. Connally*,
  330 F. Supp. 1150 (D.D.C. 1971)............................................................. 8

*Grove City Coll. v. Bell*,
  465 U.S. 555 (1984)................................................................................ 8, 9

*H.M.T. by & through Ce.T. v. Metro. Gov't of Nashville & Davidson Cnty.*,
  No. 3:22-CV-00402, 2023 WL 2287635 (M.D. Tenn. Feb. 28, 2023)................... 20

*Hamed v. Wayne Cnty.*,
  490 Mich. 1 (2011) ................................................................................. 41

*Hedrick v. W. Michigan Univ.*,
  No. 1:22-CV-308, 2022 WL 10301990 (W.D. Mich. Oct. 17, 2022) .............. 31, 41

*Hill v. Snyder*,
  878 F.3d 193 (6th Cir. 2017) ................................................................... 5

*Horner v. Ky. High Sch. Athletic Ass'n*,
  43 F.3d 265 (6th Cir. 1994) .................................................................... 13

*Horocofsky v. City of Lawrence*,
  No. 20-2529-EFM, 2022 WL 1421554 (D. Kan. May 5, 2022), *reconsideration denied sub nom. Horocofsky v. City of Lawrence, Kansas*, No. 20-2529-EFM, 2022 WL 2802316 (D. Kan. July 18, 2022)................................................................................... 14

*Huang v. Ohio State Univ.*,
  No. 2:19-CV-1976, 2022 WL 16715641 (S.D. Ohio Nov. 4, 2022) ...................... 28

*In re Doe*,
  No. 264679, 2006 WL 475285 (Mich. Ct. App. Feb. 28, 2006)....................... 32, 41

*In re Gen. Motors Air Conditioning Mktg & Sales Practices Litig*,
  406 F. Supp. 3d 618 (E.D. Mich. 2019).................................................... 47

*Jackson v. Birmingham Bd. of Educ.*,
  544 U.S. 167 (2005).............................................................................. 9, 25

*K.S. v. Detroit Public Schools*,
  130 F. Supp. 3d 1073 (E.D. Mich. 2015).................................................. 40

*Kaiser v. Allen*,
  480 Mich. 31 (2008) ............................................................................. 34

*Kalich v. AT & T Mobility, LLC*,
  679 F.3d 464 (6th Cir. 2012) ................................................................. 41

*Karasek v. Regents of Univ. of Calif.*,
  534 F. Supp. 3d 1136 (N.D. Cal. 2021 ................................................... 23

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Karasek v. Regents of Univ. of California*,
 956 F.3d 1093 (9th Cir. 2020) ............................................... 18

*Keys v. Humana, Inc.*,
 684 F.3d 605 (6th Cir. 2012) .................................................. 6

*Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*,
 645 F. Supp. 3d 1134 (D. Kan. 2022), *aff'd*, 94 F.4th 936 (10th Cir. 2024) ........................ 26

*Kollaritsch v. Michigan State Univ. Bd. of Trustees*,
 944 F.3d 613 (6th Cir. 2019) ................................................ 17

*Lewis v. LeGrow*,
 258 Mich. App. 175 (2003) .................................................. 36

*Linebaugh v. Sheraton Michigan Corp.*,
 198 Mich. App. 335 (1993) .................................................. 36

*Lipian v. Univ. of Michigan*,
 453 F. Supp. 3d 937 (E.D. Mich. 2020) ................................ 16, 17

*M.H.D. v. Westminster Sch.*,
 172 F.3d 797 (11th Cir. 1999) .............................................. 11

*MacDonald v. Thomas M. Cooley L. Sch.*,
 724 F.3d 654 (6th Cir. 2013) ................................................ 45

*Massey v. Scripter*,
 401 Mich. 385 (1977) ......................................................... 33

*McCauley v. City of Chicago*,
 671 F.3d 611 (7th Cir. 2011) ................................................ 20

*McGlotten v. Connally*,
 338 F. Supp. 448 (D.D.C. 1972 ............................................ 11

*Murdock v. Higgins*,
 454 Mich. 46 (1997) ........................................................... 30

*N. Haven Bd. of Educ. v. Bell*,
 456 U.S. 512 (1982) ......................................................... 9, 13

*Nat'l Collegiate Athletic Ass'n v. Smith*,
 525 U.S. 459 (1999) ............................................................. 8

*New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*,
 44 F.4th 393 (6th Cir. 2022) ................................................ 45

*Noggles v. Battle Creek Wrecking, Inc.*,
 153 Mich. App. 363 (1986) .................................................. 44

*Nova Se. Univ., Inc. v. Gross*,
 758 So. 2d 86 (Fla. 2000) .................................................... 33

*Paralyzed Veterans* ............................................................... 10

- vi-

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Pennhurst State Sch. & Hosp. v. Halderman*,
    451 U.S. 1 (1981)................................................................................................. 12

*Pogorzelska v. VanderCook Coll. of Music*,
    442 F. Supp. 3d 1054 (N.D. Ill. 2020) ................................................................ 29

*Radtke v. Everett*,
    442 Mich. 368 (1993) ......................................................................................... 41

*Reed v. S. Illinois Univ.*,
    No. 3:18-CV-1968-GCS, 2020 WL 3077186 (S.D. Ill. June 10, 2020) ................... 17

*Regan v. Tax'n With Representation of Washington*,
    461 U.S. 540 (1983)............................................................................................... 8

*Regents of Univ. of California v. Superior Ct.*,
    4 Cal. 5th 607 (2018) .......................................................................................... 31

*Reid v. Gen Motors LLC*,
    491 F. Supp. 3d 268 (E.D. Mich. 2020).............................................................. 46

*Reinert v. Dolezel*,
    147 Mich. App. 149 (1985) ................................................................................. 41

*Republic Bank & Tr. Co. v. Bear Stearns & Co.*,
    683 F.3d 239 (6th Cir. 2012) .............................................................................. 47

*Roe v. Marshall Univ. Bd. of Governors*,
    668 F. Supp. 3d 461 (S.D.W. Va. 2023)................................................... 14, 15, 16

*Roskin-Frazee v. Columbia Univ.*,
    No. 17 CIV. 2032 (GBD), 2018 WL 6523721 (S.D.N.Y. Nov. 26, 2018)............... 17

*Roulo v. Automobile Club of Mich.*,
    386 Mich. 324 (1971) ......................................................................................... 30

*S.C. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,
    579 F. Supp. 3d 999 (M.D. Tenn. 2022).................................................. 15, 20, 22

*S.C. v. Metro. Gov't of Nashville*,
    86 F.4th 707 (6th Cir. 2023) ............................................................................... 20

*Schemansky v. California Pizza Kitchen, Inc.*,
    122 F. Supp. 2d 761 (E.D. Mich. 2000).............................................................. 41

*Schutte v. Celotex Corp.*,
    196 Mich. App. 135 (1992) ................................................................................. 35

*Scott v. Harper Recreation, Inc.*,
    444 Mich. 441 (1993) ......................................................................................... 32

*Sheridan v. Forest Hills Pub. Sch.*,
    247 Mich. App. 611 (2001) ................................................................................. 41

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*Simpson v. Univ. of Colorado Boulder*,
   500 F.3d 1170 (10th Cir. 2007) ................................................................ 22

*Sistrunk v. City of Strongsville*,
   99 F.3d 194 (6th Cir. 1996) ...................................................................... 6

*Speed Way Transportation, LLC v. City of Gahanna, Ohio*,
   No. 21-3657, 2023 WL 2293099 (6th Cir. Mar. 1, 2023) .................................. 6, 21

*Steward Mach. Co. v. Davis*,
   301 U.S. 548 (1937).................................................................................. 12

*The Ohio State Univ. v. Gonzales*,
   143 S. Ct. 2659 (2023).............................................................................. 28

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*,
   477 U.S. 597 (1986).............................................................................. 7, 12

*Vance v. Spencer County Public School Dist.*,
   231 F.3d 253 (6th Cir. 2000) ................................................................. 16, 25

*Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675 (1970) ...................... 9, 10

*Wamer v. Univ. of Toledo*,
   27 F.4th 461 (6th Cir.), *cert. denied*, 143 S. Ct. 444 (2022)............................... 16

*Ware v. Univ. of Vermont & State Agric. Coll.*,
   No. 2:22-CV-212, 2024 WL 989804 (D. Vt. Mar. 7, 2024)................... 19, 23, 25, 35

*Weckhorst v. Kansas State Univ.*,
   241 F. Supp. 3d 1154 (D. Kan. 2017)...................................................... 14, 23

*Williams v. Port Huron Area Sch. Dist. Bd. of Educ.*,
   No. 06-14556, 2010 WL 1286306 (E.D. Mich. Mar. 30, 2010)............................ 38

*Williams v. Port Huron Sch. Dist.*,
   455 F. App'x 612 (6th Cir. 2012).............................................................. 38

*Zine v. Chrysler Corp.*,
   236 Mich. App. 261 (1999) ...................................................................... 44

**Statutes**

20 U.S.C. § 1681(a) ............................................................................. 8, 16

20 U.S.C. § 1682.................................................................................... 9

31 C.F.R. § 28.135 ................................................................................. 13

31 C.F.R. § 28.140 ................................................................................. 13

34 C.F.R. § 106.2(g) ............................................................................... 11

42 U.S.C. § 18116(a) .............................................................................. 7

MCL 37.2102(1) ................................................................................... 39

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

MCL 37.2103(i) ................................................................................ 40, 43

MCL 37.2401 ........................................................................................ 40

MCL 37.2402(a) .................................................................................... 40

MCL 445.902(g) .................................................................................... 44

MCL 445.903 ........................................................................................ 43

**Rules**

Fed. R. Civ. P. 8(a)(2) ............................................................................ 6

Fed. R. Civ. P. 9(b) .............................................................................. 45

**Treatises**

Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, coms. e & h, pp. 41-42 .......... 30

Restatement (Second) of Torts, § 46, cmt. e, f ........................................ 36

**Other Authorities**

Bessel Van der Kolk, *The Body Keeps the Score 21* (Viking, 2014) ............................. 3

H.R. Res. 190, 98th Cong., 1st Sess. (1983) ........................................ 8, 10

S. Rep. No. 100-64 (June 5, 1987) ........................................................ 10

S. Rep. No. 100-64 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. ........................ 8

S. Res. 149, 98th Cong., 1st Sess. (1983) .............................................. 8

Webster's Third New International Dictionary of the English Language 132, 851 (1961) ......... 10

## I.  INTRODUCTION

Just as it claims to prospective students, Hillsdale College argues again here that its "commitment to gender equality is unmatched" and that its Sexual Misconduct Policy is "[f]ar more robust than those of its federally funded peers." ECF No. 24-2 ("Mot.") at 1. In reality, female students at Hillsdale face an unacceptable and unusually high risk of sexual assault as a result of the unsafe campus environment that Hillsdale created and maintains. When this risk is realized, Hillsdale's Sexual Misconduct Policy not only fails to protect students who report their sexual assaults to the college, but further traumatizes those students in the process.

This is not speculation: while students at Hillsdale, both Plaintiffs Chen and Villarreal were raped by male peers who were undeterred by any risk of consequence from Hillsdale. And indeed: when Plaintiffs reported their assaults to Hillsdale, they learned that the school's Sexual Misconduct Policy was designed neither to protect them nor to hold their abusers accountable. Both women were met with inadequate responses from Hillsdale, with problems ranging from delay and lack of transparency to outright blame for their assaults and threats of retaliation from the Hillsdale administration.

Though thus far only Plaintiffs have bravely come forward to bring this lawsuit, the Amended Complaint makes clear that they are not alone. Plaintiffs allege that they and other female Hillsdale students have been—and continue to be—put at increased risk of harm by the deficiencies in Hillsdale's system for preventing, identifying, and responding to instances of sexual assault. They plausibly state claims for gender discrimination and retaliation under Title IX, negligence, intentional infliction of emotional distress, and violations of the Elliot Larsen Civil Rights Act and Michigan Consumer Protection Act.[1]

---

[1] The sufficiency of Plaintiffs' class allegations—on behalf of a proposed class of female students enrolled at Hillsdale from October 25, 2017 onwards—are addressed in Plaintiffs' Opposition to Hillsdale's Motion to Strike, submitted concurrently with this briefing.

Neither the existence of Hillsdale's inadequate Sexual Misconduct Policy nor the school's funding structure operate (as Hillsdale claims) as a shield from scrutiny or liability under Title IX or Michigan law. To the contrary: because Plaintiffs plausibly allege claims under both federal and state law, these claims should proceed to discovery so that a fact-finder can assess whether Hillsdale's Sexual Misconduct Policy is as "robust" as it claims, and as necessary to satisfy the school's legal duties. For the reasons explained in this Opposition, the Court should therefore deny Hillsdale's Motion to Dismiss Plaintiffs' Amended Complaint in its entirety.

## II.    BACKGROUND

Hillsdale is a small private college in southern Michigan and a registered 501(c)(3) entity. EFC No. 19 ("FAC") ¶ 7. By design, Hillsdale is shaped and guided by conservative Christian values. *Id.* ¶ 7-9; *see also* Mot. at 6 ("Hillsdale expects its students to uphold their moral commitments to God.").

In a stated effort to be free from government oversight and interference, Hillsdale relies on private funding. FAC ¶ 10 (quoting the Hillsdale website). Hillsdale does not follow Title IX's guidelines on sex discrimination, including regarding sexual misconduct toward students. *Id.* ¶ 11. Instead, Hillsdale utilizes a Sexual Misconduct Policy (the "Policy") that is inherently contradictory, confusing, and ambiguous. *Id.* ¶ 21.

Among other issues, the Policy: (1) fails to delineate what is prohibited behavior, and instead disavows *any* extramarital sexual activity; (2) fails to specify consequences for prohibited behavior; (3) fails to directly discuss consent and incapacitation[2]; (4) is vague as to when

---

[2] Though the Policy may seem robust on its face by using these buzzwords, it does not actually reference or define them in the policy proper. FAC ¶¶ 40-41. Instead, readers must navigate to separate web pages for brief statements about "Understanding Consent", "Understanding Incapacitation," and "Frequently Asked Questions." *Id*. This piecemeal format suggests that consent and incapacitation are irrelevant or only tangentially related to a discussion of sexual assault, and are not part of the Policy itself. *Id*.

students can expect confidentiality; (5) allocates complete discretion to the Deans, such that it is impossible to know what actions or decisions to expect in any given circumstance; and (6) is not effectively, transparently, or fairly enforced. *Id*. at p. 2, ¶¶ 22-24, 32-39, 40-60.

In light of the forgoing, it is unsurprising that the unusually high frequency of sexual assaults of Hillsdale students, and the school's pattern of improper handling of student reports, is common knowledge on campus. *See, e.g.,* FAC ¶ 63 (noting these issues are "notorious within the college's student body and [have] been for several decades"); ¶ 14 (alleging a "long history of mismanaging student reports of assault"); ¶ 26 (stating that it is "well known" among the student body that sexual assault investigations are handled "if at all, more leniently than other violations of Hillsdale's 'Honor Code'"). Though students have "long spoken up about sexual assault on campus and advocated for a stronger and more concrete sexual misconduct policy," Hillsdale has "ignored the sexual assault and harassment occurring under its watch and allowed it to continue." *Id*. ¶¶ 12, 210.[3]

Plaintiff Chen is a current Hillsdale student. FAC ¶ 1. In November 2021, she was raped by a fellow Hillsdale track athlete in a dormitory on campus. *Id*. ¶ 68. When she reported the rape to a school counselor, the counselor confirmed that Plaintiff Chen had been sexually assaulted, but warned that the Deans would take no action without "concrete evidence" of the assault. *Id*. ¶¶ 70-71. Despite this discouragement, Plaintiff Chen proceeded with reporting her assault after hearing that her assailant might be going after other women. *Id*. ¶¶ 72-73.

---

[3] Both assault and the risk of assault are traumas that impair students' abilities to learn, develop, communicate and grow. FAC ¶ 208, n. 36 (citing Bessel Van der Kolk, *The Body Keeps the Score 21* (Viking, 2014)) ("Trauma results in a fundamental reorganization of the way mind and brain manage perceptions. It changes not only how we think and what we think about, but also our very capacity to think."); *id*. at 44-45 (trauma deactivates the left hemisphere of the brain, which "has a direct impact on the capacity to organize experience into logical sequences… In technical terms they are experiencing the loss of executive function."); *id*. at 46 ("The insidious effects of constantly elevated stress hormones include memory and attention problems…"); *id*. at 70 ("attention, concentration, and new learning . . . are compromised by trauma").

In response, Hillsdale met Plaintiff Chen not with support (or concern for other potential victims) but with recrimination. Hillsdale's Dean of Women, Rebekah Dell, warned Plaintiff Chen that her assailant might pursue a counter-suit, presumably for defamation. *Id.* ¶ 75. Plaintiff Chen nevertheless proceeded in meeting with Hillsdale legal counsel Kimberley Graham, who informed Plaintiff Chen that her assailant did not refute her allegations. *Id.* ¶ 77. However, Ms. Graham went on to downplay the assault, commenting to Plaintiff Chen that she was "fortunate that her assailant did not rape her." *Id.* ¶ 79. Plaintiff Chen was, in fact, raped. *Id.* at p.1.

After refusing to interview witnesses identified by Plaintiff Chen, Ms. Graham then delivered her "findings" that Plaintiff Chen was not sexually assaulted, and that her assailant would not be punished. *Id.* ¶¶ 80, 82-83. Ms. Graham suggested that Plaintiff Chen "take time off" to "put the sexual assault behind her" so that she could be "friends" with her assailant in the future. *Id.* ¶ 84. She stated that there would be a no-contact order, but one was never implemented. *Id.* ¶¶ 85-87. As a result, Plaintiff Chen was forced to encounter her rapist regularly. *Id.* ¶ 87.

When Plaintiff Chen's mother contacted the Deans requesting a meeting and a copy of the written investigation report, Hillsdale legal counsel Bob Norton dared her to get a lawyer and said that if she read the report, she would know her daughter was lying. *Id.* ¶¶ 88-91, 222. Hillsdale continued to rebuff Plaintiff Chen and her mother's requests for transparency and clarity. *Id.* ¶¶ 92-93, 97-98. Today, Plaintiff Chen suffers emotional distress from the assault and her continued encounters with her rapist, hindering her athletic and academic performance at Hillsdale. *Id.* ¶ 99.

Plaintiff Villarreal is a former Hillsdale student. In August 2021, she was raped by a fellow student and member of Hillsdale's baseball team at his apartment five minutes away from

campus. FAC ¶ 100. She reported the rape to local police and Hillsdale's Dean of Men, Aaron Peterson. *Id.* ¶¶ 101-102.

When Plaintiff Villarreal first met with Hillsdale legal counsel Mechelle Zarou, Ms. Zarou indicated that the facts aligned with the definition of sexual assault. *Id.* ¶ 105. Yet Ms. Zarou took weeks to interview Villarreal's assailant. *Id.* ¶ 106. Once she did, she implied that Plaintiff Villarreal was to blame for the rape, noting that she had initiated romantic contact earlier in the evening. *Id.* ¶¶ 107-109.

When she delivered her "findings," Ms. Zarou admitted she had taken too long to meet with Plaintiff Villarreal's rapist and agreed that he had acted without consent, but said that he would not be expelled. *Id.* ¶ 114. He was put on social probation and athletic suspension, but these remedies were not enforced, forcing Plaintiff Villarreal to see her rapist daily. *Id.* ¶¶ 115-120, 123.

In speaking with Plaintiff Villarreal's parents, Hillsdale counsel Bob Norton falsely stated that Plaintiff Villarreal had engaged in a consensual sexual encounter that she later came to regret, and threatened that if she continued to inquire about the investigation, "there would be consequences for her." *Id.* ¶¶ 121-122. These events caused Plaintiff Villarreal to suffer from depression, socially isolate herself, and ultimately withdraw from Hillsdale. *Id.* ¶ 123.

## III.   LEGAL STANDARD

In considering a motion to dismiss, courts must construe the complaint in the light most favorable to the plaintiff, and accept all well-pleaded factual allegations as true. *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). The complaint need only give the defendant fair notice of what the claim is and the grounds upon which it rests; a "short and plain statement . . . showing that the pleader is entitled to relief"

suffices. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007); Fed. R. Civ. P. 8(a)(2)).

The Sixth Circuit has cautioned: "Dismissal of a complaint for the failure to state a claim on which relief may be granted is appropriate *only if* it appears *beyond a doubt* that the plaintiff can prove *no set of facts* in support of his claim that would entitle him to relief." *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (emphasis added) (citing *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996)). Critically, "at the pleadings stage, Plaintiffs are not required to produce evidence to support their claims." *Speed Way Transportation, LLC v. City of Gahanna, Ohio*, No. 21-3657, 2023 WL 2293099, at *5 (6th Cir. Mar. 1, 2023) (citing *Bowers v. Ophthalmology Grp.*, 733 F.3d 647, 655 (6th Cir. 2013)).

This is so because "[u]ntil discovery has begun, the plaintiff simply may not have access to all the facts." *Id.* (citing *El-Hallani v. Huntington Nat'l Bank*, 623 F. App'x 730, 735 (6th Cir. 2015)). That fact is particularly salient in "a case where a pattern or practice of discrimination is at issue"—in such cases, "the court must be aware that the plaintiff will have limited access to the crucial information regarding how the defendant treated other[s]." *El-Hallani*, 623 F. App'x at 735. Courts should take into account logistical circumstances that prevent a plaintiff from obtaining evidence supporting her claim, and adjust the plausibility threshold to account for these difficulties. *Id.*

## IV.   ARGUMENT

### A.   Plaintiffs state claims under Title IX.

Hillsdale is not shy about its "principled refusal" to accept government funding in the hopes "that it may operate independently" of federal funding obligations, including Title IX. Mot. at 6. But Hillsdale's gambit has failed. As set forth below, the College is subject to Title IX and Plaintiffs plausibly allege claims under Title IX.

### 1.     Hillsdale is subject to Title IX.

Hillsdale openly and proudly ignores Title IX's guidelines on the handling of sexual assault cases, which establish best practices for reducing and responding to instances of sexual misconduct on college campuses across the country.[4] Hillsdale believes it is unique among American colleges in its ability to ignore Title IX because it (currently) refuses federal funding. Mot. at 6. But Hillsdale admits that it sought and obtained 501(c)(3) tax-exempt status. Mot. at 12. Section 501(c)(3) tax benefits are financial assistance because they assist schools with their finances: the exemption saves schools money on their taxes, and the charitable contribution deduction helps them raise funds. *See U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986) (explaining that federal financial assistance may take nonmoney form"); *Comm. For Pub. Ed. & Religious Liberty v. Nyquist*, 413 U.S. 756, 759 (1973) (characterizing a tax credit as "financial assistance"); 42 U.S.C. § 18116(a) (Affordable Care Act) (same). As another court has recognized, the affirmative act of seeking recognition as a 501(c)(3) non-profit organization—and ensuring financial benefit—renders a college subject to Title IX. *E.H. by & through Herrera v. Valley Christian Academy*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022).

### a.     Title IX applies to schools that receive federal aid of any kind.

Title IX states: "No person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). Title IX "encompasses *all*

---

[4] *See* Kayla McGhee, *Let's Talk About Sexual Assault on Campus*, The Collegian (Oct. 4, 2018), https://hillsdalecollegian.com/2018/10/lets-talk-sexual-assault-campus/ (cited at FAC ¶ 13) ("Hillsdale's distance from Title IX policies can also create confusion. . . . Hillsdale does not . . . check the government's prescribed boxes. So what, then, is Hillsdale's [sexual misconduct] policy?"). Like Hillsdale, Plaintiffs ask that the court consider documents incorporated by reference in the Amended Complaint in ruling on Hillsdale's Motion to Dismiss. *See Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 & n.3 (S.D.N.Y. 2009) ("Because the Website is incorporated by reference into the Complaint, the Court may consider it on a motion to dismiss.").

forms of federal aid to education, direct or indirect." *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 466 (1999) (cleaned up), quoting *Grove City Coll. v. Bell*, 465 U.S. 555, 564 (1984). The primary legislative objective of Title IX was to "eliminate discrimination on the basis of sex . . . throughout the American educational system."  H.R. Res. 190, 98th Cong., 1st Sess. (1983); S. Res. 149, 98th Cong., 1st Sess. (1983); *see also* S. Rep. No. 100-64, at *7 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. at *9 (recognizing that Title IX was "passed to assist in the struggle to eliminate discrimination from our society *by ending federal subsidies of such discrimination*") (emphasis added).

### b.    A tax exemption constitutes federal aid for the purposes of anti-discrimination laws.

The Supreme Court has explained: "[T]ax exemptions . . . are a form of subsidy that is administered through the tax system. A tax exemption has much the same effect as a cash grant to the organization of the amount of tax it would have to pay on its income. . . . The system Congress has enacted provides this kind of subsidy to non profit civil welfare organizations generally[.] Congress chose . . . to subsidize [] activities that non profit organizations undertake to promote the public welfare." *Regan v. Tax'n With Representation of Washington*, 461 U.S. 540, 544 (1983). Tax-exempt non-profits are given "preferential treatment"—subsidies— "because they provide a benefit to society." *Bob Jones University v. United States*, 461 U.S. 574, 589 (1983). The federal government is "compensated for the loss of revenue by its relief from financial burdens which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of the general welfare." *Id.* at 590. In light of this system, it was long-ago settled that non-profit organizations are subject to federal antidiscrimination rules. *See, e.g., Green v. Connally*, 330 F. Supp. 1150, 1162 (D.D.C. 1971) (holding that private schools which discriminate are not entitled to tax-exempt status given "general and well-established principle that the Congressional intent in providing tax deductions

and exemptions is not construed to be applicable to activities that are either illegal or contrary to public policy"); *see also Bob Jones University v. U.S.*, 461 U.S. 574 (1983) (holding that the government may revoke tax-exempt status for racial discrimination).

**c.** <u>**There is no basis for treating Title IX differently than other anti-discrimination laws.**</u>

Neither Congress, the Supreme Court, nor the Internal Revenue Service has defined "federal financial assistance" as it pertains to Title IX. As such, there is no basis for the conclusion that the long-held principle—that schools that receive federal aid lose their license to discriminate—would not apply equally to Title IX. Plaintiffs respectfully submit that this court should therefore follow the case law soundly concluding that it does.

Title IX itself is silent as to the meaning of the phrase "federal financial assistance." Title IX authorizes enforcement to agencies "empowered to extend Federal financial assistance to any education program or activity, by way of grant, loan, or contract." 20 U.S.C. § 1682. But courts have used the word "grant" to include more than just cash grants. *See, e.g., Bob Jones*, 461 U.S. at 577-78 (stating that the IRS "granted tax exempt-status to private schools" and "granted charitable deductions for contributions to such schools"); *id.* at 587 n.10 (describing charitable exemption and deduction as a "grant of tax benefits"); *Allen v. Wright*, 468 U.S. 737, 756 (1984) (referring to the "grant of a tax exemption"); *Walz v. Tax Comm'n of City of New York*, 397 U.S. 664, 675 (1970).

Importantly, Title IX is a "broadly written" law with a purposefully "broad reach." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). The Supreme Court has directed lower courts to "accord [it] a sweep as broad as its language" and avoid "limitation[s] not apparent on [the statute's] face. *Grove City*, 465 U.S. at 564 (quoting *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 521 (1982)). Congress has done the same. *See* S. Rep. No. 100-64, at \*7 (June 5, 1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 9 (urging courts to give Title IX "the

- 9-

broadest interpretation" possible); *see also* H.R. Res. 190, 98th Cong., 1st Sess. (1983) (stating that the legislature "intended that [Title IX] be applied comprehensively and in a manner designed to eliminate discrimination on the basis of sex . . . throughout the American educational system").

To interpret a statute, courts look to its "ordinary public meaning" of the text at the time of enactment. *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738, 1749 (2020). "Financial assistance" in 1972—when Title IX was passed—meant "help," "support" or "aid" "relating to" finances—just as we would understand the phrase in 2024. *See, e.g.,* Webster's Third New International Dictionary of the English Language 132, 851 (1961) (defining "financial" as "relating to finance or financiers" and "assistance" as "the help supplied or given; support" or "aid"). This comports with the Supreme Court's statement that "federal financial assistance may take nonmoney form" and may consist of any "thing of value*." Paralyzed Veterans*, 477 U.S. at 607; *see also Walz*, 397 U.S. at 690 (Brennan, J., concurring) (noting that "[t]ax exemptions and general subsidies . . . both provide economic assistance). When the text's ordinary public meaning is plain, as it is here, "[the Court's] job is at an end." *Bostock*, 140 S. Ct. at 1738.

Consistent with the text, several other courts have held that 501(c)(3) status is a form of federal financial assistance for the purposes of Title IX. In *E.H. by & through Herrera v. Valley Christian Academy*, a female student brought suit against a private religious school alleging sex discrimination in violation of Title IX based on the school's refusal to allow her to play in games against its football team. 616 F. Supp. 3d 1040 (C.D. Cal. 2022).[5] There, as here, the parties

---

[5] Though *Herrera* also considered whether the school's acceptance of a Paycheck Protection Program ("PPP") loan subjected it to Title IX, Hillsdale is incorrect that this issue controlled and the tax-exempt holding was "dicta." Mot. at 25. The *Herrera* court analyzed the PPP loan and tax-exempt status as two separate bases to confer a federal financial benefit, citing different arguments and law, and reaching different conclusions. 616 F. Supp. 3d at 1048-1050. That the court analyzed the PPP loan issue first has no bearing on its entirely separate analysis—in a

disputed the meaning of "federal financial assistance." *Id.* at 1048. Noting that § 1682 itself does

not provide a definition, the court looked to the Department of Education's meaning: "a grant or

loan of federal financial assistance [or] . . . any other contract, agreement, or arrangement which

has as one of its purposes the provision of assistance to any education program or activity[.]" *Id.*

(citing 34 C.F.R. § 106.2(g)). The *Herrera* court acknowledged that other courts had come out

on other side of the issue, but explained that those other courts had failed to contend with the

"plain purpose" of Title IX:

> [T]he plain purpose of the statute is controlling. Here that purpose
> is clearly to eliminate discrimination in programs or activities
> benefitting from federal financial assistance. Distinctions as to the
> method of distribution of federal funds or their equivalent seem
> beside the point, as the regulations issued by the various agencies
> make apparent.

*Id.* at 1050. The court supported its plain reading of Title IX with citation to the long history,

described above, of courts finding that tax exemption is sufficient to require adherence to federal

anti-discrimination laws. *See id*. (citing *McGlotten v. Connally*, 338 F. Supp. 448, 461 (D.D.C.

1972) (holding that "assistance provided through the tax system [in the form of federal tax

benefits] is within the scope of Title IV"). *See also M.H.D. v. Westminster Sch.*, 172 F.3d 797,

802 (11th Cir. 1999) (citing *McGlotten* and noting that "[b]ecause Title IX was modeled after

Title IV, [], *McGlotten* provides support for appellant's position" that a private school's tax-

exempt status subjected it to Title IX in case alleging sexual abuse of student by teacher); *Fulani*

*v. League of Women Voters Educ. Fund*, 684 F. Supp. 1185, 1192 (S.D.N.Y. 1988), *aff'd*, 882

F.2d 621 (2d Cir. 1989) (holding that defendant received federal financial assistance within the

meaning of Title VI and Title IX "through its tax exemption").[6]

---

separate section—regarding tax-exempt status. *Id*. Indeed, in that separate section, the court cites
two cases that pre-date PPP loans and independently analyzed tax exemptions. *Id.*
[6] The Fourth Circuit recently became the first federal appellate court to reject this reading, with
which no other appellate court has disagreed. *Buettner-Hartsoe v. Baltimore Lutheran High Sch.*

That Title IX is a Spending Clause statute does not change this analysis or conclusion, because Hillsdale remains "in a position to accept or reject" its obligations.[7] *Paralyzed Veterans*, 477 U.S. at 605. In *Steward Mach. Co. v. Davis*, the Supreme Court held that a provision of the Social Security Act offering tax credits only if a state established an unemployment insurance program was not unduly coercive because the state voluntarily chose to accept the tax break. 301 U.S. 548, 585-98 (1937); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) (finding that the conditional tax break was a valid exercise of the "spending power"). In much the same way, if Hillsdale does not want to comply with Title IX's conditions, then it is free to forfeit its tax benefit and "place itself where it was before the [tax-exempt status] was accepted." *See id.* at 592-93; *see also Geisinger Health Plan v. Comm'r*, 985 F.2d 1210, 1215 (3rd Cir. 1993) (explaining that "charitable exemptions from income taxation constitutes a *quid pro quo*: the public is willing to relieve an organization from paying income taxes because the organization is providing a benefit to the public").

The only question before the Court today is whether Title IX applies to schools, like Hillsdale, that accept a federal 501(c)(3) tax exemption. This is not, as Hillsdale would have the Court believe, a case that will "upend our constitutional order." Mot. at 3. Plaintiffs do not argue that all tax exemptions and deductions are necessarily "financial assistance"—but that 501(c)(3) tax benefits, as subsidies meant to aid recipients in exchange for their service in the public interest, are. *Bob Jones*, 461 U.S. at 589.

---

*Ass'n*, No. 23-1453, 2024 WL 1289592 (4th Cir. Mar. 27, 2024). That decision—which is not binding and does not consider the public policy goals of Title IX—need not and should not control the outcome here. *See Herrera*, 616 F. Supp. 3d at 1050 ("Absent any *controlling* precedent nor 'strong legislative history to the contrary,' the Court finds that 'the plain purpose of the statute is controlling.'") (emphasis added) (quoting *McGlotten*, 338 F. Supp. at 461).
[7] At least one federal Spending Clause statute—the Affordable Care Act—explicitly states that "federal financial assistance" includes tax credits. 42 U.S.C. § 18116(a); *see also id.* (cross-referencing Title IX).

And confirming that Title IX applies to 501(c)(3) institutions is not the sea change Hillsdale makes it out to be. Indeed, Title IX liability has evolved in myriad (and more dramatic) other ways over the years. *See Doe v. Univ. of Kentucky*, 971 F.3d 553, 557 (6th Cir. 2020) ("This statute has spawned various theories of liability and provides relief broadly to those who face discrimination on the basis of sex in the American education system."); *see also Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 629 (1999) (establishing Title IX liability for student-on-student harassment 27 years after enactment of Title IX); *N. Haven*, 456 U.S. at 521 (allowing employees to sue under Title IX); *Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979) (allowing applicants to sue under Title IX); *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 271-72 (6th Cir. 1994) (allowing student-athletes to sue under Title IX based on disparities in athletic programming). In line with the Supreme Court and Congress' directives, these decisions ensured that the statute's full breadth was enforced and that students at all types of educational institutions are afforded an equal experience.

Plaintiffs' request that this Court recognize that 501(c)(3) entities, too, must refrain from discriminating on the basis of gender is no monumental ask. Combatting sexual misconduct on campus poses no religious conflict, and Title IX leaves room for Hillsdale to structure a process in accordance with its values. *See* 31 C.F.R. §§ 28.135, 28.140 (requiring that recipients publish a nondiscrimination policy, have a prompt and equitable process to address complaints, and designate an employee to coordinate these functions). Thousands of educational institutions, including small and religious schools, comply with Title IX without objection and without substantial financial burden or compromising their religious beliefs. As a beneficiary of federal financial assistance, Hillsdale can—and must—do the same.

2.      **Plaintiffs state Title IX claims.**

a.      <u>**Plaintiff Villarreal's Title IX claims are not barred because of the location of her assault.**</u>

As a threshold matter, Hillsdale is wrong that because Plaintiff Villarreal's sexual assault occurred in an off-campus apartment, she cannot allege Title IX claims.[8] A Title IX claim requires that the defendant have "substantial control over both the harasser and the context in which the [] harassment occurs." *Davis*, 526 U.S. at 630. In *Davis*, the Supreme Court reasoned only that a Title IX defendant cannot be liable "where it lacks the authority to take remedial action." *Id.* at 630.

Though the Sixth Circuit has not directly addressed the question, district courts have declined to foreclose liability for off-campus conduct. *See, e.g., Doe v. Univ. of Memphis*, No. 2:18-CV-2032-MSN-CGC, 2019 WL 13131407, at *8 (W.D. Tenn. Nov. 27, 2019) ("Allowing Plaintiff to move forward at this stage of the litigation is consistent with the holdings of other district courts addressing cases involving allegations of off-campus assaults.") (citing cases). Multiple other federal courts have analyzed the question in depth and held that it is the context, rather than the location, in which the underlying assault or harassment occurs that is key to the *Davis* inquiry. *See Brown v. Arizona*, 82 F.4th 863, 878 (9th Cir. 2023) ("Location is only one factor in determining the control over context."); *Roe v. Marshall Univ. Bd. of Governors*, 668 F. Supp. 3d 461, 465 (S.D.W. Va. 2023) ("[U]nder the plain language of § 106.44(a), a plaintiff

---

[8] The non-binding authority Hillsdale cites in support of this argument dictates no such bright-line rule. *See Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1168 (D. Kan. 2017), *aff'd sub nom. Farmer v. Kansas State Univ.*, 918 F.3d 1094 (10th Cir. 2019) ("To the extent KSU argues here for a general prohibition on Title IX liability for harassment that occurs off campus, such a bright-line rule is foreclosed by [10th Circuit law]."); *Horocofsky v. City of Lawrence*, No. 20-2529-EFM, 2022 WL 1421554, at *15 (D. Kan. May 5, 2022), *reconsideration denied sub nom. Horocofsky v. City of Lawrence, Kansas*, No. 20-2529-EFM, 2022 WL 2802316 (D. Kan. July 18, 2022) (holding that Title IX liability arises when the defendant controls both the harasser and the program or activity in which the assault occurred). *See* Mot. at 30, 42, 47 (citing cases).

may bring a Title IX deliberate indifference claim alleging an institution's substantial control over the context of an incident premised upon the events or circumstances of that incident, regardless of the location at which the sexual harassment occurred."). Just as if a student who cheated on an exam taken remotely from an off-campus apartment would be subject to the school's academic integrity policy, a student who violates the Sexual Misconduct Policy should be held similarly accountable.

Here, Plaintiff Villarreal was raped by a fellow student and member of Hillsdale's baseball team at his apartment, which is a five-minute drive away from Hillsdale's campus. FAC ¶ 100. After determining that Plaintiff Villarreal's rapist did violate Hillsdale's Sexual Misconduct Policy, Hillsdale placed Plaintiff Villarreal's rapist on social probation, required him to do community service, and suspended him indefinitely from the baseball team. *Id.* ¶¶ 114, 115. Though the punishment was not enforced, these facts evidence Hillsdale's disciplinary authority over Plaintiff Villarreal's rapist for his off-campus sexual misconduct. That is sufficient to state a claim under Title IX. *See Brown*, 82 F.4th at 875 ("[A] key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place."). Indeed, as the *Brown* Court noted, the "discipline-related factor" has been critical in other courts' assessment of Title IX claims regarding off-campus conduct. *Id.* at 878; *see also S.C. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 579 F. Supp. 3d 999, 1034 (M.D. Tenn. 2022) (holding that school's disciplinary action against plaintiff was evidence of the institution's substantial control over the context of an off-campus incident of sexual harassment); *Marshall Univ.*, 668 F. Supp. 3d at 467 (same). Moreover, Hillsdale's

Sexual Misconduct Policy governs student behavior both on and off campus. It follows that Hillsdale's Title IX obligations should do the same.[9]

**b.    Plaintiffs state a Title IX claim for gender discrimination.**

Title IX prohibits discrimination on the basis of sex under any program or activity receiving federal financial assistance. 20 U.S.C. § 1681(a). In *Davis*, the Supreme Court held that a school could be liable under Title IX for subjecting "students to discrimination where [the school] is deliberately indifferent to known acts of student-on-student harassment and the harasser is under the school's disciplinary authority." 526 U.S. at 646–47.

Deliberate indifference exists where the defendant's "response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." *Id.* at 648. Once a plaintiff shows that a defendant has actual notice that students are threatened, "the analysis shifts to the reasonableness of the [defendant's] response." *Lipian v. Univ. of Michigan*, 453 F. Supp. 3d 937, 961 (E.D. Mich. 2020).

A response is unreasonable when the defendant "has actual knowledge that its efforts to remediate are ineffective, and it continues to use those same methods to no avail[.]" *Vance v. Spencer County Public School Dist.*, 231 F.3d 253, 262 (6th Cir. 2000). Though Hillsdale claims otherwise, Mot. at 28, citing *Doe v. Plymouth-Canton Cmty. Sch.*, 2022 WL 1913074, at *10 (E.D. Mich. June 3, 2022), there is no "special circumstances" test for post-secondary institutions—courts often allow Title IX deliberate indifference claims against universities to proceed. *See, e.g., Wamer v. Univ. of Toledo*, 27 F.4th 461 (6th Cir.), *cert. denied*, 143 S. Ct. 444 (2022) (student pled plausible claim against university for deliberate indifference to sexual

_____

[9] Several of the courts that considered this issue did so "at the summary judgment stage, after discovery had been conducted into the level of control the institutions exercised." *Marshall Univ.*, 668 F. Supp. 3d at 466. Should the Court have questions about the applicability of Title IX to Plaintiff Villarreal's off-campus assault—those questions should be answered after discovery has occurred.

harassment); *Lipian*, 453 F. Supp. 3d at 963 (denying university's motion for summary judgment on student's deliberate indifference claim); *Dibbern v. Univ. of Michigan*, No. 12-15632, 2013 WL 6068808, at *8 (E.D. Mich. Nov. 18, 2013) (denying university's motion to dismiss graduate student's deliberate indifference claim based on sexual harassment); *Doe v. Univ. of Tennessee*, 186 F. Supp. 3d 788 (M.D. Tenn. 2016) (denying university's motion to dismiss students' deliberate indifference claims based on sexual assaults); *Doe v. Univ. of Memphis*, 2019 WL 13131407, at *8 (denying university's motion to dismiss student's deliberate indifference claim based on sexual assaults).

In the Sixth Circuit, there are two types of Title IX deliberate indifference claims: "before" claims and "after" claims. Here, Plaintiffs allege only "before" claims.[10]

For a Title IX "before" claim, a plaintiff must show: (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious[11] (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was so severe, pervasive, and

---

[10] Regarding "after" claims, *Kollaritsch* held that a plaintiff must plead "an incident of actionable sexual harassment, the school's actual knowledge of it, some further incident of actionable sexual harassment, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 623 (6th Cir. 2019). Because neither Plaintiff alleges a "further incident of actionable sexual harassment," Plaintiffs do not allege an "after" Title IX deliberate indifference claim.

[11] Hillsdale misrepresents this element, claiming the school must have knowledge of a particularized risk to the plaintiff specifically. Mot. at 32. The Sixth Circuit explicitly adopted the Ninth Circuit's *Karasek* test for "before" claims, which has no such requirement. *Doe on behalf of Doe #2 v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 35 F.4th 459, 465 (6th Cir. 2022), *cert. denied sub nom. Metro. Gov't of Nashville & Davidson Cnty., Tennessee v. Doe*, 143 S. Ct. 574 (2023); *cf. Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, No. 21 C 4460, 2023 WL 2428870, at *7 (N.D. Ill. Mar. 9, 2023) (rejecting *Karasek*'s formulation, while noting that the Sixth Circuit has adopted it); *Reed v. S. Illinois Univ.*, No. 3:18-CV-1968-GCS, 2020 WL 3077186, at *7 (S.D. Ill. June 10, 2020) (rejecting *Karasek*'s approach in dismissing deliberate indifference claim); *Roskin-Frazee v. Columbia Univ.*, No. 17 CIV. 2032 (GBD), 2018 WL 6523721, at *6 (S.D.N.Y. Nov. 26, 2018) (same).

objectively offensive that it can be said to have deprived her of access to the educational opportunities or benefits provided by the school. *Doe #2*, 35 F.4th at 465. The Sixth Circuit declined to extend the same-victim requirement of "after" claims to "before" claims, explaining that doing so "would thwart that purpose [of Title IX] as it would allow schools to remain deliberately indifferent to widespread discrimination as long as the same student was not harassed twice." *Id.* Instead of focusing on a school's *commission* (directly causing further misconduct), a "before" claim focuses on the school's *omission* (creating vulnerability that leads to further misconduct.) *Id.* at 466 (citing *Kollaritsch*, 944 F.3d at 623).

Finally, federal courts recognize two theories for "before" claims, and in the Sixth Circuit, Plaintiffs may plead both. In *Doe v. Univ. of Tennessee*, the Court held that plaintiffs had plausibly alleged: (1) UT had knowledge of prior incidents of sexual assault (committed by different perpetrators against different students) sufficient to put it on notice of a risk to plaintiffs, but failed to adequately address that risk, including by failing to change ineffective remedial measures; and (2) UT's official policies rendered plaintiffs vulnerable to a risk of sexual assault. 186 F. Supp. 3d 788, 806 (M.D. Tenn. 2016).

Here, Plaintiffs plausibly allege both types of "before" claims: (1) Hillsdale's knowledge of prior incidents of sexual misconduct toward students gave notice of a risk to Plaintiffs Chen and Villarreal that Hillsdale failed to mitigate by refusing change its prevention and response efforts; and (2) Hillsdale's official policies, including its Sexual Misconduct Policy, rendered Plaintiffs Chen and Villarreal vulnerable to a risk of sexual assault.[12]

---

[12] There is no inherent issue with identifying a college-wide risk. *See* Mot. at 32, citing *Barnett v. Kapla*, No. 20-CV-03748-JCS, 2020 WL 7428321, at *17 (N.D. Cal. Dec. 18, 2020). Though causation can also exist where a Plaintiff alleges risk in a specific academic or extracurricular program (e.g. fraternities or sports teams), that is not a requirement. *See Karasek v. Regents of Univ. of California*, 956 F.3d 1093, 1113 (9th Cir. 2020) (declining to "foreclose the possibility that a plaintiff could adequately allege causation even when a school's policy of deliberate indifference extends to sexual misconduct occurring across campus"); *Ware v. Univ. of Vermont*

### i.      Deliberate Indifference to Prior Incidents.

First, Plaintiffs allege that Hillsdale's deliberate indifference to sexual assault of its students created a known or obvious heightened risk—beyond the baseline societal or collegiate level—of such assault for female students. Plaintiffs Chen and Villarreal were exposed to, and injured by, this heightened risk—but they are not alone. Hillsdale's "failure to take reports of sexual violence seriously, to effectively investigate, and to take prompt remedial action is notorious within the college's student body and has been for several decades." FAC ¶ 63; *id.* ¶ 14 (noting "long history of mismanaging student reports of assault"); *see also id.* ¶¶ 27-28 (online posts indicating that "when someone gets assaulted," Hillsdale's response ranges from disbelief to outright refusal to "deal with it depending on who was involved").[13] A 2018 article in the school newspaper stated that the process of investigating reports is "not well known to students, and its case-by-case approach leaves room for speculation." *Id.* ¶ 13. Hillsdale has received "numerous complaints from female students reporting sexual abuse by their peers" and female students, "including Plaintiffs Chen and Villarreal, repeatedly experienced inadequate 'responses' by the school to their reports of sexual assault and misconduct." *Id.* ¶¶ 210, 26; *see also id.* ¶ 69 (alleging another student athlete on the track team told Plaintiff Chen "about her experience of trying to report sexual assault"), ¶ 72 (alleging Plaintiff Chen "heard that her rapist might be going after other female students").

The fact that "such investigations are handled, if at all, more leniently than other violations of Hillsdale's 'Honor Code' is well known amongst Hillsdale students." *Id.* ¶ 26.

---

*& State Agric. Coll.*, No. 2:22-CV-212, 2024 WL 989804, at *14 (D. Vt. Mar. 7, 2024) (same); *compare* . Here, the reality is that the toxic culture at Hillsdale permeates the entire student body. FAC ¶ 63.

[13] *See also* McGhee, *supra*, *Let's Talk About Sexual Assault on Campus* (stating that Hillsdale "is associated with so much pain for so many" "ladies of Hillsdale College" who have experienced sexual misconduct on campus).

Identifying Hillsdale's inadequate Sexual Misconduct Policy as part of the problem, Hillsdale students "have long spoken up about sexual assault on campus and advocated for a stronger and more concrete sexual misconduct policy." *Id.* ¶ 12; *see also id.* ¶ 210 (alleging Hillsdale has been "lobbied by students advocating for changes to the sexual misconduct policy"); ¶ 13 (quoting an article in the campus newspaper that "called for mandatory sexual assault education and improvements to the policy").[14] Nevertheless, Hillsdale's policy remains deficient, and Hillsdale has "ignored the sexual assault and harassment occurring under its watch and allowed it to continue." *Id.* ¶ 210.

With these allegations, Plaintiffs plausibly plead a known or obvious heightened risk of such assault for female Hillsdale students.[15] *See S.C. v. Metro. Gov't of Nashville*, 86 F.4th 707, 715 (6th Cir. 2023) (holding that a reasonable jury could find that plaintiff's unwelcome sexual contact was a result of district's indifference to "widespread problem" of gendered sexual misconduct, which students "widely knew about"); *cf. H.M.T. by & through Ce.T. v. Metro. Gov't of Nashville & Davidson Cnty.*, No. 3:22-CV-00402, 2023 WL 2287635, at *3 (M.D. Tenn. Feb. 28, 2023) (dismissing Title IX "before" claim where complaint was "devoid of *any suggestion* that the school district was aware [of] … a widespread problem") (emphasis added); *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (dismissing equal protection claim where plaintiff's complaint simply recited the legal elements of his claims, leaving only

---

[14] *See also* McGhee, *supra*, *Let's Talk About Sexual Assault on Campus* (reporting that one female student who engaged with the administration "was never told what the procedure was or if there even was one", saying "'If there aren't procedures or a rubric of basic steps, no one's going to know what to do,' . . . 'How do you mend the situation in the present and prevent it in the future without that?'").

[15] At a minimum, Hillsdale's Plaintiff Villarreal's assault and the administration's mishandling of her investigation henceforth put Hillsdale on notice of a heightened risk for other female students, such as Plaintiff Chen. *S.C.*, 579 F. Supp. 3d at 1016–17 (noting that, in addition to general information available to school district about issues related to student on student harassment, one plaintiff's sexual harassment provided "further specific notice" of the risk of similar harassment to another plaintiff).

one paragraph of actual factual allegations that did not plausibly suggest the alleged intentional policy or practice).

Indeed, Hillsdale's own authorities demonstrate the sufficiency of Plaintiffs' Title IX allegations here. In *Foster v. Board of Regents of University of Michigan*, the court held—at summary judgment, and on a full factual record—that the University did not demonstrate deliberate indifference to peer-on-peer sexual harassment because with each complaint it received of sexual misconduct, "the University adopted escalating measures proportionate to the misconduct." 982 F.3d 960, 966 (6th Cir. 2020). Here—even without the opportunity to conduct *any discovery*—Plaintiffs are already informed enough by their own experiences to allege that Hillsdale not only fails to escalate complaints, but instead attempts to *suppress* them. *See, e.g.*, FAC ¶¶ 60, 121 (detailing Hillsdale's threats to students who report their rapes).

Forgetting Plaintiffs' burden at the pleading stage, Hillsdale asks Plaintiffs for *more* "facts, data, first-hand accounts, or victim statements" in support of their claims. Mot. at 5. But "at the pleadings stage, Plaintiffs are not required to produce evidence to support their claims." *Speed Way*, 2023 WL 2293099, at *5 (citing *Bowers*, 733 F.3d at 655). Until discovery has begun, Plaintiffs have limited access to facts in Hillsdale's possession, custody, and control. *See id.* (citing *El-Hallani*, 623 F. App'x at 735).

Plaintiffs Chen and Villarreal have bravely publicly shared their experiences of sexual assault at Hillsdale, in part to represent and protect their unnamed class members. Hillsdale's Sexual Misconduct Policy makes clear that the school disapproves of *any* extramarital sexual activity, reprimanding students that such conduct is immoral. This language discourages anyone from reporting an assault as it could result in an investigation into whether the assault victim had herself violated the Policy. Considering the environment they are in, it is understandable that other female students at Hillsdale may be unwilling or unable to come forward as Plaintiffs have.

It thus makes little sense to require Plaintiffs to make an additional showing of *other women's* specific experiences of sexual assault or harassment at Hillsdale.

This is particularly true given that Hillsdale intentionally avoids structures and systems that would account for (or track) such misconduct. Hillsdale cannot both circumvent a Title IX oversight into its handling of campus sexual assault, while also challenging Plaintiffs to point to the would-be evidence from such oversight. That other plaintiffs—such as those in *Simpson v. Univ. of Colorado Boulder*, 500 F.3d 1170 (10th Cir. 2007)—had the benefit of additional evidentiary support at the pleadings stage does not mean Plaintiffs here are not entitled to obtain it through discovery. *See Doe 1 v. Univ. of San Francisco*, No. 22-CV-01559-LB, 2023 WL 5021811, at *10 (N.D. Cal. Aug. 4, 2023) ("The fortuity of an internal investigation gave [plaintiffs] data at the pleadings stage that is not replicated in most cases. And it is an unremarkable fact of coverups that the concealer has knowledge of it."). *Cf. S.C.*, 579 F. Supp. 3d at 1015 (discovery showed "disciplinary statistics and documentation compiled by school district confirm[ing] that inappropriate sexual activity involving students, including harassment and assault, were a real, non-speculative risk at its schools"). Plaintiffs nevertheless have reason to believe discovery will reveal additional evidence of the pattern of deliberate indifference, above and beyond those already reflected in the Amended Complaint by virtue of publicly available information.

### ii.     Official Policy of Deliberate Indifference.

Second, Plaintiffs allege that Hillsdale's official policies, including its Sexual Misconduct Policy, rendered Plaintiffs vulnerable to a risk of sexual assault. Plaintiffs identify significant problems with the Sexual Misconduct Policy. The opening "Policy Statement," which deems all sexual activity occurring outside of heterosexual marriage immoral, renders the rest of the Policy moot and discourages female students who do engage in such activity—and are abused—from

reporting that abuse. FAC ¶¶ 22-24. The Policy allocates all of the details of investigation and punishment to the discretion of the Deans, which makes it impossible to know who will investigate their report or by what procedures. *Id*. ¶¶ 32-39. It fails to directly discuss consent and incapacitation, with a piecemeal format that suggests that these concepts are only tangentially relevant to sexual misconduct and not actually part of the Policy. *Id*. ¶¶ 40-41. The Policy is vague as to when students can expect confidentiality when reporting. *Id*. ¶¶ 42-47. And the Policy is not effectively, transparently, and fairly enforced. *Id*. ¶¶ 48-60. This, too, meets the standard for deliberate indifference. *See Doe 1 v. Baylor Univ*., 240 F. Supp. 3d 646, 653 (W.D. Tex. 2017) (denying motion to dismiss deliberate indifference claim where university's "policy or custom of inadequately handling and even discouraging reports of peer sexual assault created a heightened risk of sexual assault"); *Ware*, 2024 WL 989804, at *1 (denying motion to dismiss deliberate indifference claim where plaintiffs alleged UVM's "policies were generally deficient," causing a heightened campus-wide risk of sexual assault). As in *Ware*, it is a reasonable and appropriate inference at this juncture that "if [Hillsdale's] investigation policies were clearer, sanctions were more formal, and students and teachers received increased sexual assault prevention training, conditions on campus may have been less conducive to sexual misconduct" by "increase[ing] reporting and, therefore, accountability for assailants." 2024 WL 989804, at *16 (citing *Karasek v. Regents of Univ. of Calif*., 534 F. Supp. 3d 1136, 1155 (N.D. Cal. 2021).

### iii.    Other Elements

Finally, Plaintiffs allege all other elements of their "before" claims. Both Plaintiffs were sexually assaulted in contexts subject to Hillsdale's control. Plaintiff Chen was raped by a fellow Hillsdale track athlete in a dormitory on Hillsdale's campus. FAC ¶ 68; s*ee Weckhorst*, 241 F. Supp. 3d at 1170 ("[P]eer sexual assaults that occur at on-campus dormitories clearly implicate Title IX."). Plaintiff Villarreal was raped by a member of Hillsdale's baseball team at his

apartment five minutes away from campus. FAC ¶ 100. As explained above, this too was a context subject to Hillsdale's control. *See supra* at Section IV.A.2.a. And, as a result of Hillsdale's deliberate indifference, both Plaintiffs were raped—a level of sexual misconduct that is unquestionably "severe, pervasive, and objectively offensive." *See Davis*, 526 U.S. at 631.

Hillsdale does not contest that these sexual assaults undermined and detracted from Plaintiffs' educational experiences at Hillsdale. *See Davis*, 526 U.S. at 633–36, 653 (finding that male student's fondling, verbal harassment, and sexually suggestive behavior that caused plaintiff's academic decline and emotional distress constituted requisite severe, pervasive, and objectively offensive conduct). Plaintiff Chen continues to see her rapist at school and track events, at least three times per week. FAC ¶ 99. One semester following the assault, Plaintiff Chen was in a small class with him and only eight other students. *Id*. These constant encounters cause Plaintiff Chen to have panic attacks, feel hyperaware of her surroundings, and experience physical discomfort and severe anxiety. *Id*. She has been diagnosed with generalized anxiety disorder and PTSD, which has in turn impacted both her academic and athletic performance. *Id*.

Likewise, Plaintiff Villarreal continued to see her rapist at social events and on campus following her assault, as often as once daily. *Id*. ¶¶ 117, 118, 123. She began to suffer from depression, stopped caring about schoolwork, and withdrew from her social life. *Id*. ¶ 123. She felt emotionally numb and experienced insomnia. *Id*. This decline led Plaintiff Villarreal to withdraw from Hillsdale altogether. *Id*. She now sees a therapist and has been prescribed antidepressants. *Id*.

To be clear: Plaintiffs do *not* allege that Hillsdale is liable for failing to "purg[e itself] of actionable peer harassment" or "engage in particular disciplinary action." Mot. at 28 (citing *Davis*, 526 U.S. at 648). Plaintiffs' theory is that Hillsdale knew its female students were at an usually high risk of assault due to Hillsdale's broken system for sexual assault prevention and

response, yet continued to utilize that same system (including the Sexual Misconduct Policy) "to no avail." *Vance*, 231 F.3d at 262. As a result, Plaintiffs Chen and Villarreal were sexually assaulted.

And while the Sexual Misconduct Policy imagines (inadequate) remedial measures to mitigate the effects of such misconduct, Hillsdale failed to provide even these inadequate measures for either Plaintiff, instead shaming both and threatening them to drop the matter. *See Vance*, 231 F.3d at 260–61 ("Although no particular response is required, and although the [defendant] is not required to eradicate all sexual harassment, the [defendant] must respond and must do so reasonably in light of the known circumstances."); *compare Barlow v. Washington*, 2021 WL 2036704, at *4 (W.D. Wash. May 21, 2021), *aff'd in part*, 2022 WL 2256318 (9th Cir. June 23, 2022) (holding that, if a university responds to a harassment claim by investigating, punishing, and diligently monitoring progress of the harassing student, it is not deliberately indifferent); *Ware*, 2024 WL 989804, at *16 ("When universities are on notice that their policies are inadequate to prevent sexual assault on campus, they must change those policies. Plaintiffs' allegations here – inadequate transparency, improper reliance on informal procedures, and improper delay – clear that threshold."). Plaintiffs' Title IX deliberate indifference claims stand.

### c.  <u>Plaintiffs state a Title IX claim for retaliation.</u>

The Supreme Court has recognized that Title IX's prohibition on discrimination on the basis of sex encompasses retaliation against an individual for complaining of such discrimination. *Jackson*, 544 U.S. 167. To establish a Title IX retaliation claim, a plaintiff must show that: (1) she engaged in protected activity under Title IX by complaining about Title IX discrimination; (2) this activity was known to the defendant; (3) the defendant then took an adverse action against her; and (4) there was a causal connection between the protected activity and the adverse action. *Univ. of Tennessee*, 186 F. Supp. 3d at 809.

A prima facie case requires a "*minimal* threshold showing of retaliation." *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012) (emphasis added). "Protected activity" includes reporting sexual assault or harassment of a student by another student. *Kincaid v. Unified Sch. Dist. No. 500, Kansas City, Kansas*, 645 F. Supp. 3d 1134, 1161 (D. Kan. 2022), *aff'd*, 94 F.4th 936 (10th Cir. 2024). "Adverse action" is that which would deter a reasonable person from making or supporting a charge of discrimination. *Doe v. Morgan State Univ.*, 544 F. Supp. 3d 563, 584 (D. Md. 2021). Hillsdale does not contest that Plaintiffs engaged in protected activity, that such activity was known to Hillsdale, or that there was a causal connection between the protected activity and the alleged adverse actions.

Both Plaintiffs reported their sexual assaults to Hillsdale. FAC ¶ 222. Both Plaintiffs were subject to adverse action as a result: (1) Hillsdale refused to provide Plaintiffs with anything in writing about the investigations into their reports; (2) Dean Dell indicated to Plaintiff Chen that she risked facing a counter-suit by her assailant; (3) Hillsdale counsel Bob Norton called Plaintiff Chen's mother and tried to intimidate her, telling her that Plaintiff Chen was wrong about her assault and daring her to get a lawyer; (4) Hillsdale counsel Bob Norton threatened Plaintiff Villarreal if she continued to seek transparency about the investigation and punishment; and (5) Hillsdale never implemented or enforced any punishment for Plaintiffs' assailants, forcing Plaintiffs to see and interact with their assailants in class, at sporting events, in the dining hall, and at social events. *Id.* ¶ 223.[16]

---

[16] Plaintiffs concede that—while highly inappropriate—Dean Dell's suggestion that Plaintiff Chen take time off during the summer break "to put the sexual assault behind her" does not constitute adverse action. *See Gordon v. Traverse City Area Pub. Sch.*, 686 F. App'x 315, 321 (6th Cir. 2017) (recognizing that administrators suggestion that a student stay home from school for a few days did not amount to adverse action). But while offering Plaintiff Chen the option of staying home following her sexual assault is not actionable, the Dean's damaging remark that doing so would allow Plaintiff Chen to "be friends with her assailant in the future" *would* make a reasonable student think twice before reporting her experience of sexual assault or harassment to Hillsdale.

Hillsdale incorrectly contends that Plaintiffs' claims fail because many of the alleged adverse actions were undertaken by various Hillsdale employees, Mot. at 43 (citing *Bose v. Bea*, 947 F.3d 983 (6th Cir. 2020)). This misinterpretation of the law makes little sense: Hillsdale suggests that *any* action carried out by an individual—even on behalf of the Title IX defendant—cannot support a retaliation claim. In *Bose*, the plaintiff's Title IX theory was that a chemistry professor reported her for cheating in retaliation for opposing his unwanted sexual advances. *Id.* at 988. The Sixth Circuit declined to impute the professor's retaliatory motive to the college under the "cat's paw" theory of causation, which links the discriminatory motive of one actor to the adverse action of another without requiring notice of the former to the latter. *Id. Bose* relied on the Supreme Court's reasoning in *Gebser*, in which the Court concluded that Title IX imposed liability only for a funding recipient's own official decisions, not its employees' independent actions. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 291 (1998). The chemistry professor in *Bose* had acted independently in reporting the plaintiff for cheating. *Bose*, 947 F.3d at 991. But *Gebser* makes clear that an adverse action can be undertaken by an individual—they only need be "an official of the recipient entity with authority to take corrective action to end the discrimination." 524 U.S. at 290.

Here, Dean of Women Rebekah Dell, Hillsdale counsel Kimberley Graham, and Hillsdale counsel Bob Norton each met or communicated with Plaintiffs and their families in their official capacities and in direct connection with Plaintiffs' sexual misconduct complaints. Indeed, these are the individuals who were purportedly charged with determining and carrying out Hillsdale's response to Plaintiffs' sexual misconduct complaints, pursuant to Hillsdale's Sexual Misconduct Policy—to suggest they acted in any way other than an "official" capacity is nonsensical. *Gebser*, 524 U.S. at 291.

Moreover, the retaliation Plaintiffs suffered was in connection with the complaint "process" itself, making this case wholly unlike those cited by Hillsdale. *Cf. Bose*, 947 F.3d at 991 (noting that there was no evidence that the college's act of expelling the plaintiff was motivated by her Title IX complaint for sexual harassment); *Garrett v. Ohio State Univ.*, 60 F.4th 359, 367 (6th Cir.), *cert. denied sub nom. The Ohio State Univ. v. Gonzales*, 143 S. Ct. 2659 (2023) (affirming dismissal of retaliation claim based on plaintiffs' general mistreatment by unnamed individuals affiliated with OSU, with no apparent connection to OSU's Title IX response).

The adverse actions Plaintiffs identify would dissuade a reasonable student from choosing to report their sexual assault or harassment to Hillsdale. It is straightforward that intimidation and threats—implied or express—by school officials in connection with a sexual assault investigation constitutes adverse action. *See* FAC ¶ 222 (alleging that Hillsdale warned Plaintiff Chen about a counter-suit, dared Plaintiff Chen's mother to get a lawyer, and threated Plaintiff Villarreal with consequences if she continued to inquire about her investigation); *Doe v. Syracuse Univ.*, No. 22-2674, 2023 WL 7391653, at *3 (2d Cir. Nov. 8, 2023) (reversing dismissal of retaliation claim where plaintiff alleged that university staff made and "intimidating litigation inquiry" and threatening comments to plaintiff in response to her Title IX report).[17]

And Hillsdale's refusal to provide Plaintiffs with documentation—a basic Title IX guideline—would deter a reasonable student from reporting sexual assault, because it indicates that Hillsdale does not take investigations seriously and instead creates the risk of facts being

---

[17] The statements at issue here can hardly be said to compare to those at issue in *Huang*, Mot. at 43, where administrators told the plaintiff to "trust the process" (and, as relevant here, provided her with a 37-page investigation report that the court found to be "on its face a professional and well-reasoned account of the results of a thorough investigation of all of Plaintiff's allegations of sexual harassment and [] retaliation."). *Huang v. Ohio State Univ.*, No. 2:19-CV-1976, 2022 WL 16715641, at *21 (S.D. Ohio Nov. 4, 2022).

misconstrued or misrepresented (as they have been here). *See Cavalier*, 306 F.Supp.3d at 32 (considering, in finding that plaintiff had plausibly alleged deliberate indifference, that university initially failed to provide plaintiff with documentation of its promised no-contact order against her assailant).

Perhaps believing that only Plaintiffs' fifth example of adverse action (failing to implement or enforce any punishment for Plaintiffs' assaults) can withstand *Bose*, Hillsdale notes that Title IX does not afford plaintiffs a right to make "particular remedial demands." Mot. at 43 (citing *Davis*, 526 U.S. at 648). But Plaintiffs have never contended that they deserved the right to craft punishments for their abusers. *See id.* (dismissing dissent's concern that Title IX plaintiffs could demand a specific desk assignment).

But when, as here, *schools* make disciplinary decisions, plaintiffs do have a Title IX right to enforcement of those remedies. *See, e.g., Pogorzelska v. VanderCook Coll. of Music*, 442 F. Supp. 3d 1054, 1064 (N.D. Ill. 2020) (allowing plaintiff's Title IX deliberate indifference claim to proceed where college found assailant "guilty but not guilty" of sexual assault and issued a remedial no-contact order which it then failed to enforce); *Cavalier v. Cath. Univ. of Am.*, 306 F. Supp. 3d 9, 32 (D.D.C. 2018) (holding that plaintiff plausibly alleged deliberate indifference where university failed to maintain and enforce a no-contact order between plaintiff and her assailant that it verbally assured her was in place).

Further, courts have reasoned that "inaction of the type that formed the basis for [a plaintiff's] deliberate indifference claim may constitute an 'adverse action' for the purpose of her retaliation claim." *Doe v. Morgan State Univ*., 544 F. Supp. 3d 563, 585 (D. Md. 2021) (denying summary judgment for defendants on Title IX claims where college's inaction was "not merely passive or ignorant neglect" but rather "partial action . . . followed by an alleged failure to follow

through on its obligations," such "[i]naction in the face of a known obligation to act is an affirmative decision and not meaningfully distinguishable in this context from an action").

Hillsdale's actions—both independently and together—satisfy the adverse action element of the Title IX retaliation inquiry. *See Morgan State*, 544 F. Supp. 3d at 585 (holding at summary judgment that even if the Court were to find that each individual action was not significant enough to constitute an adverse action, "[t]he cumulative impact of retaliatory acts may become actionable even though the actions would be *de minimis* if considered in isolation.") (citing *Brennan v. Norton*, 350 F.3d 399, 422 (3d Cir. 2003)). Accordingly, Plaintiffs' allegations meet the low bar to state a *prima facie* claim for retaliation under Title IX.

### B.     Plaintiffs state a claim for negligence.

To state a claim for negligence, a plaintiff must establish: (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages. *Roulo v. Automobile Club of Mich.*, 386 Mich. 324, 328 (1971). Plaintiffs have sufficiently pled each of these requirements.

### 1.     Plaintiffs established that Hillsdale owed Plaintiffs a legal duty.

Plaintiffs established that Hillsdale owed Plaintiffs a legal duty. The determination whether a particular relationship supports a duty of care rests on policy and is a question of law. Rest.3d Torts, Liability for Physical and Emotional Harm, § 40, coms. e & h, pp. 41-42. Admittedly, there is no generalized duty to protect another who is endangered by a third person's conduct under Michigan law. *Murdock v. Higgins*, 454 Mich. 46, 54 (1997). However, this duty does exist when a "special relationship" exists either between the defendant and the victim, or the defendant and the third party who caused the injury. *Id.* The special relationship exception is "based on control; in each circumstance one person entrusts his care to another person, who is in

control and best able to provide a place of safety." *In re Doe*, No. 264679, 2006 WL 475285, at

*2 (Mich. Ct. App. Feb. 28, 2006). Courts have found such a special relationship exists between

a university and its students.[18] *See, e.g.*, *Avila v. Citrus Community College Dist.*, 38 Cal.4th 148,

163 (2006) (holding that college owed a duty to student-players "to, at a minimum, not increase

the risks inherent in the sport"); *Regents of Univ. of California v. Superior Ct.*, 4 Cal. 5th 607,

625 (2018) (concluding that because colleges impose a variety of rules and restrictions inside and

outside of the classroom to maintain a safe environment, and have the power to influence

students' values and behaviors, the "college-student relationship thus fits within the paradigm of

a special relationship."); *Barlow v. State*, 540 P.3d 783 (Wash. 2024) (special relationship exists

between a university and its students).

Here, Plaintiffs allege that Hillsdale exercised substantial control over their lives and the

lives of their fellow students (including their perpetrators). *See* FAC ¶ 137 (alleging that

Hillsdale exercised control over Plaintiffs' lives because Plaintiffs slept in campus dorms, ate in

campus dining halls, attended class in campus classrooms, and studied in campus spaces); *id.* ¶

115 (alleging that Hillsdale exercised control over the activities Villarreal's rapist, limiting his

ability to attend social events, requiring him to do community service, and suspending him from

athletics). The "Policy Statement" that opens Hillsdale Sexual Misconduct Policy makes

sweeping statements about how students must "grasp the fact of [Hillsdale's] commitments and

become partners with the College by engaging to cooperate with its principles" and engaging

only in "morally responsible" behavior. *Id.* ¶ 22. This "oversight of student activity" is precisely

---

[18] Courts have recognized that grade schools exercise *more* control over their students than universities, *Hedrick v. W. Michigan Univ.*, No. 1:22-CV-308, 2022 WL 10301990, at *5 (W.D. Mich. Oct. 17, 2022), but no Michigan case holds that universities cannot have special relationships with their still-teenage students.

the type that gives rise to a duty to aid or protect students. *Doe*, 2006 WL 475285, at *2 (affirming dismissal of negligence claim where plaintiff was assaulted by a non-student).

Hillsdale's cases are inapposite on this point. In *Scott*, the Supreme Court affirmed dismissal of a negligence claim against a merchant for an assault in its parking lot, but in doing so noted that the merchant had "put in place each promised security measure," indicating that it "did reduce the incidence of crime in its parking area." *Scott v. Harper Recreation, Inc*., 444 Mich. 441, 450 (1993). Plaintiffs allege that Hillsdale did not follow through on its promised security measures, and there is no evidence that Hillsdale's actions did anything to reduce Plaintiffs' risk of assault. *Bailey* addresses "the scope of the duty with regard to residential or commercial landlords." *Bailey v. Schaaf*, 494 Mich. 595, 614 (2013). And *Graves* analyzed a highly unique situation in which the plaintiff alleged that defendants should have known that surprising a guest on a talk show by discussing same-sex crushes would incite him to kill the person who admitted their crush on the guest. *Graves v. Warner Bros*., 253 Mich. App. 486, 489 (2002).

Moreover, even if the law did not impose the legal duties referenced above, Hillsdale voluntarily assumed a duty to prevent sexual misconduct. A party is under a legal duty when it voluntarily assumes a function that it is not legally required to perform. *Estate of Qing Kong v. A.J. Marshall Co*., 233 Mich. App. 229, 231 (1998). *Fultz v. Union-Commerce Assocs*., 470 Mich. 460, 464 (2004). Plaintiffs allege Hillsdale had policies and procedures in place purportedly to investigate and address instances of sexual assault or misconduct, and that it took affirmative steps in indicating to students that it had taken on such a duty. For example, despite Hillsdale's argument that it "plainly cannot control students" when off campus, Mot. at 47, Hillsdale declared an (albeit unenforced) punishment for Villarreal's rapist for his actions in an off-campus apartment. FAC ¶ 100, 115. This too amounts to voluntary assumption of duty. *See,*

*e.g., Nova Se. Univ., Inc. v. Gross*, 758 So. 2d 86 (Fla. 2000) (university assumed duty of acting

reasonably to maintaining student's safety from sexual assault); *Coghlan v. Beta Theta Pi*

*Fraternity*, 133 Idaho 388, 400 (1999) (denying motion to dismiss where allegations supported

an inference that university assumed a duty to exercise reasonable care to safeguard the underage

plaintiff from the criminal acts of third persons).

Special relationship or not, public policy supports finding that Hillsdale "had a duty to

adopt fair procedures and implement those procedures with reasonable care" in investigating and

adjudicating reports of sexual misconduct. *See Doe v. Univ. of Denver*, 2022 COA 57, 516 P.3d

946, 959 n. 10, cert. granted in part, No. 22SC499, 2023 WL 2372557 (Colo. Mar. 6, 2023)

(holding that "even absent a special relationship . . . the duty factors weigh in factor of

recognizing a duty of care by DU").

### 2.     Plaintiffs established breach, causation, and damages.

Breach asks whether the defendant violated the standard of care by failing to do what a

reasonable person would or would not to do under the circumstances. *Massey v. Scripter*, 401

Mich. 385, 390 (1977). Plaintiffs allege that Hillsdale breached its duties to provide a safe

environment—not wholly free from sexual assault, but with no greater than the baseline risk.

FAC ¶ 137. Hillsdale failed to maintain adequate policies which would deter, detect, and

properly respond to incidence of sexual assault, creating an unacceptable and unusually high risk

for female students by emboldening perpetrators who knew no meaningful consequences would

follow. *Id*. ¶ 138, 140. Hillsdale's Sexual Misconduct Policy inconsistently and inaccurately

defines sexual misconduct and sexual assault; fails to clearly establish punishments for

violations, and fails to guarantee students who report anonymity, privacy, or confidentiality. *Id*.

¶ 139. Hillsdale consistently fails to implement the Policy as written, as evidenced by Plaintiffs'

experiences: it did not interview witnesses identified by Plaintiffs, provide updates to Plaintiffs

on the status of their investigations, implement necessary interim measures to protect plaintiffs, or explain its findings. *Id.* ¶ 140. These acts and omissions evidence that Hillsdale's conduct failed to meet the minimum standard of care required of a reasonable university.[19]

Hillsdale blames Plaintiffs for reporting, arguing that if they had truly known of the college's pattern of mismanaging such reports, they should never have reported, or even remained at Hillsdale after learning as much. Mot. at 37-38, 49. But there is no such contradiction: indeed, "common sense" allows for the inference that Plaintiffs knew of a problematic pattern but chose to report anyway in hope of a different outcome. *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ("The plausibility of an inference depends on a host of considerations, including common sense . . ."). In fact, Plaintiffs specifically allege that despite being warned by Lindsay Peirce that she needed "concrete evidence" for the Deans to take action, Plaintiff Chen chose to report "because she heard that her rapist might be going after other female students and she did not want someone else to go through what she had been through." FAC ¶ 70-72. Common sense also dictates that an allegation that Hillsdale's mishandling of sexual assault reports was "notorious within the college's student body" indicates that it known by both Plaintiffs and their assailants. FAC ¶ 63.

Plaintiffs also allege causation. Proximate cause requires that damages suffered are a "foreseeable, natural, and probable" consequence of the defendant's conduct. *Kaiser v. Allen*, 480 Mich. 31, 38 (2008). There can be more than one proximate cause contributing to an injury. *Brisboy v. Fibreboard Corp.,* 429 Mich. 540 (1988). Causation is an intensely factual question

---

[19] Plaintiffs' allegations are nowhere close to the "laundry list of . . . conclusory and redundant allegations of negligence" of *David v. Royal Caribbean Cruises Ltd.*, No. 1:19-CV-21657-UU, 2019 WL 13235812, at *1 (S.D. Fla. Apr. 30, 2019). There, the plaintiff injured on a sports court alleged *no facts* demonstrating that the defendant "installed the sports court, that it had any duty with regard to the sports court, or that the sports court was dangerous in any way," using catchall allegations such as "All other acts or omissions constituting a breach of the duty to use reasonable care revealed through discovery." *Id.*

and should typically be resolved by the jury. *Schutte v. Celotex Corp.*, 196 Mich. App. 135, 138 (1992).

Plaintiffs allege that Hillsdale caused Plaintiffs' damages through its own acts and omissions, including: allowing and tolerating sexual assault; failing to train administrators and investigators to properly respond to reports; failing to warn Plaintiffs of the heightened risk of assault they faced; failing to properly investigate reports of assault and rape; failing to take the necessary steps to protect Plaintiffs from further contact with their assailants; failing to explain their findings to Plaintiffs; threatening Plaintiffs with retaliation; and making offensive and false accusations in an effort to blame Plaintiffs for their assaults. FAC ¶ 143.

At this juncture, the Court can properly find that but for these systemic failures, Plaintiffs' assaults would not have occurred. *See Ware*, 2024 WL 989804, at *16 ("It is a reasonable inference that if UVM's investigation policies were clearer, sanctions were more formal, and students and teachers received increased sexual assault prevention training, conditions on campus may have been less conducive to sexual misconduct. Plaintiffs are entitled, at this early stage, to the assumption that improved transparency regarding investigatory procedures would have encouraged increased reporting and, therefore, accountability for assailants.") (citations and quotation marks omitted).

Finally, Plaintiffs allege both physical pain, emotional damages, and suffering as a result of Hillsdale's breach. FAC ¶¶ 141, 142 (Plaintiffs suffered sexual assault and rape, anxiety, PTSD, and depression). Plaintiffs' negligence claim is adequately pled.

### C. Plaintiffs state a claim for intentional infliction of emotional distress (IIED).

Hillsdale argues that Plaintiffs have not stated a plausible claim of intentional infliction of emotional distress ("IIED"). Mot. at 51. Although Hillsdale pretends not to understand Plaintiffs' allegations supporting their IIED claim, they are clear and sufficient: Hillsdale's

failure to have or enforce appropriate policies governing sexual misconduct injured Plaintiffs and caused them severe emotional distress. FAC ¶¶ 156, 159. Plaintiffs do not allege that Hillsdale "could have done more," Mot. at 53 (citing *Brock v. Mich. State Univ.*, No. 1:21-CV-436, 2022 WL 178681, at *5 (W.D. Mich. Jan. 20, 2022)), but rather that its affirmative actions in establishing and implementing its Sexual Misconduct Policy form a valid basis for Plaintiffs' IIED claims.

Under Michigan law, IIED requires proof of four elements: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4); severe emotional distress. *Lewis v. LeGrow*, 258 Mich. App. 175, 196 (2003). To be actionable, a defendant's conduct may either be "specifically intended to cause a plaintiff emotional distress" or "so reckless that any reasonable person would know that emotional distress would result." *Id.* at 197 (citation and quotation marks omitted). The conduct must be so outrageous and extreme that it went beyond the bounds of decency and would be "regarded as atrocious and utterly intolerable in a civilized community." *Linebaugh v. Sheraton Michigan Corp.*, 198 Mich. App. 335, 342 (1993). The test for whether conduct is outrageous and extreme is whether an average member of the community, upon hearing the facts, would resent the actor and exclaim "outrageous!" *Lewis*, 258 Mich. App. at 196. Outrageous conduct may arise from the abuse of a position, relationship, or power to affect the victim's interests, or where the actor proceeds in the face of knowledge that a person is particularly susceptible to emotional distress. Restatement (Second) of Torts, § 46, cmt. e, f.

Plaintiffs allege that Hillsdale's sexual misconduct policy starts with the premise that all sexual activity, consensual or not, outside of heterosexual marriage is morally irresponsible. FAC ¶¶ 22, 23. This language discourages anyone from reporting an assault as it could result in an investigation into whether the assault victim had herself violated the policy. Moreover, the policy fails to define consent or guarantee confidentiality, suggesting they are only "potentially

relevant" to a discussion of sexual assault. FAC ¶¶ 40, 43-44. And the policy delegates the scope of the investigation and discipline to the discretion of the deans, failing to guarantee a fair and impartial investigation under rules made known to all involved parties. *Id*. ¶¶ 25, 34-37. The policies themselves demonstrate a total lack of empathy and support for victims of sexual assault at a college campus where families expect that their children will be kept safe. Such failure to establish policies to provide that protection would be found by the average person to be outrageous.

Beyond that, the actual investigations Hillsdale conducted were so inappropriate that they could easily be found by a reasonable juror to be extreme and outrageous. When Plaintiff Chen reported her rape, a lawyer for Hillsdale told Plaintiff Chen that she had not been sexually assaulted because there was no obvious force. Hillsdale refused to discipline the rapist and suggested Plaintiff Chen put the incident behind her so she could be "friends" with her assailant in the future. Hillsdale refused to provide Plaintiff Chen with status updates or a written report, and counsel for Hillsdale accused Plaintiff Chen of lying, daring her mother to get a lawyer. Then Hillsdale suggested but did not enforce a no-contact order, forcing Plaintiff to see her assailant in class and other school and track events. FAC ¶¶ 70-99.

Similarly, Hillsdale engaged in a blame-the-victim approach with Plaintiff Villarreal instead of engaging in a thorough and neutral investigation. Hillsdale accused Villarreal of reporting solely because she had come to "regret" a "consensual" encounter. Hillsdale failed to enforce its stated punishment against her assailant, allowing him to return to the baseball team and attend parties and encounter Plaintiff regularly. When Plaintiff followed up with Hillsdale about the investigation, Hillsdale counsel threatened her parents with retaliation, causing them to believe she needed to transfer to another school to protect her safety and well-being. FAC ¶¶ 100-123.

These amount to extreme and outrageous responses by Hillsdale—not third parties—to the sexual assault of women whom the college had an obligation to protect. *Cf. Williams v. Port Huron Area Sch. Dist. Bd. of Educ.*, No. 06-14556, 2010 WL 1286306, at *15 (E.D. Mich. Mar. 30, 2010), rev*'d and remanded sub nom. Williams v. Port Huron Sch. Dist.*, 455 F. App'x 612 (6th Cir. 2012) (granting summary judgment for defendants on IIED claim where theory was "based on a third party's intentional conduct").

Finally, Hillsdale's pattern of blaming victims, backtracking and downplaying the severity of sexual assaults, and failing to protect reporting students from their assailants amounts to conduct so reckless that a reasonable person should know emotional distress would result. *See Lewis*, *supra* at 198 (affirming denial of summary judgment for defendant on IIED claim where defendant's act was a "significant breach of trust").

It cannot be held at this stage that Plaintiffs' allegations do not amount to outrageous intentional conduct as a matter of law.

### D.     Plaintiffs state a claim under the Elliot-Larsen Civil Rights Act (ELCRA).

Plaintiffs allege sex discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), MCLA 37.2101 *et seq.* based on Hillsdale's intentional creation and maintenance of:

> [A] sexually discriminatory environment, through its practices and policies concerning sexual violence, which favor its male students over its female students, including Plaintiffs, and . . . [which] deprive[] Plaintiffs of the full and equal utilization of or benefit from the institution, including but not limited to, a sexually hostile educational environment, full and equal safety, full and equal enjoyment of the institution, and full and equal access to the institution's remedial avenues.

FAC ¶ 168. Specifically, Hillsdale's practices and policies put female students, like Plaintiffs, "at a heightened risk of suffering sexual violence by emboldened male perpetrators," and further

denies them "equal access to and treatment of the institution's remedial procedures when making complaints of sexual violence." *Id.* ¶¶ 168, 171.

Hillsdale seeks dismissal of Plaintiffs' ELCRA claims, principally arguing that "the ELCRA claims fail because the asserted hostile environment is the result of the perceived threat of assault *by other students*, not by Hillsdale, and Plaintiffs cannot establish *respondeat superior* liability for risks caused by students." Mot. at 55. This argument wholly ignores the Amended Complaint, through which Plaintiffs seek to hold Hillsdale accountable *for its own discriminatory conduct*—and specifically, *its own practices and policies* concerning sexual violence, which favor its male students over its female students—not assaults perpetrated by Hillsdale's male students. This is precisely the sort of discrimination the ELCRA was designed to redress, including (expressly) in academic settings. As such, Hillsdale's arguments predicated on respondeat superior fail.

The ELCRA was "designed to target 'the prejudices and biases' borne against persons because of their membership in a certain class, and … to eliminate the effects of offensive or demeaning stereotypes, prejudices, and biases.'" *Doe by next friend Kolokithas v. Alpena Pub. Sch. Dist.*, 345 Mich. App. 35, 42 (2022) (quoting *Radtke v. Everett*, 442 Mich. 368, 379, 501 N.W.2d 155 (1993)). A remedial statute, the ELCRA must "be liberally construed to suppress the evil and advance the remedy." *Eide v. Kelsey-Hayes Co.*, 431 Mich. 26, 34 (1988).

To effectuate this purpose, the Michigan Legislature articulated state-recognized civil rights—among them, the right to the full utilization of educational facilities without sex discrimination. Indeed, ELCRA expressly applies to sex discrimination *by educational institutions* (like Hillsdale) by guaranteeing students (like Plaintiffs)  "[t]he opportunity to obtain . . . the full and equal utilization of . . . educational facilities without discrimination

because of . . . sex. MCL 37.2102(1). Under the ELCRA, an "educational institution" is defined broadly to include:

> [A] public or private institution, or a separate school or department thereof, and includes an academy, college, elementary or secondary school, extension course, kindergarten, nursery, local school system, university, or a business, nursing, professional, secretarial, technical, or vocational school; and includes an agent of an educational institution.

MCL 37.2401. An "educational institution," so defined, is prohibited from engaging in "practices" that "[d]iscriminate against an individual in the full utilization of or benefit from the institution, or the services, activities, or programs provided by the institution because of . . . sex." MCL 37.2402(a). Moreover, the Act defines "discrimination because of sex" to include "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's . . . education." MCL 37.2103(i).

Hillsdale does not—and cannot—contest that it is an "educational institution" under ELCRA, or that ELCRA prohibits it from fostering a sexually discriminatory environment, as pled in Plaintiffs' Complaint. Instead, Hillsdale creates a strawman—moving to dismiss claims not brought by Plaintiffs, citing legal authorities irrelevant to the claims actually brought by Plaintiffs. Indeed, in Hillsdale's primary case—*K.S. v. Detroit Public Schools*—the court denied the district's motion for summary judgment because it found a genuine issue of material fact as to whether sexual harassment by a volunteer public school "mentor" could be "imputed" to the district "under the doctrine of *respondeat superior*." 130 F. Supp. 3d 1073, 1087 (E.D. Mich. 2015). It may well be true that, just as the school district in *K.S.*, Hillsdale is liable for specific sexual assaults committed against its students. But nowhere in the Amended Complaint do Plaintiffs seek to hold Hillsdale vicariously liable for the criminal acts perpetrated by their rapists. Rather, Plaintiffs bring a *class* ELCRA claim against Hillsdale, for its own creation and maintenance of a Sexual Misconduct Policy that "favor[s] its male students over its female

students." FAC ¶ 168. " This classwide discrimination is perpetrated *directly by Hillsdale*, and is distinct from any individual liability for the sexual assaults that continue to occur at an alarming rate on Hillsdale's campus.[20] Indeed, one of the cases that Hillsdale cites in this section of its motion—*Foster*—does not concern ELCRA at all, but underscores why Title IX liability attaches here. *See* Mot. at 55 (citing *Foster*); *see supra* at 21 (noting that *Foster* supports Title IX liability here).

Again: Hillsdale does not—and cannot—contest that an educational institution can be liable for its own acts and omissions that discriminate on the basis of sex. Here, Plaintiffs seek to hold Hillsdale accountable for its own "practices and policies concerning sexual violence, which favor its male students over its female students," FAC ¶ 168, including by, among other things:

- Creating and maintaining "an environment that deters students from seeking support after suffering sexual assault, including through Hillsdale's use of the deficient 'Sexual Misconduct Policy.'" FAC ¶ 20.

- Developing a Sexual Misconduct Policy that: (1) fails to delineate what is prohibited behavior, and instead disavows *any* extramarital sexual activity; (2) fails to specify consequences for prohibited behavior; (3) fails to directly discuss consent

---

[20] Hillsdale's remaining authorities concerning *respondeat superior* liability, and the "actual or constructive notice" required to prove same, are therefore equally inapposite. *See Hamed v. Wayne Cnty.*, 490 Mich. 1, 10-11 (2011) (concerning whether an employer may be held "vicariously liable" for unforeseeable sexual harassment perpetuated by one employee against another); *Kalich v. AT & T Mobility, LLC*, 679 F.3d 464, 474 (6th Cir. 2012) (same); *Schemansky v. California Pizza Kitchen, Inc.*, 122 F. Supp. 2d 761, 771 (E.D. Mich. 2000) (same); *Radtke v. Everett*, 442 Mich. 368, 396 (1993) (same); *Sheridan v. Forest Hills Pub. Sch.*, 247 Mich. App. 611, 621 (2001) (same); *Alpena*, 345 Mich. App. at 47 (concerning whether an educational institution may be held "vicariously liable" for unforeseeable sexual harassment perpetuated by one student against another); *Cook v. Bennett*, 94 Mich. App. 93, 98 (1979) (considering when "[a] teacher owes a duty to exercise reasonable care over students in his or her charge"); *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 962 (N.D. Ill. 2017) (considering whether university could be liable for "the harmful acts of third parties" under Illinois, not Michigan, law). *Cf. Hedrick v. W. Michigan Univ.*, No. 1:22-CV-308, 2022 WL 10301990, at *4 (W.D. Mich. Oct. 17, 2022) (considering when schools "stand *in loco parentis*, i.e., in place of parents"); *Austin-Hall v. Woodard*, No. 3:18-CV-270, 2020 WL 5943018, at *6 (S.D. Ohio Oct. 7, 2020) (same); *In re Doe*, No. 264679, 2006 WL 475285, at *2 (Mich. Ct. App. Feb. 28, 2006) (same); *Reinert v. Dolezel*, 147 Mich. App. 149, 156-57 (1985) (considering when parents can be held vicariously liable for the acts of their children).

and incapacitation; (4) is vague as to when students can expect confidentiality; (5) allocates complete discretion to the Deans, such that it is impossible to know what actions or decisions to expect in any given circumstance; and (6) is not effectively, transparently, or fairly enforced. FAC at p. 2, ¶¶ 22-24, 26, 32-39, 40-60.

- Failing "to take reports of sexual violence seriously, to effectively investigate, and to take prompt remedial action."  FAC ¶ 64.

As Hillsdale almost implicitly acknowledges by failing to meaningfully engage these allegations, they are sufficient to support an ELCRA claim under both disparate treatment and disparate impact theories of liability. *See Duranceau v. Alpena Power Co.*, 250 Mich. App. 179, 181-82 (2002) ("A prima facie case of discrimination under the Civil Rights Act can be made by proving either disparate treatment or disparate impact.").

Indeed, Plaintiffs allege both "intentional discrimination" by Hillsdale against its female students, and Hillsdale's maintenance of a "facially-neutral" policy that has a "discriminatory effect" on its female students. *Id*. To wit: Plaintiffs allege that "[t]he intent and effect of Hillsdale's practices and policies *is discriminatory to its female students in favor of its male students, as females suffer sexual violence at a significantly higher rate than males*, particularly while in college, and are, consequently, the persons *targeted and negatively impacted by the institution's derelict practices and policies*, whereas the policies and practices benefit males, as male students who perpetrate sexual violence avoid consequences." FAC ¶ 173 (emphasis added). *See also, e.g.*, *id*. ¶ 65 ("The intent and effect of Hillsdale's practices and policies is to foster an environment that tacitly accepts sexual violence against its female students for the sake of preserving the status quo and in favor of its male students."); *id*. ¶ 169 ("Hillsdale had actual and/or constructive knowledge that its practices and policies have created a sexually hostile educational environment for women based on prior student reports of sexual harassment and assault and students' complaints regarding the college's written sexual violence policies and its

handling of sexual assault investigations."); *id.* ¶ 170 ("Despite such notice, Hillsdale has intentionally maintained its practices and policies concerning sexual violence, and thus, a sexually discriminatory environment.").[21]

Again, it is Hillsdale's own actions that Plaintiffs challenge through this lawsuit—not their individual abusers'. Hillsdale's creation of policies that deter students from reporting instances of sexual assault, practice of concealing allegations of sexual assault as opposed to conducting proper investigations, and tacitly sanctioning sexual assault by its students through its failure to take remedial action substantially interferes with female students' educations, including Plaintiffs. By its plain language, such actions violate the ELCRA, particularly when viewed through the lens of a remedial statute, as required Michigan law. MCL 37.2103(i).

### E.    Plaintiffs state a claim under the Michigan Consumer Protection Act (MCPA).

Plaintiffs have plausibly alleged fraudulent misrepresentation and fraudulent omission claims under the Michigan Consumer Protection Act. MCL 445.903. Discovery will reveal that Hillsdale unlawfully engaged in "unfair, unconscionable, or deceptive methods, acts, or practices" with respect to misrepresentations and omissions Hillsdale made to Plaintiffs about the quality and safety of a Hillsdale education. *Id.* Specifically, Hillsdale's failure to reveal its lack of adequate sexual harassment and sexual assault policies, its history of mishandling sexual assault and sexual harassment complaints, and its misrepresentations that the college campus was a safe environment violate sections (s), (bb), and (cc) of the Act. Indeed, the Sexual Misconduct Policy itself is a misrepresentation because Hillsdale does not enforce the policy as written.

---

[21] Hillsdale inexplicably, and boldly, ignores these allegations in asserting that Plaintiffs fail to allege female and male students "are treated differently" by Hillsdale. Mot. at 59-60.

**1.      Plaintiffs are protected by the MCPA because the purchase of an undergraduate education is personal, not commercial or business-related.**

Hillsdale challenges Plaintiffs' MCPA claim by arguing that Plaintiffs' purchase of a Hillsdale education is not protected under the Act because Plaintiffs have career, i.e. "business" aspirations that a Hillsdale education would supposedly help them achieve. Mot. at n. 60. However, Hillsdale's argument lacks merit.

"[T]he MCPA is a remedial statute designed to prohibit unfair [unconscionable, or deceptive methods, acts, or] practices in trade or commerce and must be liberally construed to achieve its intended goals." *Brownlow v. McCall Enterprises*, *Inc.*, 315 Mich. App. 103, 125 (2016). The Act defines "trade or commerce," as "the conduct of a business providing goods, property, or service *primarily for personal, family, or household purposes*" and includes "the *advertising, solicitation***,** offering for sale or rent, *sale*, lease, *or distribution of a service* or property, *tangible or intangible*, real, personal, or mixed, or any other article, or a business opportunity." MCL 445.902(g) (emphasis added). The Act is meant "to protect consumers in their purchases of goods which are primarily used for personal, family or household purposes." *Zine v. Chrysler Corp.*, 236 Mich. App. 261, 271 (1999), quoting *Noggles v. Battle Creek Wrecking, Inc.*, 153 Mich. App. 363, 367 (1986). If an item is purchased primarily for business or commercial, rather than personal purposes, the MCPA does not supply protection. *Id.*

Hillsdale engaged in trade or commerce by providing educational services to Plaintiffs for personal, family, or household purposes. Plaintiffs Chen and Villarreal are pursuing their undergraduate educations for the holistic purpose of a "college experience"—including participation in athletics, extracurricular clubs, social activities, and political engagement. FAC ¶¶ 1, 2, 18, 19. The fact that the women aspire to be working professionals does not make their pursuit of an undergraduate education any less personal, nor does it indicate that such

employment was their primary purpose in purchasing a Hillsdale education. Otherwise, any service purchased and received by a person that could make them of marginally greater value in the American marketplace could never come within reach of the MCPA.[22] Thus, Plaintiffs are protected by the Act.

**2.    Plaintiffs' MCPA claims satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b).**

Hillsdale repeatedly misconstrues the substance of Plaintiffs' fraudulent misrepresentation and omission claims, arguing primarily that Plaintiffs have failed to satisfy the heightened particularity pleading requirements of Federal Rule of Civil Procedure 9(b). Mot. at 5; *see* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 410-11 (6th Cir. 2022) (stating that a party alleging fraud must "specify the 'who, what, when, where, and how' of the alleged fraud"). Plaintiffs have pled their MCPA claims with requisite specificity so as to inform Hillsdale of the legal challenges it faces.

**a.    Fraudulent Misrepresentation**

To establish a claim for fraudulent misrepresentation, a plaintiff must allege: (1) that defendant made a material misrepresentation; (2) that it was false; (3) that when the seller made it, the seller knew it was false, or made it recklessly, without knowledge of its truth and as a positive assertion; (4) that the seller made it with the intention that it should be acted upon by

---

[22] Hillsdale's citation to *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654 (6th Cir. 2013) is misplaced. The law students in that case specifically alleged they intended to use their professional degrees to "attain[] full-time employment in the legal sector," an expressly business purpose. *Id.* at 661. The Sixth Circuit did not purport to hold that all students, including undergraduates, seek out higher education only for business purposes. Because Plaintiffs allege that they elected to attend Hillsdale College because of the values it espoused, and not only to attain employment, *MacDonald* is inapposite. *See* FAC ¶¶ 18, 19.

plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that the plaintiff thereby suffered injury. *Reid v. Gen Motors LLC*, 491 F. Supp. 3d 268, 276 (E.D. Mich. 2020).

Hillsdale's attempt to paint Hillsdale's mission statements and specific safety statements made by Hillsdale representatives at Admitted Students Day as "nonactionable puffery" fails. Students have a reasonable expectation to be safe in their educational environment, which Hillsdale reinforced through its acts and omissions. *See* FAC ¶¶ 183, 185, 189-190. Frankly, it is concerning that Hillsdale would analogize its assurances about its "safe, healthy campus environment" to grandiose promises by car companies about their vehicles being the "best in the world." Mot. at 63 (citing *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626 (E.D. Mich. 2019)). This analogy is misplaced and falls flat.

Hillsdale's argument that Plaintiffs have failed to identify any actionable misrepresentation is false. Plaintiffs' Amended Complaint abounds with fraudulent misrepresentations made by Hillsdale which Plaintiffs relied on and were injured by. Hillsdale knew statements about Hillsdale's allegedly "supportive community" which "exists for the improvement and ultimate happiness of its students" and offers a "wide range of services designed to promote *a safe, healthy campus environment*" were false because of previous similar sexual assault scandals taking place at the college. FAC Figures 1, 2, ¶ 185. Plaintiffs allege that they decided to attend Hillsdale after researching and relying on information provided on Hillsdale's website indicating that the college was a safe place to get an education. FAC ¶¶ 17-19. Plaintiffs further allege that they relied on safety assurances made to parents by a Hillsdale representative at Admitted Students Day that their children would be safe in Hillsdale's care. FAC ¶ 183. Hillsdale made these statements with the intention that Plaintiffs would rely on them when deciding to attend Hillsdale. Moreover, Plaintiffs allege that Hillsdale misrepresented that

it would actually enforce the sexual assault policy effectively and transparently, when it did not do so for either of them. FAC ¶¶ 26, 27, 68-99, 100-123.

Hillsdale inaccurately asserts that Plaintiffs fail to allege that statements made by the college were untrue, or "that the overall Hillsdale education failed to help them develop in heart and mind." Mot. at 64. This assertion overlooks paragraphs of the Amended Complaint detailing how Hillsdale's campus became an entirely hostile environment to Plaintiffs once Plaintiffs reported that they had been assaulted. FAC ¶¶ 77-99, 112-123. As Plaintiffs allege, statements made by Hillsdale were untrue because Plaintiffs were exposed to a dangerous campus environment, sexually assaulted, and subjected to further harm through faulty investigations and retaliatory threats. This environment was surely not supportive, nor conducive to "growth," as falsely misrepresented by the college. Hillsdale misreads the requisite specificity of Rule 9(b), which Plaintiffs have here satisfied. More exacting technicality is just not required at the pleading stage.

### b. <u>Fraudulent Omission</u>

To establish a claim for fraudulent omission, a plaintiff must allege: "(1) precisely what was omitted; (2) who should have made a representation; (3) the content of the alleged omission and the manner in which the omission was misleading; and (4) what [defendant] obtained as a consequence of the alleged fraud." *In re Gen. Motors Air Conditioning Mktg & Sales Practices Litig*, 406 F. Supp. 3d 618, 636 (E.D. Mich. 2019). However, asking Plaintiffs at the pleading stage to state fraudulent omission with such specificity is not practicable and thus Plaintiffs should face a "slightly more relaxed pleading burden" and can succeed without the same level of specificity usually required for 9(b), so long as still trying to answer essential "who, what, when, where, and how" questions required by test. *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 255-56 (6th Cir. 2012).

Hillsdale repeatedly misconstrues Plaintiffs' contention in this case. Plaintiffs' contention is not that a sexual assault policy does not exist. Instead, Plaintiffs' allegations plausibly establish that while the policy exists as mere words on paper labeled "Sexual Misconduct Policy," it has proven time and again to be functionally ineffective and entirely useless at protecting students. FAC ¶¶ 21-26, 32-39, 51-60. Furthermore, when students do report instances of sexual misconduct, Hillsdale does not follow the procedures provided by the Policy.

First, Plaintiffs allege that Hillsdale knew about the inadequate sexual assault policy and the resultant dangerous environment on Hillsdale's campus, yet nevertheless failed to disclose this to students, including Plaintiffs. FAC ¶¶ 13, 27, 28. Plaintiffs allege that they relied on Hillsdale's misleading representations about the safety, community, self-development, and happiness that they would be provided in purchasing a Hillsdale education. FAC ¶¶ 186-189. As a result of Hillsdale's fraudulent omissions, it obtained thousands of dollars in tuition payments made by Plaintiffs. Plaintiffs further allege that they would have made decidedly different purchasing decisions with respect to their education had this information been made available to them, or at the very least paid less for their Hillsdale education. FAC ¶ 191. Plaintiff Villarreal has in fact made a different purchasing decision by unenrolling from Hillsdale due to the danger to which she was exposed as a result of relying on Hillsdale's fraudulent omission of material information. Plaintiffs have not "invent[ed] a defect," as Hillsdale incorrectly states. Mot. at 65. Plaintiffs have been exposed to material information about Hillsdale's rampant mishandling of campus sexual assaults that, had it not been withheld from them, would have precluded the purchase of a Hillsdale education to begin with.

## V.       CONCLUSION

For the foregoing reasons, the Court should deny Hillsdale's motion to dismiss Plaintiffs' Amended Complaint.

Dated: April 15, 2024                        Respectfully submitted,

*/s/ Annika K. Martin*

Annika K. Martin
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592
akmartin@lchb.com

Michelle A. Lamy
Caitlin M. Nelson
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
mlamy@lchb.com
cwoods@lchb.com

Beth M. Rivers
Megan A. Bonanni
Channing Robinson-Holmes
**PITT MCGEHEE PALMER BONANNI & RIVERS PC**
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
Telephone: 248.398.9800
Facsimile: 248.268.7996
brivers@pittlawpc.com
mbonanni@pittlawpc.com
crobinson@pittlawpc.com

*Attorneys for Plaintiffs*