UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GRACE CHEN, et al.,

      Plaintiffs,

                              Case No. 1:23-cv-1129

v.

                              HON. JANE M. BECKERING

HILLSDALE COLLEGE,

      Defendant.

_____/

## OPINION AND ORDER

Plaintiffs Grace Chen (Chen) and Danielle Villarreal (Villarreal) filed this putative class action, alleging several claims under Title IX and state law.  Now pending before the Court is Defendant Hillsdale College (Hillsdale)'s Motion to Dismiss (ECF No. 23).[1]  For the following reasons, the Court grants the motion and closes this case.

### I.  BACKGROUND

#### A.  Factual Background

Hillsdale College, which is registered as an entity with tax exempt status under 26 U.S.C. § 501(c)(3), is a private four-year college located in Hillsdale, Michigan (Am. Compl. [ECF No. 19] ¶¶ 3 & 7).  Plaintiffs allege that "[i]n an attempt to maintain its 'independence' from government regulations, Hillsdale [College] 'does not accept federal or state taxpayer subsidies for any of its operations' and instead relies on private funding" (*id.* ¶ 10 (citation omitted)).  This

---

[1] Defendant also filed a Motion to Strike Class Allegations (ECF No. 29), which is properly dismissed as moot, given the Court's decision to grant the motion to dismiss.

lawsuit arises from two alleged sexual assaults in the fall of 2021, when Plaintiffs Chen and Villarreal were both students at Hillsdale College.

1.      **Chen's Allegations**

Chen, a current Hillsdale College student studying to become a physician's assistant, alleges that she was raped by a fellow Hillsdale track athlete in a dormitory on campus on or around November 22, 2021 (*id.* ¶¶ 1, 68).  When she reported the sexual assault to a school counselor in February 2022, the counselor allegedly warned her that the Hillsdale College deans would not take action without "concrete evidence" of the assault (*id.* ¶¶ 70–71).  Chen nonetheless reported the assault in March 2022 (*id.* ¶ 72).  Chen met with Hillsdale College's Dean of Women, Rebekah Dell, and Dean Dell allegedly indicated that Chen's assailant may pursue a countersuit, presumably for defamation (*id.* ¶¶ 73–75).

Dean Dell arranged for Chen to meet with Kimberley Graham, an outside lawyer whom Hillsdale College was using to investigate the assault (*id.* ¶ 76).  Graham informed Chen that her assailant did not deny her account allegations, and Graham allegedly refused to interview the witnesses whom Chen had identified, purportedly because there were no factual discrepancies between the accounts provided by Chen and her assailant (*id.* ¶ 77).  Graham subsequently indicated that Chen's assailant would not be punished "because he was already doing community service, AA meetings, and counselling for a prior drinking infraction" (*id.* ¶ 83).  Graham suggested that there would be a no-contact order, but Chen alleges that one was never implemented (*id.* ¶¶ 85–86).  As a result, Chen continues to regularly encounter her assailant (*id.* ¶¶ 87 & 99).

2.     **Villarreal's Allegations**

Villarreal, who plans to become a lawyer, alleges that she was raped by a fellow student and a member of Hillsdale College's baseball team at his off-campus apartment on or around August 29, 2021 (*id.* ¶¶ 2, 100).   A day or two later, she reported the sexual assault to local police and Hillsdale's Dean of Men, Aaron Peterson (*id.* ¶¶ 101–02).   Dean Peterson instructed her to meet with Mechelle Zarou, an outside lawyer whom Hillsdale College was using to investigate the assault (*id.* ¶ 102).   Plaintiffs allege that Zarou indicated that the facts Villarreal described aligned with the definition of sexual assault (*id.* ¶ 105).   Villarreal's assailant was not initially responsive to Zarou's messages, and Zarou did not interview him until weeks after her meeting with Villarreal (*id.* ¶ 106).

In early October 2021, Villarreal met with Zarou to reconcile discrepancies between Villarreal's account and her assailant's account (*id.* ¶¶ 107–08).   Later that month, Zarou met with Villarreal again and informed her that the assailant would not be expelled from Hillsdale College because, although he initially "acted without consent," "he stopped penetrating her when she told him to [stop]" (*id.* ¶ 114).   On or around October 26, 2021, Zarou informed Villarreal that Hillsdale College had placed her assailant on social probation, required him to do community service, and suspended him indefinitely from baseball (*id.* ¶ 115).   According to Villarreal, however, the punishment was not enforced as she subsequently saw him at a party (*id.* ¶¶ 116–17).   Additionally, he was allowed back on the baseball team for the second semester (*id.* ¶ 120).   Villarreal, who also regularly encountered her assailant, ultimately withdrew from Hillsdale (*id.* ¶ 123).

### B.  Procedural Posture

On October 25, 2023, Plaintiffs, on behalf of themselves and a putative class of "[a]ll female students who are or were enrolled at Hillsdale College from October 25, 2017 onwards and

who were sexually assaulted or treated in a manner covered by the sexual assault policy," initiated

this case with the filing of a Complaint (Compl. [ECF No. 1] ¶ 103).  Plaintiffs are not citizens of

Michigan and filed their Complaint under both this Court's diversity jurisdiction and federal-

question jurisdiction (*id.* ¶ 4).

In lieu of answering the Complaint, Defendant filed a Motion to Dismiss (ECF No. 11).

On January 11, 2024, Plaintiffs filed an Amended Complaint (ECF No. 19), and this Court

therefore dismissed the motion to dismiss as moot (Order, ECF No. 20).   In their Amended

Complaint, Plaintiffs allege the following six claims:

I.   Negligence;

II.   Intentional Infliction of Emotional Distress;

III.   Sex Discrimination in Violation of Michigan's Elliot-Larsen Civil Rights
       Act (ELCRA), Mich. Comp. Laws § 37.2101 *et seq.*;

IV.   Violations of Michigan's Consumer Protection Act (MCPA), Mich. Comp.
      Laws § 445.901 et seq.;

V.   Violation of Title IX, 20 U.S.C. § 1681 *et seq.*, for Discrimination; and

VI.   Violation of Title IX, 20 U.S.C. § 1681 *et seq.*, for Retaliation

(ECF No. 19).  According to Plaintiffs, Defendant's Sexual Misconduct Policy, which is attached

to the Amended Complaint as their Exhibit A (ECF No. 19-1), lacks clear rules and procedures,

provides Hillsdale College with total discretion, fails to provide any transparency to students, fails

to directly discuss the concept of consent, and fails to specify under what circumstances

confidentiality will be maintained (*id.* ¶¶ 21–60).   Plaintiffs also allege that Defendant's

investigations of sexual assaults are a "charade at best" as "the school does not thoroughly

investigate the facts or witnesses, let alone conduct an impartial, transparent investigation" (*id.* ¶

4

48).  Plaintiffs amended their description of the putative class to more broadly include "[a]ll female students who are or were enrolled at Hillsdale College from October 25, 2017 onwards" (*id.* ¶ 124).

On February 1, 2024, Defendant filed a Motion to Dismiss the Amended Complaint, in its entirety (ECF No. 23).  Plaintiffs filed a response in opposition to the motion to dismiss on April 16, 2024 (ECF No. 44), and Defendant filed a reply to the response on May 14, 2024 (ECF No. 54).  Having considered the parties' submissions, the Court concludes that oral argument is unnecessary to resolve the issues presented.  *See* W.D. Mich. LCivR 7.2(d).

## II.  ANALYSIS

### A.  Motion to Dismiss

1.  **Motion Standard**

Defendant's motion is filed pursuant to Federal Rule of Civil Procedure 12(b)(6).  Rule 12(b)(6) authorizes the court to dismiss a claim for relief in any pleading if it "fail[s] to state a claim upon which relief can be granted[.]"  FED. R. CIV. P. 12(b)(6).  To survive a motion to dismiss, a complaint must present "enough facts to state a claim to relief that is plausible on its face."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557, 570 (2007).[2]  "A claim has facial

---

[2] In their response brief, Plaintiffs incorrectly state that dismissal of a complaint for the failure to state a claim on which relief may be granted is appropriate "*only if* it appears *beyond a doubt* that the plaintiff can prove *no set of facts* in support of his claim that would entitle him to relief" (ECF No. 44 at PageID.735, quoting *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957) (emphases supplied by Plaintiffs)).  In its 2007 decision in *Twombly*, the Supreme Court "retire[d]" the old "no-set-of-facts" motion standard from *Conley*.  550 U.S. at 562–63 (indicating that *Conley's* "no set of facts" language "has been questioned, criticized, and explained away long enough," and is "best forgotten").  *See also Courie v. Alcoa Wheel & Forged Prod.*, 577 F.3d 625, 629 (6th Cir. 2009) (acknowledging that the Supreme Court "raised the bar for pleading requirements beyond the old 'no -set-of-facts' standard of *Conley*").  Indeed, Plaintiffs' references to what "discovery will reveal," *see, e.g.,* Resp., ECF No. 44 at PageID.751, 772, indicate a tacit acknowledgement by Plaintiffs that their Amended Complaint lacks the requisite factual specificity.  "[A] plaintiff cannot use discovery to bridge the gap between a deficient pleading and the possibility that a claim might survive upon further investigation."  *Kovalchuk v. City of*

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  Although the plausibility standard is not equivalent to a "'probability requirement,' … it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting FED. R. CIV. P. 8(a)(2)).

In deciding a motion to dismiss for failure to state a claim, the court must construe the complaint in the light most favorable to the non-movant and accept all well-pleaded factual allegations in the complaint as true. *Thompson v. Bank of Am., N.A.*, 773 F.3d 741, 750 (6th Cir. 2014).  Importantly, courts need not accept legal conclusions as true. *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 480 (6th Cir. 2020).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Last, because this case is brought under this Court's diversity jurisdiction, the Court applies the substantive law of Michigan and federal procedural law. *See Biegas v. Quickway Carriers, Inc.,* 573 F.3d 365, 374 (6th Cir. 2009) ("Under the *Erie* doctrine, federal courts sitting in diversity apply the substantive law of the forum state and federal procedural law.").  When applying a court's substantive law, the Court must "follow the decisions of the state's highest court when that court has addressed the relevant issue." *City of Cleveland v. Ameriquest Mort. Sec., Inc.*, 615 F.3d 496, 502 (6th Cir. 2010) (citation omitted).

---

*Decherd, Tenn.*, 95 F.4th 1035, 1041 (6th Cir. 2024) (citing *New Albany Tractor, Inc. v. Louisville Tractor, Inc.*, 650 F.3d 1046, 1051 (6th Cir. 2011).

2. <u>**Discussion**</u>

a. **Negligence (Count I)**

In Count I, Plaintiffs allege that Defendant had "a duty to provide Plaintiffs with a safe educational environment" (Am. Compl. ¶ 137).  Plaintiffs allege that Defendant "exercised a measure of control over Plaintiffs' lives and that of other students" inasmuch as "Plaintiffs were underclassmen who lived their lives on campus: sleeping in campus dorms, eating in campus dining halls, attending class in campus classrooms, and studying in campus study spaces" (*id.*). Plaintiffs allege that Defendant "breached that duty of care by exposing Plaintiffs to an unacceptable and unusually high risk of sexual assault" because Defendant did not have "policies that prevent sexual assault" and did not "properly respond to incidents of sexual assault that did happen" (*id.* ¶¶ 138–40).

Defendant seeks dismissal of Count I, arguing that Defendant did not have a "special relationship" with Plaintiffs that could trigger a duty to protect them from wrongdoing by third parties (ECF No. 33 at PageID.526–528).  Defendant argues that even if it had a special relationship with Plaintiffs, it had no duty to prevent third-party crimes where there was no "imminent and foreseeable" threat from Plaintiffs' assailants (*id.* at PageID.528–529).  Defendant also argues that Plaintiffs have not adequately alleged either that Defendant acted negligently or that such negligence caused the assaults to occur (*id.* at PageID.529–531).  Last, Defendant argues that to the extent that Plaintiffs allege that its conduct *after* the assaults was negligent, Defendant argues that Plaintiffs allege only generalized "emotional damages" from feeling "institutionally betrayed," which is insufficient to state a negligence claim (*id.* at PageID.531–532).

In response, Plaintiffs first argue that a special relationship exists between Defendant and its students, by operation of law, because Defendant exercised substantial control over Plaintiffs'

lives and the lives of their fellow students, including their assailants (ECF No. 44 at PageID.759–761).  Alternatively, Plaintiffs argue that even if the law does not impose such a legal duty, Defendant voluntarily assumed the duty to prevent sexual misconduct by having a Sexual Misconduct Policy and "declar[ing] an (albeit unenforced) punishment for Villarreal's rapist" (*id.* at PageID.761–762, citing Am. Compl. ¶¶ 100 & 115).  Third, Plaintiffs argue that "[s]pecial relationship or not, public policy supports finding that Hillsdale 'had a duty to adopt fair procedures and implement those procedures with reasonable care" in investigating and adjudicating reports of sexual misconduct" (*id.* at PageID.762) (quoting *Doe v. Univ. of Denver*, 516 P.3d 946, 959, 959 n.10 (Colo. Ct. App. 2022)).  Last, Plaintiffs argue that they sufficiently alleged that Defendant breached its duty to provide a safe environment—not wholly free from sexual assault, but with no greater than the baseline risk—and caused their damages (*id.* at PageID.762–764).

Defendant's motion is properly granted as to Count I.

The elements of a negligence claim are (1) the defendant owed the plaintiff a legal duty, (2) the defendant breached the legal duty, (3) the plaintiff suffered damages, and (4) the defendant's breach was a proximate cause of the plaintiff's damages.  *Highfield Beach at Lake Michigan v. Sanderson*, 954 N.W.2d 231, 247 (Mich. Ct. App. 2020).  Consistent with Michigan law, the parties agree that the threshold determination, whether a relationship supports a duty of care, is a question of law for the Court (ECF No. 33 at PageID.526; ECF No. 44 at PageID.759).  *See Loweke v. Ann Arbor Ceiling & Partition Co.*, 809 N.W.2d 553, 556 (Mich. 2011) ("[A] defendant is not liable to a plaintiff unless the defendant owed a legal duty to the plaintiff.");  *Murdock v. Higgins*, 559 N.W.2d 639, 642 (Mich. 1997) (1997) ("The threshold question, whether a duty exists, is a question of law, an issue solely for the court to decide.") (citation omitted).

Plaintiffs proffer three bases for finding that Defendant owed them a duty of care, which the Court will consider in turn.

**First,** Plaintiffs assert that a duty of care arises by operation of law.  The general rule, however, is that "[a]n individual has no duty to protect another from the criminal acts of a third party in the absence of a special relationship between the defendant and the plaintiff or the defendant and the third party." *Graves v. Warner Bros.*, 656 N.W.2d 195, 200 (Mich. Ct. App. 2002) (reasoning that criminal activity, "by its deviant nature, is normally unforeseeable") (citation omitted).  *See also Murdock*, 559 N.W.2d 639, 643 (Mich. 1997) ("Generally, an individual has no duty to protect another who is endangered by a third person's conduct.").  Therefore, Plaintiffs must demonstrate that there is a special relationship under the law that gives rise to a duty on the facts they have alleged.

Special relationships, such as the relationships the law has found between a landlord and its tenants or a merchant and its invitees, are predicated on "an imbalance of control, where one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself." *Bailey v. Schaaf*, 835 N.W.2d 413, 419 (Mich. 2013) (internal quotation marks, citation, and emphasis omitted).  In the school setting, "[t]he doctrine of *in loco parentis* treats school administrators as standing in the place of students' parents under circumstances where the children's actual parents cannot protect, guide, and discipline them." *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 189 (2021).

Hence, in *Cook v. Bennett*, 288 N.W.2d 609 (Mich. Ct. App. 1979), where an elementary school teacher and principal were sued for injuries suffered by a pupil while playing a game during recess, the Michigan court of appeals held that "[a] teacher owes a duty to exercise reasonable care over students in his or her charge," indicating that the duty is "coterminous with the teacher's

presence at school" and that "[s]upervision implies oversight." *Id.* at 611 (ultimately concluding that there was no showing that the teacher could have breached any duty because "he was not present nor were any children placed in his charge at the time of [the] plaintiff's injury").

Applying *Cook's* reasoning in *In re Doe*, No. 264679, 2006 WL 475285, at *2 (Mich. Ct. App. Feb. 28, 2006), where a high school was sued for a sexual assault suffered by the plaintiff's son, the Michigan Court of Appeals concluded that the rationale for imposing a duty, i.e., *in loco parentis,* was not applicable because the plaintiff's son was not participating in any school-sponsored event.  Additionally, the appellate panel determined that the circumstances did not support the conclusion that the injury was foreseeable. *Id.*  The appellate panel acknowledged that while "one would like to assume that a child is safe from harm on school premises whenever school-sponsored events are taking place," the high school personnel did not owe the plaintiff's son a duty of care under the law. *Id.* at *3.

Here, Plaintiffs do not allege that Defendant's staff were sponsoring, supervising, or even present at any college activity when they were assaulted.  Nor do Plaintiffs allege any facts supporting the proposition that Defendant had any notice that would have made the assaults foreseeable.  And Plaintiffs do not identify any Michigan precedent supporting the proposition that a special relationship exists between a college and its adult students that would give rise to a general duty of care to protect the students from the criminal acts of a third party.  Indeed, in 2003, the Court of Appeals for the Eighth Circuit observed that "[s]ince the late 1970s, the general rule is that *no* special relationship exists between a college and its own students because a college is not an insurer of the safety of its students." *Freeman v. Busch*, 349 F.3d 582, 587 (8th Cir. 2003) (collecting cases).  The Third Circuit likewise opined in 2010 that "[t]he idea that public universities exercise strict control over students via an *in loco parentis* relationship has decayed to

the point of irrelevance." *McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 245 (3d Cir. 2010).  *Cf. Hedrick v. W. Michigan Univ.*, No. 1:22-cv-308, 2022 WL 10301990, at *5 (W.D. Mich. Oct. 17, 2022) (observing, within the context of a First Amendment case, that "[u]niversities are different from [high] schools due to the 'age, independence, and living arrangements' of the students who attend them") (quoting *Mahanoy Area Sch. Dist. v. B. L. by & through Levy*, 594 U.S. 180, 194 n.2 (2021) (Alito, J., concurring)).  In short, Plaintiffs have not demonstrated that there is a special relationship under the law between a college and its adult students that gives rise to a duty on the facts they have alleged.

*Second,* Plaintiffs assert that even if a duty of care does not exist by operation of law, Defendant voluntarily assumed such a duty.  Specifically, Plaintiffs argue that Defendant, by having a Sexual Misconduct Policy and punishing offenders, voluntarily assumed a duty to prevent sexual misconduct.  An actor voluntarily assumes a duty only when he or she "undertakes, gratuitously or for consideration, to render services to another which he [or she] should recognize as necessary for the protection of the other's person or things."  *Schanz v. New Hampshire Ins. Co.*, 418 N.W.2d 478, 481 (Mich. Ct. App. 1988) (quoting Restatement (Second) of Torts § 323)).

As many courts on similar facts have concluded, neither Defendant's adoption nor its implementation of a sexual misconduct policy constituted an undertaking to "render services" necessary to protect students.  For example, in *Barlow v. State*, 540 P.3d 783, 790 (Wash. 2024) (en banc), the Washington Supreme Court held that a college's "code of conduct is irrelevant to establishment of a duty."  The state supreme court reasoned that while the code "may provide the university the ability to academically punish students after the fact," it "does not create control of students' behavior in a preventative way."  *Id.*  Similarly, in *Rabel v. Illinois Wesleyan University*, 514 N.E.2d 552, 560 (Ill. Ct. App. 1987), the Illinois Court of Appeals surveyed relevant precedent

across the nation and rejected the plaintiff's negligence claim against her university, holding that the "university, by its handbook, regulations, or policies [had not] voluntarily assumed … a duty to protect its students from [injuries]." *See generally Pawlowski v. Delta Sigma Phi*, No. CV-03-0484661S, 2009 WL 415667, at *3 (Conn. Super. Ct. Jan. 23, 2009) (collecting cases for the proposition that absent affirmative conduct on the part of a university, "courts have been reluctant to find that negligent administration of a university's rules or policies gives rise to an enforceable duty") (ultimately concluding on the facts before it, where the harm arose from underage drinking, that the university's alleged failures—such as failing to enforce or adopt rules regarding the operation of fraternities, failing to supervise off-campus drinking, and failing to enforce its rules against underage drinking—did not provide a basis for an assumption of duty within the meaning of Restatement § 323).

Plaintiffs' second basis for finding a duty of care is similarly unavailing.  Defendant's adoption and implementation of a Sexual Misconduct Policy, which largely tracks misconduct prohibited by law, did not place Defendant in a custodial relationship with its students for purposes of imposing a duty of protection.

***Third,*** relying on a decision from a state court of appeals in Colorado, Plaintiffs last argue that public policy should give rise to a duty of care.  However, "federal courts[] will not modify and write state law" based on "public policy," and "the development of Michigan common law should be left to Michigan courts."  *Berrington v. Wal-Mart Stores, Inc.*, 799 F. Supp. 2d 772, 776 (W.D. Mich. 2011), *aff'd,* 696 F.3d 604, 609–10 (6th Cir. 2012) ("The district court was correct in declining to carve an unprecedented category of public policy claims out of Michigan law[.]").

In any event, as Defendant points out in its Reply brief, the Colorado case concerned whether the university owed the alleged assailant a duty of care in investigating and adjudicating

the allegations of non-consensual sexual contact against him, and the Colorado Court of Appeals "express[ed] no opinion on whether [the university] owed … a duty of care to an alleged victim of non-consensual sexual contact."  *Doe v. Univ. of Denver*, 516 P.3d at 957 n.9.  Moreover, on May 6, 2024, shortly after Plaintiffs filed their response in this case, the Colorado supreme court held that a university "does *not* owe its students a tort-based duty to use reasonable care in adopting and implementing fair procedures related to the investigation and adjudication of sexual-misconduct claims."  *Univ. of Denver v. Doe*, 547 P.3d 1129, 1147 (Colo. 2024) (emphasis added).

In sum, because Plaintiffs do not plausibly allege any basis for concluding that Defendant owed them a duty of care on the facts alleged, their negligence claim fails as a matter of law.  Count I is properly dismissed.

### b.      Intentional Infliction of Emotional Distress (Count II)

In its totality, Plaintiffs' claim for Intentional Infliction of Emotional Distress (IIED) in Count II consists of the following five paragraphs:

> 156. Hillsdale intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of failing to have or enforce policies that prevent sexual assault and mismanaging student reports of sexual assault.
>
> 157. Hillsdale's conduct was so extreme and outrageous that it went beyond the bounds of decency and was atrocious and utterly intolerable.
>
> 158. Hillsdale's conduct was intentional or reckless. Hillsdale acted with indifference as to whether its conduct would harm Plaintiffs. Hillsdale acted with intentional disregard of the known and substantial risk that its negligence would reasonably result in harm to Plaintiffs.
>
> 159. Hillsdale's conduct was the cause of Plaintiffs' severe emotional distress.
>
> 160. Hillsdale's conduct was the cause of Plaintiffs' damages.

(Am. Compl., ECF No. 19 at PageID.255–256).

Defendant seeks dismissal of Count II, arguing that Plaintiffs "do not come close to pleading an IIED claim" (ECF No. 54 at PageID.879).  According to Defendant, if Plaintiffs' claim of intentional infliction of emotional distress is meant to target Defendant's *pre*-assault conduct and the emotional distress resulting from the assaults, then the claim fails for the same reasons that their negligence claim fails, to wit:  Plaintiffs have not alleged any facts supporting their assertions that Defendant mishandled previous reports of sexual assault and thus fostered a culture where would-be assailants feel "emboldened," much less that Defendant engaged in "extreme and outrageous conduct" (ECF No. 33 at PageID.532–533).  Defendants argue that Plaintiffs' claim also fails for the separate reason that Michigan law does not support the notion that an IIED claim can be "based on a third party's intentional conduct" (*id.* at PageID.533).  Alternatively, Defendants argue that if Plaintiffs' IIED claims are instead meant to target Defendant's response to their reports, their IIED claim also fails because Plaintiffs have not plausibly alleged that Defendant's investigation and disciplinary action were extreme or outrageous (*id.* at PageID.533–534).

In response, Plaintiffs summarily contend that Defendant's failure to establish policies that provide protection from sexual assault "would be found by the average person to be outrageous" and "[b]eyond that, the actual investigations Hillsdale conducted were so inappropriate that they could easily be found by a reasonable juror to be extreme and outrageous" (ECF No. 44 at PageID.765–766).  Plaintiffs also argue that Defendant's "pattern of blaming victims, backtracking and downplaying the severity of sexual assaults, and failing to protect reporting students from their assailants amounts to conduct so reckless that a reasonable person should know emotional distress would result" (*id.* at PageID.767).

Defendant's motion is properly granted as to Count II.

14

The parties agree that the elements of an IIED claim are "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress" (ECF No. 33 at PageID.532; ECF No. 44 at PageID.765).  *See Lewis v. LeGrow*, 670 N.W.2d 675, 689 (Mich. Ct. App. 2003) (citation omitted).  To be actionable, a defendant's conduct may either be "specifically intended to cause a plaintiff emotional distress" or "so reckless that any reasonable person would know that emotional distress would result."  *Id.* (citation and quotation marks omitted).  The defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.*  The test to determine whether a person's conduct was extreme and outrageous is whether recitation of the facts of the case to an average member of the community "would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"  *Id.* (quoting, in pertinent part, *Roberts v. Auto–Owners Ins. Co.,* 374 N.W.2d 905, 909 (Mich. 1985), quoting Restatement Torts, 2d, § 46, comment d).  Whether alleged conduct is sufficiently severe to assert an IIED claim is initially a question of law for the court.  *Sawabini v. Desenberg*, 372 N.W.2d 559, 565 (Mich. Ct. App. 1985) (citing *Roberts, supra*).

In their Amended Complaint, Plaintiffs do not dispute that Defendant's Sexual Misconduct Policy defines sexual misconduct and consent, provides a method for confidential reporting, and states that privacy and confidentiality are guaranteed.  *See* Am. Compl. ¶¶ 40, & 42–44.  And Plaintiffs do not dispute that Defendant's investigative process includes hiring third-party investigators, interviewing witnesses, maintaining regular contact with the reporting student and the accused, implementing any necessary interim measures, choosing preventative measures and/or punishments, and making sure both the reporting student and the accused are informed of the findings and results of an investigation on the same day.  *See id.* ¶¶ 33, 36–37, 48, 50, 52–55,

57, 76, 83, 102, 106, 112, & 114–15.   Last, Plaintiffs do not dispute that Defendant's policy "prohibits retaliation against any person who, in good faith, reports sexual misconduct, participates in an investigation or sanction for sexual misconduct, or otherwise assists in combatting sexual misconduct on the Hillsdale College campus" (*id.* ¶ 59).

Plaintiffs challenge the adequacy of the policy and the quality of Defendant's investigations, but inadequacies and deficiencies are not the type of extraordinary transgression of socially tolerable conduct necessary to proceed with this tort.  Simply put, accepting as true that Defendant's resolution of Plaintiffs' sexual assault complaints was unfair or unreasonable, the alleged facts nonetheless do not rise to the level of outrageousness required for an IIED claim. Nor have Plaintiffs plausibly stated an IIED claim based on a "pattern" of behavior in responding to reports of assault where Plaintiffs allege no facts[3] about any reports or investigations other than their own.[4]  Plaintiffs' allegations do not plausibly show that they are entitled to relief under an IIED theory.  Count II is properly dismissed.

### c.    ELCRA (Count III)

In Count III, Plaintiffs allege that Defendant "had a duty under the ELCRA not to discriminate against Plaintiffs on the basis of sex in the full and equal utilization of or benefit from the institution, or the services, activities, or programs provided by the institutions" (Am. Compl. ¶ 167).  Plaintiffs allege that in violation of this duty, Defendant "intentionally created and maintains a sexually discriminatory environment, through its practices and policies concerning sexual violence, which favor its male students over its female students, including Plaintiffs, and

---

[3] Plaintiffs reference two posts on Redit.com as "confirm[ing] the belief among Hillsdale students that the school's investigation process is designed neither to determine truth nor to ensure student safety" (Am. Compl. ¶¶ 27–28).

[4] Indeed, Plaintiffs indicate in briefing that thus far, no other students have come forward (ECF No. 44 at PageID.730).

effectively deprives Plaintiffs of the full and equal utilization of or benefit from the institution" (*id.* ¶ 168).  According to Plaintiffs, "[t]he intent and effect of Hillsdale's practices and policies is discriminatory to its female students in favor of its male students, as females suffer sexual violence at a significantly higher rate than males, particularly while in college, and are, consequently, the persons targeted and negatively impacted by the institution's derelict practices and policies, whereas the policies and practices benefit males, as male students who perpetrate sexual violence avoid consequences" (*id.* ¶ 173, citing "RAINN, *Victims of Sexual Violence: Statistics*, https://www.rainn.org/statistics/victims-sexualviolence").

        Defendant argues, in pertinent part,[5] that Plaintiffs' ELCRA claim that Defendant's failure to properly respond to reports of sexual assault creates a hostile educational environment is properly dismissed because no factual allegations plausibly suggest that any difference in treatment is because of membership in a protected class (gender) where Defendant's practices and policies, even if deficient, apply to all reporters of sexual assault, regardless of the genders of the reporters or perpetrators (ECF No. 33 at PageID.539–541).

        In response, Plaintiffs argue that Defendant intentionally discriminated against its female students and maintained a "facially-neutral" policy that had a "discriminatory effect" on its female students (ECF No. 44 at PageID.771–772).  According to Plaintiffs, "such actions violate the ELCRA, particularly when viewed through the lens of a remedial statute" (*id.* at PageID.772).

---

[5] Defendant also argues that Plaintiffs' ELCRA claim fails because the alleged hostile environment is the result of the perceived threat of assault *by other students*, not by Defendant, and Plaintiffs cannot establish respondeat superior liability for risks caused by students (ECF No. 33 at PageID.535–539).  However, Plaintiffs clarified in their response that their ELCRA claim seeks to hold Defendant accountable not for the risks created by students but for Defendant's own discriminatory conduct, specifically, Defendant's "own practices and policies concerning sexual violence, which favor its male students over its female students" (ECF No. 44 at PageID.768, 769–770).

Defendant's motion is properly granted as to Count III.

Michigan's ELCRA applies to sex discrimination by educational institutions and guarantees students "[t]he opportunity to obtain . . . the full and equal utilization of . . . educational facilities without discrimination because of . . . sex."  MICH. COMP. LAWS § 37.2102(1) (Declaration).  Under the ELCRA, an "educational institution" is defined to include "a public or private institution, or a separate school or department thereof, and includes a[] … college, … [and] an agent of an educational institution."  MICH. COMP. LAWS § 37.2401.  The Act defines "discrimination because of sex" to include "conduct or communication [that] has the purpose or effect of substantially interfering with an individual's . . . education."  MICH. COMP. LAWS § 37.2103(k)(*iii*).  There are two categories of discrimination claims under the ELCRA:  disparate treatment and disparate impact.  The Court considers both categories, in turn, to determine whether Plaintiffs' Amended Complaint alleges sufficient factual content from which a reasonable inference can be drawn that discrimination occurred.

***No Plausible Disparate-Treatment Claim.***  "To prove disparate treatment, the plaintiff must show that [she] was a member of the class entitled to protection under the act and that [s]he was treated differently than persons of a different class *for the same or similar conduct*."  *Reisman v. Regents of Wayne State Univ.*, 470 N.W.2d 678, 685 (Mich. Ct. App. 1991) (emphasis added). Here, however, Plaintiffs allege only that Defendant treats *differently situated* persons differently, claiming that those who commit sexual assault are treated better than those who suffer it.  *See, e.g.*, Am. Compl. ¶ 173 (alleging that Defendant's policies "benefit males ... who perpetrate sexual violence," while burdening "females [who] suffer sexual violence").  Plaintiffs' allegations therefore fail to state a plausible disparate-treatment claim under the ELCRA.

*No Plausible Disparate-Impact Claim.*  Demonstrating disparate impact, in turn, "requires a showing that an otherwise facially neutral [] policy has a discriminatory effect on members of a protected class," *Lytle v. Malady*, 579 N.W.2d 906, 916 n.26 (Mich. 1998) (citation omitted), or "burdens a protected class of persons more harshly than others," *Reisman*, 470 N.W.2d at 685.  A plaintiff seeking to establish a claim of disparate impact must identify (1) a specific practice or policy and (2) data indicating that the specific practice or policy had an adverse impact on a protected group. *Davis v. Cintas Corp.,* 717 F.3d 476, 494 (6th Cir. 2013) (Title VII); *Dunlap v. Tennessee Valley Auth.*, 519 F.3d 626, 629 (6th Cir. 2008) (Title VII); *Jones v. Pepsi-Cola Metro. Bottling Co.*, 871 F. Supp. 305, 309 (E.D. Mich. 1994) (ELCRA).  *Cf. Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004) ("Cases brought pursuant to the ELCRA are analyzed under the same evidentiary framework used in Title VII cases."); *Radtke v. Everett*, 501 N.W.2d 155, 162 (Mich. 1993) (indicating that in interpreting the ELCRA, courts may look for guidance to federal precedent construing analogous federal civil-rights statutes).

The United States Supreme Court has instructed that "a disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a defendant's policy or policies causing that disparity." *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 542 (2015).  In the case before it, which concerned race discrimination in housing, the Supreme Court explained that a "robust causality requirement … protects defendants from being held liable for racial disparities they did not create." *Id.* at 542.  The Sixth Circuit has similarly warned that a "complete failure to make any such statistical showing is fatal to [a plaintiff's] claim." *Butts v. McCullough*, 237 F. App'x 1, 9 (6th Cir. 2007) (age discrimination). *See, e.g., Ohio Democratic Party v. Husted*, 834 F.3d 620, 638 (6th Cir. 2016) (indicating, in a Voting Rights Act case, that "to invalidate a State's innocuous voting regulation based solely on

evidence that social and historical conditions resulted in a disparate impact would impermissibly punish a state for the effects of private discrimination").

Here, Plaintiffs' own experiences are insufficient to alone show that female students at Hillsdale College are disparately impacted by the policy.  And Plaintiffs' Amended Complaint does not cite any statistics showing that Defendant's practices and policies causally burden female students "more harshly" than male students.  The statistics upon which Plaintiffs rely demonstrate only that sexual assaults are perpetrated more frequently by male students.  *See* Am. Compl. ¶ 173. The statistics do not support a reasonable inference that Defendant's policies and practices are discriminatory and does not show that male and female students at Hillsdale College were impacted differently by the policy.  In short, Plaintiffs' allegations fail to state a plausible disparate-treatment claim under the ELCRA.

### d.    MCPA (Count IV)

In Count IV, Plaintiffs allege that Michigan's MCPA applies to them because Defendant "engaged in trade or commerce by providing educational services primarily for personal, family, or household purposes" (Am. Compl. ¶ 184).  According to Plaintiffs, Defendant committed "unfair, unconscionable or deceptive methods, acts, or practices" acts by representing on its webpage that a Hillsdale College education "would have qualities it did not," as follows:

- Hillsdale represented that Plaintiffs would "grow in heart and mind by studying timeless truths in a supportive community dedicated to the highest things."

- Hillsdale represented that it would "develop the minds and improve the hearts of the students."

- Hillsdale represented that it "exists for the improvement and ultimate happiness of its students.  This great and enduring happiness is its highest purpose."

- Hillsdale represented that it "not only readies you for the world, we also set a standard for it."

- On its webpage for Student Support, the school specifically touts the "wide range of services designed to promote a safe, healthy campus environment."

(*id.* ¶ 185) (footnotes omitted).  Plaintiffs also allege that "[o]ne former student's parents recalled a Hillsdale administrator stating at a welcome event for admitted students that parents could be assured that when they left their children in Hillsdale's care, Hillsdale would keep them safe" (*id.* ¶ 183; *see also* ¶ 185 ("Hillsdale staff also assured parents that their children would be safe in the school's care")).   Plaintiffs allege that Defendant's omissions of material facts and/or representations about material facts violate MICH. COMP. LAWS § 445.903(s), (bb), and (cc) (*id.* ¶ 190).  Plaintiffs allege that Defendants' "failure to disclose its history of mishandling student reports of sexual abuse is a material fact that was important to Plaintiffs' decision to purchase a Hillsdale education" (*id.* ¶ 189; *see also* ¶ 191 ("If Plaintiffs had known the truth about a Hillsdale education, they would not have paid for a Hillsdale education or they would have paid less.")).

Defendant seeks dismissal of Count IV, arguing that Plaintiffs' MCPA claim fails to identify any actionable misrepresentations and therefore fails to satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) (ECF No. 33 at PageID.541–545).  Defendant opines that its representations about its "supportive community" and "safe, healthy campus environment" are "quintessentially non-actionable" statements (ECF No. 54 at PageID.858).  Defendant argues that even if Plaintiffs satisfied Rule 9(b), the MCPA affords them no protection where Plaintiffs failed to allege that their education was purchased "primarily for personal, family, or household purposes" (ECF No. 33 at PageID.546, n.60).

In response, Plaintiffs argue that they sufficiently alleged a claim under the MCPA where they alleged that they are pursuing their undergraduate educations for the "holistic purpose of a

21

'college experience'—including participation in athletics, extracurricular clubs, social activities, and political engagement" (ECF No. 44 at PageID.773, citing Am. Compl. ¶¶ 1–2 & 18–19). Plaintiffs also argue that their claim satisfies the heightened pleading requirements of Rule 9 because Defendant's mission statement and specific safety statements are actionable inasmuch as Defendant made the statements with the intention that Plaintiffs would rely on them when deciding to enroll (*id.* at PageID.774–775).

Defendant's motion is properly granted as to Count IV.

To state an MCPA claim, a plaintiff must allege facts that, if true, establish that a "method[], act[], or practice[] in the conduct of trade or commerce" is "[u]nfair, unconscionable, or deceptive." MICH. COMP. LAWS § 445.903(1).  "Trade or commerce" is further defined to "mean[] the conduct of a business providing goods, property, or service primarily for personal, family, or household purposes."  MICH. COMP. LAWS § 445.902(1)(g).  The Sixth Circuit has recognized that the MCPA's definition of "trade or commerce" "creates an exception to the Act's coverage, to wit:  if a consumer—whether a business or a natural person—buys a good, property, or service for a business purpose—that is, not 'primarily for [a] personal, family, or household purpose[ ]'—then the Act does not apply."  *MacDonald v. Thomas M. Cooley L. Sch.*, 724 F.3d 654, 660–61 (6th Cir. 2013) (citing *Slobin v. Henry Ford Health Care,* 666 N.W.2d 632, 634 (Mich. 2003) (per curiam) (holding that while the MCPA applies to consumer purchases, the Act "does not apply to purchases that are primarily for business purposes")).

***The MCPA Does Not Apply to Plaintiffs' Allegations.***  A threshold question is whether Plaintiffs' factual allegations fall within the purview of the MCPA.  The intent of the MCPA is "to protect consumers in their purchases of goods [or services] which are primarily used for personal, family or household purposes."  *Zine v. Chrysler Corp.*, 600 N.W.2d 384, 392 (Mich. Ct. App.

1999) (citation omitted).  Here, Plaintiffs do not allege that they purchased their college education "primarily" for personal, family, or household purposes, as required to fall within MICH. COMP. LAWS § 445.902(1)(g). Rather, in their Amended Complaint, Plaintiffs allege that they purchased Defendant's "good" or "services" to obtain both an undergraduate degree in furtherance of their respective career plans and a "holistic college experience."

In *MacDonald v. Thomas M. Cooley Law School*, 880 F. Supp. 2d 785, 788 (W.D. Mich. 2012) (Quist, J.), *aff'd,* 724 F.3d 654 (6th Cir. 2013), this Court rejected the dual-purpose approach to pleading a plausible claim under the MCPA.  The crux of the plaintiffs' MCPA claim in *MacDonald* was their allegation that the law school had "blatantly misrepresent[s] and manipulat[es] its employment statistics," statistics that the plaintiffs alleged were "demonstrably false."  *Id.* at 789.  This Court determined that the plaintiffs did not purchase their legal education "so that they could leisurely read and understand Supreme Court Reports, or to provide legal services for themselves or family members[;] [r]ather, Plaintiffs purchased a legal education in order to make money as lawyers," i.e., "a business purpose."  *Id.* at 792.  This Court therefore dismissed the plaintiffs' MCPA claim for failure to state a claim on which relief could be granted.  On appeal, the Sixth Circuit affirmed this Court's decision in *MacDonald*, noting that "[i]f, for example, the graduates had alleged that they attended Cooley to get a legal education with no intention of using it to make money, then the district court might have erred in holding that the Act did not apply."  *MacDonald*, 724 F.3d at 661.

Another district court within the Sixth Circuit subsequently followed the decision in *MacDonald* to resolve a consumer protection claim arising in the higher education context.  In *Suhail v. University of the Cumberlands*, 107 F. Supp. 3d 748, 751 (E.D. Ky. 2015), two postgraduate psychology students sued the defendant-university in Kentucky for changes made to

their program's curriculum after they enrolled.  Like the MCPA, Kentucky's consumer protection act ("the KCPA") provides a cause of action to "[a]ny person who purchases ... goods or services primarily for personal, family or household purposes." *Id.* at 757–58 (quoting KY. REV. STAT. § 367.220).  Relying on the Sixth Circuit's decision in *MacDonald,* the district court determined that even considering the plaintiffs' allegations in the light most favorable to them, it could not conclude that the plaintiffs' decision to pay tuition and seek a degree from the university was "*primarily* for personal ... purposes." *Id.* at 760 (emphasis in original).  The district court ultimately held that the plaintiffs were "outside the class of persons that the KCPA is intended to protect." *Id.  See also Reynolds v. Concordia Univ.*, No. 21-cv-2560 (ECT/DTS), 2022 WL 1323236, at *18 (D. Minn. May 3, 2022) (observing in a case brought under the Uniform Trade Practices Act that an undergraduate degree is "ordinarily something used for 'commercial' or economic purposes—to earn a living—and this is true despite the attendant personal fulfillment or benefits it might bring.").

The Sixth Circuit has since reaffirmed its decision in *MacDonald* and its instruction that the text of the MCPA requires courts to "consider the purpose of the 'good'" at issue. *Geomatrix, LLC v. NSF Int'l*, 82 F.4th 466, 487–88 (6th Cir. 2023) (ultimately determining that the services the plaintiff provided were ones to help the plaintiff "engage in its own business," not services that can be "pass[ed] … along to consumers," and affirming the district court's decision to dismiss the MCPA claims).

Like the students' deficient allegations in *MacDonald* and *Suhail*, Plaintiffs' allegations in this case likewise fail to support a plausible MCPA claim.  Plaintiffs do not allege that they purchased their college education "primarily" for personal purposes, MICH. COMP. LAWS § 445.902(1)(g), and they allege that their purchase furthers their career goals.  *See* Am. Compl.

¶ 1 (Chen "is currently studying to become a physician's assistant"); ¶ 2 (Villarreal "plans to become a lawyer").  Their purpose, in part, was to purchase an undergraduate education to enter specific professions and, in the words of *MacDonald*, 880 F. Supp. 2d at 792, "make money," i.e., "a business purpose."  Their allegations evince dual purposes, which is insufficient under Michigan caselaw to state a plausible MCPA claim.  Accordingly, the Court concludes that Plaintiffs' claim in Count IV does not fall within the MCPA's protection.

      ***The MCPA Allegations Do Not State a Plausible Claim.***  Even assuming arguendo that Plaintiffs' allegations fall within the purview of the MCPA's protection, the allegations do not state a plausible MCPA claim.  The statements upon which Plaintiffs rely for their MCPA claim are (1) a statement attributed to a "Hillsdale administrator" at "a welcome event," and (2) five statements from Defendant's website.

      The statement attributed to "a Hillsdale administrator" is wholly insufficient to state a claim.  Federal Rule of Civil Procedure 9(b) applies to fraud-based MCPA allegations.  *See Zine*, 600 N.W.2d at 398; *Pitts v. Monaco Coach Corp.*, 330 F. Supp. 2d 918, 928 (W.D. Mich. 2004) (recognizing the same).  Rule 9 requires a party "alleging fraud" to "specify the 'who, what, when, where, and how' of the alleged fraud."  *New London Tobacco Mkt., Inc. v. Kentucky Fuel Corp.*, 44 F.4th 393, 410–11 (6th Cir. 2022) (citation omitted).  FED. R. CIV. P. 9(b).  A plaintiff's complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Id.* (citation omitted).  The statement from an unidentified administrator on an unidentified date does not include sufficient particulars to put Defendant on notice of the nature of Plaintiffs' MCPA claim.

The remaining statements from Defendant's website—statements describing a "supportive community" and a "safe, healthy campus environment," with the students' "ultimate happiness" as Defendant's purpose—are vague and aspirational statements, whereas the relevant MCPA provisions govern omissions and representations about material "facts."  *See* MICH. COMP. LAWS § 445.903(s), (bb), & (cc).  Under Michigan law, statements of opinion or other promotional salesmanship are not actionable for fraud.  *Ram Int'l, Inc. v. ADT Sec. Servs., Inc.*, 555 F. App'x 493, 501 (6th Cir. 2014) (citing *Van Tassel v. McDonald Corp.*, 407 N.W.2d 6, 7–8 (Mich. Ct. App. 1987)).  *Cf. Leaf v. Refn*, 742 F. App'x 917, 927 (6th Cir. 2018) ("[I]t is proper to construe the provisions of the MCPA 'with reference to the common-law tort of fraud.'") (quoting *Zine*, 600 N.W.2d at 398 (1999) (quoting *Mayhall v. A.H. Pond Co., Inc.*, 341 N.W.2d 268, 270 (Mich. Ct. App. 1983)).

For example, in *Ram Int'l*, the alarm security company's statements that its products were "reliable" and "never fails" were nonactionable opinions, but the alarm security company's boasts that it would "be there for its clients '24 hours a day, 7 days a week'" and offered "24-hour monitoring by ADT trained professionals" were actionable statements.  *Ram Int'l*, 555 F. App'x at 501.  Similarly, in *Bledsoe v. FCA US LLC*, 378 F. Supp. 3d 626, 649 (E.D. Mich. 2019), the diesel truck manufacturer's statements that its trucks are the "cleanest" or "best in the world" were nonactionable opinions, but its statements that the trucks "meet an ascertainable and quantifiable standard for fuel efficiency and emissions set in place by a third-party regulator (implying independent corroboration)" were actionable statements.

The cherry-picked statements from Defendant's website fall within the former category. Defendant's broad promises of happiness and safety are inherently subjective and not verifiable. They are simply not specific enough, as a matter of law, to assess falsity.  Nor are the statements

26

ones that reasonable consumers would interpret as factually reliable or verifiable.  Indeed, as Defendant points out, the two assaults that Plaintiffs allege do not render untruthful Defendant's statements that it promotes "a safe, healthy campus environment" or that it strives for its students' "happiness" as its "ultimate purpose."

In sum, even if Plaintiffs' allegations fall within the ambit of the MCPA, the allegations fail to state an actionable claim under the Act.  Count IV is properly dismissed.

> e.    **Title IX (Counts V & VI)**

In Count V, Plaintiffs allege that Defendant "failed to carry out its duties to investigate and take corrective action under Title IX" (Am. Compl. ¶ 209).  And in Count VI, Plaintiffs allege that Defendant "engaged in multiple types of retaliatory conduct against Plaintiffs for pursuing investigations into their assault" (*id.* ¶ 223).  In both Counts V and VI, Plaintiffs allege that Defendant is subject to Title IX because Defendant "enjoys tax-exempt status as a 501(c)(3) registered entity" (*id.* ¶¶ 201 & 220).

Defendant seeks dismissal of Counts V and VI, arguing that Plaintiffs cannot state a Title IX claim against it because Defendant is not subject to Title IX (ECF No. 33 at PageID.493–498). Defendant argues that its status as a tax-exempt 501(c)(3) organization does not save Plaintiffs' claims because "to claim a tax exemption is not to receive federal funds" and concluding otherwise would put Title IX's constitutionality in doubt (*id.* at PageID.498–508).  Defendant argues that even if Title IX applied, Plaintiffs have failed to state a Title IX claim for either gender discrimination or retaliation (*id.* at PageID.509–526).

In response, Plaintiffs opine that Defendant's gambit to operate independently of federal funding obligations has failed (ECF No. 44 at PageID.735).  Plaintiffs argue that Title IX applies to schools that receive federal aid "of any kind" and that the affirmative act of seeking recognition

as a 501(c)(3) non-profit organization—and its ensuing financial benefit—renders a college subject to Title IX (*id.* at PageID.736–740, citing *E.H. by & through Herrera v. Valley Chr. Acad.*, 616 F. Supp. 3d 1040 (C.D. Cal. 2022)).  Plaintiffs conclude that this Court should likewise hold that tax exemption is sufficient to require adherence to the obligations in Title IX (*id.* at PageID.742).  Plaintiffs argue that they have sufficiently stated the elements of their Title IX claims (*id.* at PageID.743–759).

Defendant's motion is properly granted as to Counts V and VI.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). According to the United States Supreme Court, Title IX is "justif[ied]" by "the expenditure of federal funds," and the statute "condition[s] an offer of federal funding on a promise by the recipient." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 708–09 (1979)).  A principal objective of Title IX is "to avoid the use of federal resources to support discriminatory practices in education programs." *Cannon*, 441 U.S. at 704.

Supreme Court caselaw makes clear that "[u]nlike ordinary legislation, which imposes congressional policy on regulated parties involuntarily, Spending Clause legislation operates based on consent: in return for federal funds, the recipients agree to comply with federal imposed conditions." *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (internal citations and quotation marks omitted).  "[C]onditioning an offer of federal funding on a promise by the recipient not to discriminate … amounts essentially to a contract between the Government and the recipient of funds." *Id.* at 212–13 (quoting *Gebser*, 524 U.S. at 286).  Because Spending

Clause legislation operates based on consent, the "legitimacy of Congress' power" to enact such laws rests not on its sovereign authority, but on "whether the [recipient] voluntarily and knowingly accepts the terms of that 'contract.'"  *Id.* at 213.

The viability of Plaintiffs' Title IX claims against Defendant rest on the proposition that Defendant's § 501(c)(3) status constitutes receipt of "Federal financial assistance."  However, the phrase "Federal financial assistance" is not defined in the statute.[6]  While the Sixth Circuit has not yet addressed whether § 501(c)(3) status constitutes receipt of "Federal financial assistance" for purposes of Title IX, the Court of Appeals for the Fourth Circuit recently addressed the issue in *Buettner-Hartsoe v. Baltimore Lutheran High School Association*, 96 F.4th 707 (4th Cir. 2024).

In *Buettner-Hartsoe*, the plaintiff-mother brought suit against a private school under Title IX and state law for sexual harassment and assault suffered by her minor daughter.  *Id.* at 710. Like Defendant in this case, the defendant-school is organized as a nonprofit and is exempt from federal taxes but denied receiving any direct federal funding or federal financial assistance.  The defendant filed a motion to dismiss, which the district court denied.  On appeal, the Fourth Circuit began with the text of Title IX, looking to its language and to the ordinary meaning of the words it uses.  *Id.* at 711.  The Fourth Circuit determined that the phrase "receiving Federal financial assistance" means taking or accepting federal financial aid, help, or support.  *Id.* at 712.  Thus, the Fourth Circuit determined that the plain text of Title IX contemplates the "transfer of funds from the federal government to an entity."  *Id.*  Next, the Fourth Circuit surveyed Supreme Court precedent construing the scope of when Federal financial assistance includes indirect assistance,

---

[6] In contrast, in the Affordable Care Act, also a Spending Clause statute, Congress expressly defined "federal financial assistance" to include tax credits.  *See* 42 U.S.C. § 18116(a).  "[W]here Congress knows how to say something but chooses not to, its silence is controlling."  *Royal Truck & Trailer Sales & Serv., Inc. v. Kraft*, 974 F.3d 756, 760 (6th Cir. 2020) (citation omitted).

determining that the phrase "receiving Federal financial assistance" means "taking or accepting federal financial aid, help, or support, even when that assistance is through an intermediary." *Id.* at 712–13 (examining *Grove City College v. Bell*, 465 U.S. 555, 563–70 (1984); *U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 607 (1986); and *Nat'l Collegiate Athletic Ass'n v. Smith*, 525 U.S. 459, 468 (1999)).

Applying the law to the facts before it, the Fourth Circuit first observed that the proposition that tax exemption is *not* "Federal financial assistance" was not a novel concept. *Id.* at 714. Indeed, the Fourth Circuit indicated that "since Title IX's inception over fifty years ago, it has never been applied to organizations based solely on their tax-exempt status, [a]nd for good reason." *Id.* The Fourth Circuit reasoned that while "'assistance' means 'aid, help, or support,' which all connote financial grants, … tax exemption is the withholding of a tax burden, rather than the affirmative grant of funds." *Id.* Moreover, the Fourth Circuit pointed out that unlike federal grants, where money "changes hands," a tax exemption "merely allows organizations to keep the money they otherwise would owe in income tax." *Id.* (citing *Nat'l Collegiate*, 525 U.S. at 468 ("Title IX coverage is not triggered when an entity merely benefits from federal funding.")). The Fourth Circuit concluded that tax exemption does not mean "Federal financial assistance" for Title IX purposes. The Fourth Circuit therefore reversed the lower court's decision. *Id.* at 715.

Plaintiffs do not offer any significantly novel argument that would undercut the Fourth Circuit's well-reasoned decision, including their reliance on the decision of a district court in California before the Fourth Circuit decided *Buettner-Hartsoe*. Nor is the Court persuaded that a different conclusion is warranted by Plaintiffs' assertion that courts have used the word "grant" to include more than just cash grants. *See, e.g., Bob Jones Univ. v. U.S.*, 461 U.S. at 574, 577–78 (1983) (stating that the IRS "granted tax exempt-status to private schools" and "granted charitable

deductions for contributions to such schools"); *Allen v. Wright*, 468 U.S. 737, 756 (1984) (referring to the "grant of a tax exemption").  As Defendant points out in its reply brief (ECF No. 54 at PageID.862), Plaintiffs' assertion rests on conflating the noun and verb forms of the word "grant."  Last, Plaintiffs emphasize that the Supreme Court has described Title IX as a "broadly written" law with a purposefully "broad reach" (ECF No. 44 at PageID.738–739, quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005)).  However, *Jackson* addressed the remedial scope of Title IX, not the parties subject to its terms.  *See Jackson*, 544 U.S. at 179 (holding that Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex).

Therefore, for the reasons stated more fully by the Fourth Circuit, the Court likewise concludes that Defendant's § 501(c)(3) status does not implicate the terms of Title IX's proposed contract with educational institutions.  Accordingly, Plaintiffs fail to state cognizable claims against Defendant in Counts V and VI.  Because Title IX does not impose obligations on Defendant, the Court declines to consider whether Plaintiffs' allegations would state a claim under the statute.  Instead, Counts V and VI are properly dismissed.

**3.    Dismissal with Prejudice**

"Ordinarily, if a district court grants a defendant's 12(b)(6) motion, the court will dismiss the claim without prejudice to give parties an opportunity to fix their pleading defects."  *CNH Am. LLC v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am. (UAW)*, 645 F.3d 785, 795 (6th Cir. 2011).  Here, however, Plaintiffs have already had an opportunity to amend their original Complaint.  Defendant argues that this Court should dismiss Plaintiffs' Amended Complaint with prejudice, especially given that Defendant flagged the pleading deficiencies in its original motion to dismiss, and Plaintiffs failed to thereafter cure the deficiencies in their Amended

31

Complaint (ECF No. 33 at PageID.487 & 546; ECF No. 54 at PageID.859 & 887).  For their part, despite Defendant's repeated requests for a dismissal with prejudice, Plaintiffs have not requested—let alone filed a motion in support of—a second opportunity to amend.

Consequently, the Court determines that dismissal with prejudice is warranted in this case. *See, e.g., Golf Vill. N., LLC v. City of Powell, Ohio*, 14 F.4th 611, 624 (6th Cir. 2021) (holding that a district court does not abuse its discretion in dismissing an amended complaint with prejudice where a plaintiff never moves for leave to file a second amended complaint); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 627–28 (6th Cir. 2019) (same); *see also Just. v. Petersen*, No. 21-5848, 2022 WL 2188451, at *4 (6th Cir. June 17, 2022) (indicating that "it is not the district court's role to initiate amendments") (quoting *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 438 (6th Cir. 2008)).

## III.  CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant Hillsdale College's Motion to Dismiss (ECF No. 23) is GRANTED.

**IT IS FURTHER ORDERED** that Defendant Hillsdale College's Motion to Strike Class Allegations (ECF No. 29) is DISMISSED as moot.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case.  *See* FED. R. CIV. P. 58.


Dated:  September 13, 2024                              /s/ Jane M. Beckering
                                                      JANE M. BECKERING
                                                      United States District Judge